1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Gary E. Gans (Bar No. 89537)
2     garygans@quinnemanuel.com
      Samuel B. Shepherd (Bar No. 163564)
3     samshepherd@quinnemanuel.com
      Dawn Utsumi (Bar No. 247652)
4     dawnutsumi@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
6   Facsimile:   (213) 443-3100

7   Attorneys for Petitioner
    Icon Film Distribution Ltd.

8

9                    UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12   ICON FILM DISTRIBUTION LTD., a          CASE NO. CV11. 10773 ~ JAK
     United Kingdom limited liability                     (JCGx)
13   company,
                                             PETITIONER ICON FILM
14            Petitioner,                     DISTRIBUTION LTD.'S
                                              PETITION TO VACATE
15       vs.                                  ARBITRATION AWARD

16   COTTONWOOD PICTURES, LLC, a
     California limited liability company,
17
              Respondent.
18

19

20

21

22

23

24

25

26

27

28

04470.23482/4527263.2

                                      PETITION TO VACATE ARBITRATION AWARD

1    Pursuant to 9 U.S.C. § 10 (the "Federal Arbitration Act"), Petitioner Icon Film

2  Distribution Ltd. ("Icon") petitions this Court to vacate the arbitration award (the

3  "Award") of the International Film & Television Alliance ("IFTA") dated

4  November 30, 2011 in an arbitration captioned *Cottonwood Pictures, LLC v. Icon*

5  *Film Distribution Ltd., Case No. 11-15* (the "Arbitration"), and alleges as follows:

6

7                                    **PARTIES**

8    1.    Icon is a United Kingdom limited liability company with its principal

9  place of business in London, England.  Icon was the respondent and counter-

10  claimant in the Arbitration.

11    2.    Respondent Cottonwood Pictures, LLC ("Cottonwood") is a California

12  limited liability company with its principal place of business in Los Angeles,

13  California.  Cottonwood was the claimant and counter-respondent in the Arbitration.

14

15                                  **JURISDICTION**

16    3.    This Court has jurisdiction over the subject matter of this action

17  pursuant to 28 U.S.C. § 1332.  Icon is a citizen of the United Kingdom.

18  Cottonwood is a citizen of the State of California.  The amount in controversy

19  exceeds $75,000, exclusive of costs and interest.

20    4.    This Court also has jurisdiction over the subject matter of this action

21  pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral

22  Awards (the "New York Convention"), which is codified at 9 U.S.C. § 203 and 28

23  U.S.C. § 1331.

24    5.    The Federal Arbitration Act applies to this proceeding pursuant to

25  Article III of the New York Convention, and pursuant to 9 U.S.C. § 10, because the

26  arbitration arises out of an agreement evidencing transactions involving interstate

27  commerce,

28

**VENUE**

6.    The Central District of California, Los Angeles Division, is the District and Division in which the Award was made.  Therefore, this Court is the proper venue for this action pursuant to 9 U.S.C. §§ 9 and 204.

**THE ARBITRATION**

7.    As of May 16, 2008, Cottonwood, as lessor, and Icon, as lessee, entered into a Motion Picture Lease Agreement (the "Agreement") concerning the distribution rights for the motion picture *The Tree of Life* (the "Film") in the United Kingdom.

8.    The Agreement contains an arbitration clause providing that any dispute or claim arising out of the Agreement be resolved by arbitration in Los Angeles, California, in accordance with the arbitration rules of IFTA, the global trade organization for the independent film industry.

9.    On February 22, 2011, Cottonwood initiated the Arbitration against Icon by filing an Arbitration Demand with IFTA (the "Arbitration Demand").  A true and correct copy of the Arbitration Demand is attached hereto as Exhibit 1. Cottonwood alleged that Icon breached the Agreement and requested damages of at least $1.8 million.

10.    On April 19, 2011, Icon filed a Response and Counterclaim to the Arbitration Demand (the "Response and Counterclaim").  A true and correct copy of the Response and Counterclaim is attached hereto as Exhibit 2.  In the Response and Counterclaim, Icon denied the material allegations of Cottonwood's Arbitration Demand, alleged that the Agreement had been terminated, and requested damages of $450,000.

11.    On May 12, 2011, Cottonwood filed a Response to Icon's counterclaim, denying the material allegations thereof.  A true and correct copy of the Cottonwood's response is attached hereto as Exhibit 3.

1    12.    On April 21, 2011, IFTA designated Jack Freedman as the arbitrator

2  (the "Arbitrator") in the Arbitration.

3    13.    The Arbitrator conducted a hearing on October 18, 19, 20, 21 and 26,

4  2011, in Los Angeles, California, at the offices of counsel for Cottonwood.

5    14.    On November 30, 2011, the Arbitrator issued the Award.  The Award

6  provides that Cottonwood recover the amount of $1,277,835 plus attorneys' fees and

7  costs on its claims and that Icon's claims are denied.  A true and correct copy of the

8  Award is attached hereto as Exhibit 4.

9    15.    This Petition is timely filed under 9 U.S.C. § 12 because the Award

10  was issued less than three months ago.

11

12                         **BASIS FOR PETITION**

13    16.    The Award should be vacated because the Arbitrator engaged in

14  misconduct in violation of 9 U.S.C. § 10(a)(3).  Specifically, the Arbitrator refused

15  to hear material and pertinent evidence when he refused to make critical evidence

16  available before or at the hearing.  The Arbitrator further refused to hear material

17  and pertinent evidence when he barred Icon's expert from testifying on critical

18  issues.  Icon's right to present a full and complete defense, and therefore obtain a

19  fair and impartial hearing, was materially prejudiced by this misconduct and by the

20  Arbitrator's reliance on the absence of the evidence he precluded in rendering the

21  Award.

22    17.    The Award also should be vacated because the Arbitrator demonstrated

23  actual bias and evident partiality against Icon and its counsel in violation of 9 U.S.C.

24  § 10(a)(2).  Prior to the Arbitration, the Arbitrator had solicited the assistance of

25  Icon's counsel, a partner at Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn

26  Emanuel"), to help his son get a summer associate position at Quinn Emanuel, but

27  Quinn Emanuel declined to offer him a job.  After he was appointed as the

28  Arbitrator, the Arbitrator failed to disclose that he was unable to be impartial as a

1   result.  The Arbitrator revealed his actual bias and evident partiality in a number of

2   ways, including, but not limited to: (i) denying Icon the opportunity to conduct

3   discovery in accordance with the Arbitrator's discovery order; (ii) refusing to hear

4   evidence despite its materiality and pertinence to core issues in the Arbitration; (iii)

5   permitting Cottonwood to introduce hearsay evidence on those same core issues and

6   relying on that evidence in his Award; and (iv) initiating improper *ex parte*

7   communications with Icon's counsel.

8        18.    The Award also should be vacated because the Arbitrator exceeded his

9   powers in violation of 9 U.S.C. § 10(a)(4), and engaged in misbehavior which

10   substantially prejudiced Icon's rights in violation of 9 U.S.C. § 10(a)(3).  The

11   Arbitrator exceeded his powers and engaged in misbehavior by disregarding a

12   concededly unambiguous critical provision of the Agreement and, instead, applied

13   his own irrational interpretation of the provision in rendering the Award.  The

14   Arbitrator also manifestly disregarded federal and California law concerning the

15   exclusion of evidence that was not produced during discovery.

16        19.    The Award also should be vacated because Icon was unable to present

17   its case in violation of Article V(1)(b) of the New York Convention.  The Arbitrator

18   denied Icon the opportunity to present evidence regarding critical issues in the

19   Arbitration.  The Arbitrator also denied Icon the opportunity to meaningfully cross-

20   examine Cottonwood's witnesses on these material issues.  Icon was substantially

21   prejudiced because the Arbitrator's conduct denied Icon the opportunity to be heard

22   at a meaningful time and in a meaningful manner.

23        20.    As a result of the Arbitrator's misconduct, including the refusal to hear

24   material and pertinent evidence, acting with evident partiality, exceeding his

25   powers, engaging in misbehavior in a manner that severely prejudiced Icon's rights,

26   and denying Icon due process, Icon was not afforded a full, fair and impartial

27   hearing.

28

04470.23482/4527263.2

-4-

PETITION TO VACATE ARBITRATION AWARD

1

## PRAYER FOR RELIEF

2   Wherefore, Icon respectfully requests that:

3         (a)    The Award be vacated in its entirety;

4         (b)    The matter be remanded to IFTA for a new hearing with a new

5              arbitrator;

6         (c)    Icon be awarded its reasonable attorney's fees and costs; and

7         (d)    For other relief which the Court deems to be just and proper.

8

9   DATED: December 29, 2011      QUINN EMANUEL URQUHART &

10                             SULLIVAN, LLP

11

12                             By _Gary Gans / D.U._

13                                Gary E. Gans

14                                Attorneys for Petitioner Icon Film

15                                Distribution Ltd.

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



LOEB & LOEB LLP

Main  310.282.2000
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA 90067-4120

## FACSIMILE

This transmission is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service.  Thank you.

| | | | |
|---|---|---|---|
| **Date:** | February 22, 2011 | **Time:** | 3:23:29 PM    943 |
| **To:** | Steven Corney<br>Olswang LLP | **Fax:**<br>**Phone:** | 011 44 20 7067 3999<br>011 44 20 7067 3000 |
| **From:** | Michael Anderson<br>**Personal ID:**    10895<br>**Client/Re:**    214146/10004 | **Fax:**<br>**Phone:** | 310.510.6735<br>310.282.2303 |

**Pages (including Cover):** 81

If transmission is not complete, please call our operator at 310.282.2103.

Re:  Cottonwood Pictures, LLC v. Icon Film Distribution Ltd.

**MESSAGE TO ADDRESSEE:**

Please see attached.

LA2109702.1
214146-10004

02-22-11    03:49pm    From-LOEB & LOEB                          3102822200              T-519   P.002    F-441



MICHAEL ANDERSON
of Loeb & Loeb LLP

10100 Santa Monica Boulevard       Direct  310.282.2303
Suite 2200                         Main    310.282.2000
Los Angeles, CA 90067-4120         Fax     310.510.6735
                                   manderson@loeb.com

Via Facsimile and Mail

February 22, 2011

Steven Corney
Olswang LLP
90 High Holborn
London WC1V 6XX
Fax No. 44-20-7067-3999

Re:   Cottonwood Pictures, LLC v. Icon Film Distribution Ltd.

Dear Mr. Corney:

I received your February 18, 2011 letter.  Attached is Cottonwood Pictures, LLC's Arbitration
Demand filed with the Independent Film & Television Alliance Arbitration Tribunal today.

Thank you for your attention to this matter.

Sincerely,

Michael T. Anderson
Loeb & Loeb LLP

Enclosure

Los Angeles   New York   Chicago   Nashville   www.loeb.com

A limited liability partnership including professional corporations

LA2109601.1
214146-10004

LOEB & LOEB LLP
MICHAEL T. ANDERSON
DONALD A. MILLER
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067-4120
Telephone:  310-282-2000
Facsimile:  310-282-2200

Attorneys for Claimant
COTTONWOOD PICTURES, LLC

INDEPENDENT FILM & TELEVISION ALLIANCE

| | |
|---|---|
| COTTONWOOD PICTURES, LLC, | Arbitration No. |
| Claimant, | **ARBITRATION DEMAND** |
| v. | |
| ICON FILM DISTRIBUTION LTD, | |
| Respondent. | |

Claimant Cottonwood Pictures, LLC hereby alleges as follows:

1.    Introduction.  Claimant Cottonwood Pictures, LLC ("Cottonwood") brings this IFTA Arbitration Demand to require distributor Icon Film Distribution Ltd. ("Icon") to honor the terms of a written distribution agreement for the motion picture "The Tree of Life" (the "Picture").  Pursuant to a May 16, 2008 Motion Picture Lease Agreement between Cottonwood and Icon (the "Lease Agreement"), Icon was given certain rights to exploit the Picture in the United Kingdom for a term of 15 years after the Picture's release.  In return, Icon was to pay Cottonwood an advance payment totaling $2.25 million and certain percentages of the gross receipts arising from the exploitation of the Picture in the United Kingdom.  Additionally, Icon agreed to pay the remaining amount of its minimum guarantee to Cottonwood's lender Union Bank N.A. ("Union Bank") pursuant to an October 19, 2009 Notice of

Loeb & Loeb
London LLn &uty Partnership
Including Professional
Corporations
LA2102174.2
214146-10004

1

1   Assignment.  While Icon has paid to Cottonwood $450,000 of the $2.25 million

2   advance payment, Icon has failed to pay the remaining $1.8 million of the advance

3   payment to either Cottonwood or Union Bank.

4         2.     Claimant Cottonwood Pictures, LLC.  Claimant Cottonwood Pictures is

5   a California limited liability company with its principal place of business located in

6   Los Angeles, California.  Cottonwood Pictures is an independent motion picture

7   production company.

8         3.     Respondent Icon Film Distribution Ltd.  Respondent Icon Film

9   Distribution Ltd. is a United Kingdom entity.  Icon is a film distributor throughout

10  the United Kingdom.

11        4.     Addresses of Claimant and Respondent.  The following is the contact

12  information for Claimant and Respondent:

| Claimant: | Respondent: |
|---|---|
| Cottonwood Pictures, LLC<br>Attn.: Mitch Horwits<br>2000 Avenue of the Stars, Suite 620-N<br>Los Angeles, California 90067<br>phone: (310) 461-1491<br>fax: (310) 461-1490 | Icon Film Distribution Ltd.<br>Solar House<br>915 High Road<br>London N12 8QJ<br>England<br>phone: (44) 20-8492-6300<br>fax: (44) 20-8492-6301 |
| Claimant's Counsel:<br>Michael T. Anderson<br>Loeb & Loeb LLP<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, California 90067<br>phone: (310) 282-2303<br>fax: (310) 510-6735 | Respondent's Counsel:<br>Steven Corney<br>Olswang LLP<br>90 High Holborn<br>London WC1V 6XX<br>phone: (44) 20-7067-3000<br>fax: (44) 20-7067-3999 |

24        5.     The May 16, 2008, Agreement.  On May 16, 2008, Cottonwood and

25  Icon entered into a Motion Picture Lease Agreement in connection with the

26  distribution and exploitation of the Picture throughout the United Kingdom.

27  Attached as Exhibit A is a true and accurate copy of the Lease Agreement.  Pursuant

28  to ¶ E1 of the Agreement, in return for the right to distribute and exploit the Movie

1  throughout the United Kingdom, Icon was to pay Cottonwood an "advance

2  payment" of $2.25 million:  $450,000 of the advance payment was to be paid within

3  14 days after the execution of the Agreement, and $1.8 million of the advance

4  payment was to be paid within 14 days after notice of delivery of the "Initial

5  Physical Material" for the Movie.  Icon paid Cottonwood the initial $450,000 upon

6  execution of Agreement.  However, although Cottonwood, through its sales agent,

7  Summit Entertainment, notified Icon that the initial physical materials were

8  available for delivery, Icon has failed to pay Cottonwood or Union Bank the

9  remainder of the advance payment in the amount of $1.8 million.

10      6.    Notice of Assignment.  On October 19, 2009, Cottonwood, Icon, and

11  Union Bank entered into a notice of assignment, pursuant to which Icon was to pay

12  the remaining advance payment of $1.8 million that Icon owed Cottonwood to

13  Union Bank (the "Notice of Assignment").  Attached as Exhibit B is a true and

14  accurate copy of the Assignment Agreement.  Again, however, while Cottonwood

15  notified Icon that the initial physical materials were available for delivery, Icon has

16  failed to pay Union Bank the remainder of the advance payment in the amount of

17  $1.8 million.

18      7.    Assignment Agreement.  On February 10, 2011, Union Bank and

19  Cottonwood entered into an Assignment Agreement, pursuant to which Union Bank

20  has assigned to Cottonwood all of its rights pursuant to the Notice of Assignment,

21  including its right to pursue any claims against Icon for non-payment of the advance

22  payment.  Attached as Exhibit C is a true and accurate copy of the Notice of

23  Assignment.  Cottonwood, therefore, has succeeded to all of the rights of Union

24  Bank under the Notice of Assignment.

25      8.    Waiver of Defenses.  Icon agreed to pay Union Bank the remaining

26  amount of the advance payment, and agreed, pursuant to ¶¶ 1 (g) and (o) of the

27  Notice of Assignment, that it waived any defense that any condition precedent exists

28

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA2102174.2
214146-10004                                            3

1  (other than the acting services of Brad Pitt and Sean Penn) for the payment of the

2  Minimum Guarantee Payment to Union Bank.

3          9.     Arbitration Clauses; Jurisdiction.  Pursuant to ¶ 7c of Schedule C of the

4  Lease Agreement, "any dispute or claim arising out of or relating to this Agreement

5  (including any dispute regarding delivery or the quality of material delivered by

6  [Cottonwood]) or the breach hereof may be resolved by arbitration in Los Angeles,

7  California, in accordance with the rules and procedures of the Independent Film &

8  Television Alliance[.]"  In addition, pursuant to ¶ 5 of the Notice of Assignment, all

9  claims arising out of the Notice of Assignment "shall be subject to and resolved by

10  mandatory binding expedited arbitration conducted under the auspices of the

11  Independent Film & Television Alliance and its rules in effect as of the date the

12  request for arbitration is filed[.]"

13         10.    No Counter-Claim Provision.  Pursuant to ¶ 5(c) of the Notice of

14  Assignment, "[i]f the issue of whether any of the Conditions Precedent [*e.g.*,

15  whether Cottonwood notified Icon that the initial physical materials were available

16  for delivery] has been effected is the subject of any arbitration proceeding

17  hereunder, then that issue (and only that issue) shall be determined in a separate

18  arbitration proceeding before any other claim is heard.  [Icon] may not assert in such

19  proceeding any counter-claim or other offset, or any defense other than the defense

20  of a failure to effect one or more of the Conditions Precedent to [Icon]."

21         11.   Despite repeated requests for payment from Cottonwood, Icon has

22  breached the Lease Agreement and the Notice of Assignment by failing to pay the

23  remaining advance payment in the amount of $1.8 million to either Cottonwood or

24  Union Bank.

25

26

27

28

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA2102176.2
214146-10004

4

# FIRST CAUSE OF ACTION

### (for Beach of the Lease Agreement)

12.   Claimant incorporates paragraphs 1 through 11 by reference.

13.   Claimant's Performance.  Cottonwood has performed all of its obligations under the Agreement.  Specifically, Cottonwood, through its sales agent, Summit Entertainment, timely notified Icon that the initial physical materials were available for delivery.

14.   Respondent's Breach.  Icon has breached the Lease Agreement by failing to pay the remaining balance of the advance payment to Cottonwood or Union Bank.

15.   Damages.  Cottonwood has suffered damages of at least $1.8 million. In addition to the advance payment, Icon was to pay Cottonwood certain percentages of gross receipts from the distribution and exploitation of the Movie.

16.   Attorney's Fees.  Paragraph 7b of the Agreement provides that "[i]n the event of any action, suit or proceeding hereunder, the prevailing Party shall be entitled to recover reasonable outside attorney's fees and outside accountant's fees and travel expenses, in addition to the costs of the said action, suit or proceeding." Cottonwood hereby requests reimbursement of its attorney's fees incurred in this action as well.

# SECOND CAUSE OF ACTION

### (for Breach of the Assignment)

17.   Claimant incorporates paragraphs 1 through 16 by reference.

18.   Claimant's Performance.  Cottonwood and Union Bank have performed all of its obligations under the Notice of Assignment.  Specifically, Cottonwood, through its sales agent, Summit Entertainment, timely notified Icon that the initial physical materials were available for delivery.

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA2102174.2
214146-10004

5

19.   Standing.  Cottonwood has standing to prosecute the claims against Icon arising under the Notice of Assignment by virtue of the assignment of those claims to Cottonwood pursuant to the February 10, 2011 Assignment Agreement.

20.   Respondent's Breach.  Icon has breached the Assignment by failing to pay the remaining balance of the advance payment to either Cottonwood.or Union Bank.

21.   Damages.  Cottonwood has suffered damages of at least $1.8 million.

22.   Attorney's Fees.  Paragraph 5(c) of the Assignment provides that "[t]he arbitration award shall also provide for payment by the losing party (i.e., the party or parties against whom an arbitration award is issued) of . . . the fees and costs incurred in connection with said arbitration, as well as the reasonable attorney's fees and costs incurred by the prevailing parties (i.e., all parties to the arbitration other than the losing party)[.]"  Cottonwood also requests reimbursement of its attorney's fees and costs incurred in this matter.

NOW, THEREFORE, Cottonwood prays for the following relief:

1.   For an award of compensatory damages, in an amount to be proven at the arbitration hearing, of at least $1.8 million against Icon;

2.   For an award of interest, as provided under the Lease Agreement, the Notice of Assignment, and by law;

3.   For an award of attorney's fees and costs; and

4.   For such other relief as the Arbitrator deems appropriate.

Dated:  February 22, 2011                    LOEB & LOEB LLP
                                             MICHAEL T. ANDERSON
                                             DONALD A. MILLER


                                             By:  _M. Anderson_____
                                                  Michael T. Anderson
                                                  Attorneys for Claimant
                                                  Cottonwood Pictures, LLC

Loeb & Loeb
ms4ed Liability Partnership
including Professional
Corporations
LA21/02174.2
214146-10004

6

02-22-11    03:52pm   From-LOEB & LOEB                    3102822200           T-519   P.009/081   F-441

# EXHIBIT A

## MOTION PICTURE LEASE AGREEMENT

As of 16 May 2008

Cottonwood Pictures, LLC
2000 Avenue of the Stars, Suite 820-N
Los Angeles, California 90067
Telephone: (310) 461-1491
Facsimile: (310) 461-1490                                    ("Lessor"), and

Icon Film Distribution Ltd.
Solar House
915 High Road
London N12 8QJ
ENGLAND
Phone: (44) 20.8492.6300
Facsimile: (44) 20.8492.6301                                ("Lessee")

enter into this agreement (the "Agreement") concerning Lessor's lease and license to Lessee of certain Rights to Exploit certain tangible personal property embodying the Motion Picture as more particularly described below. (Unless otherwise defined herein, defined terms are used as defined in the Standard Terms and Conditions attached hereto).

A.    PICTURE:    "THE TREE OF LIFE" - with Brad Pitt credited on screen as starring in the role of the father and Sean Penn credited on screen as starring in the role of adult "Jack"; shot on film, in colour with perfect synchronization of sound and picture; including all versions and/or cuts thereof, subject to paragraph G below (the "Picture").

B.    TERRITORY:    UNITED KINGDOM (which includes Great Britain, Northern Ireland, Eire, the Channel Islands, and the Isle of Man) for all Leased Rights and MALTA and GIBRALTAR, including all embassies, armed forces installations, oil rigs and marine rigs (the "Territory").

C.    TERM:    Commencing upon the execution of this Agreement by both parties and terminating fifteen (15) years after the earlier of: (i) the first Theatrical release of the Picture in the Territory, or (ii) nine (9) months after Lessor's Notice of Delivery ("Term"). Notwithstanding the foregoing, the Term automatically extends for an additional three (3) years if Lessee has not recouped from one hundred percent (100%) of Gross Receipts for all Leased Rights by the end of the unextended Term the sum of: (i) the Distribution Expenses for all Leased Rights; and (ii) the Advance. Solely for purposes calculating any such extension to the Term, Home

02-22-11   03:52pm   From-LOEB & LOEB                3102822200          T-519   P.011/081   F-441

Video Distribution Expenses shall be deemed to be thirty percent (30%) of HV Gross Receipts.

D.   RIGHTS:

1.   Rights and Holdbacks:  Upon signature of this Agreement and subject to full payment of the Advance in accordance with the terms of this Agreement, Lessor leases and licenses to Lessee only the exclusive right to exhibit, promote, advertise, market, perform, sub-distribute and Exploit the Rights indicated with a "Yes" below, and all incidental Rights pertaining thereto, for the Territory, during the Term and in the Language(s), subject to the exceptions, limitations, and restrictions set forth in this Agreement and the Standard Terms and Conditions attached hereto.

| | Leased To Lessee | Reserved To Lessor | Lessor's/Lessee's Holdback Period |
|---|---|---|---|
| **Cinematic Rights:** | | | |
| Theatrical | Yes | No | * |
| Non-Theatrical | No | No | * |
| Public Video | Yes | No | * |
| Commercial Video | Yes | No | * * * |
| **Home Video Rights:** | | | |
| Home Video Rental | Yes | No | * * * |
| Home Video Sell Through | Yes | No | * * * |
| **Ancillary Rights:** | | | |
| Airline | No | Yes | * * |
| Ship | No | Yes | * * |
| Hotel/Motel | Yes | No | * * * |
| **Pay TV Rights:** | | | |
| Terrestrial | Yes | No | * * * * |
| Cable | Yes | No | * * * * |
| Satellite | Yes | No | * * * * |
| **Free TV Rights:** | | | |
| Terrestrial | Yes | No | * * * * * |
| Cable | Yes | No | * * * * * |
| Satellite | Yes | No | * * * * * |
| **Other Rights:** | | | |
| Pay-Per-View | Yes | No | * * * * * * |
| Video-on-Demand | Yes | No | * * * * * * |
| (including so-called "electronic sell-through") | | | |
| On-Line | Yes | No | * * * * * * * |

Deal Terms; 08-8200
"THE TREE OF LIFE" - UK
V: May 19, 2008

2

\*        Until the earlier of: (i) the first Theatrical release of the Picture in the United
         States, or (ii) nine (9) months after Lessor's Notice of Delivery, unless
         otherwise waived or shortened by Lessor by Notice (the "Availability Date").

\*\*       For airlines and ships flying the flag of any country in the Territory, within
         the Territory, until one (1) month after the First Theatrical Release of the
         Picture in the Territory.  For all other airlines and ships, until the first
         Theatrical release of the Picture in the United States, unless otherwise
         waived or shortened by Lessor by Notice.

\*\*\*      Until the earlier of: (i) the first Video release of the Picture in the United
         States; or (ii) six (6) months after the Availability Date.

\*\*\*\*     Until the earlier of: (i) twelve (12) months after the First Theatrical Release
         of the Picture in the Territory; or (ii) six (6) months after the First Video
         Release of the Picture in the Territory, unless otherwise waived or shortened
         by Lessor by Notice.

\*\*\*\*\*    Until the earlier of (i) twenty-one (21) months after the First Theatrical
         Release of the Picture in the Territory; or (ii) fifteen (15) months after the
         First Video Release of the Picture in the Territory, unless otherwise waived
         or shortened by Lessor by Notice.

\*\*\*\*\*\*   Until sixty (60) days after the First Video Release of the Picture in the
         Territory, unless otherwise waived or shortened by Lessor by Notice.

\*\*\*\*\*\*\*  Lessee may only Exploit via On-Line Rights using technologies which restrict
         access to the Picture to ultimate consumers located in the Territory.
         Furthermore Lessee may not Exploit via On-Line Rights: (i) until sixty (60)
         days after the First Video Release of the Picture in the Territory, unless
         otherwise waived or shortened by Lessor by Notice; and (ii) without first
         giving Lessor at least thirty (30) days prior written Notice of its intention to
         begin Exploiting via such Rights (such Notice to include a detailed
         description of the technologies being used to confine access to the Picture
         to ultimate consumers located in the Territory).  Lessor shall not authorize
         Exploitation via On-Line Rights outside the Territory unless technologies are
         used which prevent access to the Picture from within the Territory.
         Furthermore, once Lessor authorizes a third party to Exploit via On-Line
         Rights outside the Territory, then Lessee may Exploit via On-Line Rights in
         the Territory using the same technology(ies). Notwithstanding the foregoing,
         and without limitation, Lessee may exploit the Pay TV, Free TV and Other
         Rights by any means (including, without limitation, DSL or broadband) to
         closed-end users.

2.       Reserved Rights: "Reserved Rights" means all rights which are not among the Leased
         Rights in the Languages and the Territories and which Lessor hereby expressly retains,
         including, without limitation, all Underlying Material and intangible property relating to
         the Leased Rights and the Picture, including all trademarks and copyrights.  For

Deal Terms: 06-0203
"THE TREE OF LIFE" - UK
V: May 19, 2008                                        3

avoidance of doubt, Lessor's Exploitation of the Reserved Rights shall not hinder or derogate from Lessee's right to Exploit the Leased Rights.

3.   Other Rights:  Lessee may Exploit clips of the Picture via the Internet for promotional and publicity purposes, provided such Exploitation does not contain more than three (3) minutes of the Picture and any music embodied in such clips has been cleared for such On-Line promotional use.

4.   Wireless Devices:  As used in this Agreement, a "Wireless Device" means a mobile/cellular telephone, a combination personal digital assistant-wireless telephone device and any mobile game device that is/are principally used for personal voice, text or image communication, or any other similar device now known or hereafter devised.

Ringtone Rights: As used in this Agreement,. "Ringtone Rights" means the right to Exploit any visual or auditory element of the Picture (including any Materials relating to the Picture) as games, ringtones, ringbacks, alarms, and other forms of auditory and visual alerts, video clips, wallpapers, screensavers, short codes, interactive standard and premium messaging applications (e.g. SMS and MMS), mobile greeting cards, and bundled products consisting of some or all of the aforementioned categories on any Wireless Device.

Ringtone Rights are a Reserved Right. Notwithstanding anything to the contrary in this Agreement and provided that Lessee respects the territorial limitation of the Leased Rights, Lessee may promote and advertise the Picture (without charge to the consumer) via Wireless Devices; provided, however, that such promotion and advertising does not interfere with Lessor's Reserved Rights (including, without limitation, the Ringtone Rights). For clarity, provided that Lessee's promotion or Exploitation of the Picture does not materially interfere with Lessor's Reserved Rights, it is not a breach of this Agreement if consumers in the Territory access the World Wide Web (including Lessee's website) from any Wireless Device and receive the Picture or excerpts and publicity materials of the Picture that are generally available over the Internet.

5.   Subscription-Video-On-Demand:  For clarity, Video-On-Demand includes so-called "subscription-video-on-demand".

6.   Required Theatrical Release Date:  The term "Required Theatrical Release Date" means nine (9) months after the later of: (i) the first permitted Theatrical release of the Picture in any territory, and (ii) Lessor's Notice of Delivery.  Subject to any Theatrical Holdback, Lessee shall cause the Picture's First Theatrical Release in the Territory to occur by the Required Theatrical Release Date.  Lessee's failure to Theatrically release the Picture by the Required Theatrical Release Date does not impair Lessor's right to Exploit any Reserved Rights, and for purposes of determining any Holdbacks applicable to such Reserved Rights, the First Theatrical Release in the Territory is deemed to have occurred by the Required Theatrical Release Date if the Picture's actual First Theatrical Release has not occurred in the Territory by such date.

7.   Language(s): The original English language version of the Picture (i) without subtitles, and (ii) dubbed and/or subtitled in Welsh, Gaelic, Maltese and Hindi ("Language(s)").

8.   Videogram Type/Format:  Lessee shall not Exploit the Picture via any interactive means, manner, or media, such as Video Games (notwithstanding the foregoing, Lessee acknowledges that DVD format is not interactive).  Subject to the foregoing restriction, Lessee may Exploit the Home Video Rights via any Videogram type or format now known or hereafter devised or invented in the Territory during the Term, which permits viewing a Motion Picture in a linear manner consistent with Home Video Exploitation.

9.   Television Runs:

   a.   Pay TV: Lessee may exploit the Pay TV Rights for an unlimited number of Runs.

   b.   Free TV:  Lessee may exploit the Free TV Rights for an unlimited number of Runs.

E.   ADVANCE PAYMENT:

1.   Advance: In consideration for the Rights leased to Lessee by Lessor, Lessee shall pay to Lessor the total Advance of TWO MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS (US$2,250,000) payable in the following installment amounts and by the following payment method as defined hereinbelow:

| Payment (US$) | Method | Due Payment Date |
|---|---|---|
| US$ 450,000 | T/T | Within fourteen (14) days after execution of this Agreement; and, |
| US$ 1,800,000 | T/T | Within fourteen (14) days after Notice of Delivery. |

All amounts payable to Lessor under this Agreement including the Advance and any Overages will be subject to all laws and regulations applicable in the Territory requiring the deduction and/or withholding of monies for income, sales or other taxes assessable with respect to Gross Receipts. Should Lessee be required by the laws of any country in the Territory to deduct withholding tax from amounts due and payable to Lessor, Lessee will be entitled to withhold such taxes or recover such taxes from sums owed to Lessor in respect to amounts already paid and remit such taxes to the relevant taxing authority in the Territory and will supply Lessor with certificates evidencing the payment of such taxes.

2.   Payment: Lessee shall pay all payments indicated above as payable by T/T, and shall pay all payments of Overages, by Telegraphic Transfer free of any transmission or conversion charges to the following account:

Wells Fargo Bank
7th and Marquette
Minneapolis, MN 55402
ABA Number: 091000019
Swift Code: WFBIUS6S
Account Name: Cottonwood Pictures, LLC - collection account
Account Number: 3822280661
Reference: The Tree of Life

**F.** **LESSOR'S SHARE OF GROSS RECEIPTS AND CROSS-COLLATERALIZATION:** Lessor and Lessee shall share the Gross Receipts arising from Lessee's Exploitation of the Picture, and from all applicable Incidental Rights to the Picture, as follows:

**1.** **Theatrical, Public Video and Commercial Video Rights:** Seventy percent (70%) of Gross Receipts arising from Exploitation of the Theatrical, Public Video and Commercial Video Rights (the "Cinematic Gross Receipts") accrues to Lessor and thirty percent (30%) accrues to Lessee as a Distribution Fee until Lessee has recouped the recoupable Distribution Expenses that relate solely to the Theatrical, Public Video and Commercial Video Rights (the "Cinematic Distribution Expenses") and the Advance from Lessor's seventy percent (70%) share. Upon recoupment of the Cinematic Distribution Expenses and the Advance paid, if ever, Lessee shall retain fifty percent (50%) of subsequent Cinematic Gross Receipts as a continuing Distribution Fee and shall pay Lessor fifty percent (50%) of all such subsequent Cinematic Gross Receipts as Overages.

**2.** **Non-Theatrical and Hotel/Motel Rights:** Fifty percent (50%) of all Gross Receipts arising from Exploitation of the Non-Theatrical and Hotel/Motel Rights ("NT/H/M Gross Receipts") accrues to Lessor and fifty percent (50%) accrues to Lessee as a Distribution Fee. In calculating Lessor's share of NT/H/M Gross Receipts, Lessee shall not deduct for Distribution Expenses or other amounts relating to the Exploitation of the Non-Theatrical and Hotel/Motel Rights; such Distribution Expenses and amounts are solely for Lessee's account. Lessee shall retain Lessor's share of NT/H/M Gross Receipts in order to recoup from Lessor's share of NT/H/M Gross Receipts any Advance and any recoupable Cinematic Distribution Expenses remaining unrecouped from Cinematic Gross Receipts (such unrecouped Advance and Cinematic Distribution Expenses, if applicable, are subsequently referred to collectively as the "Cinematic Shortfall"). Lessee shall pay to Lessor as Overages the amount, if any, that Lessor's share of NT/H/M Gross Receipts exceeds any such remaining Cinematic Shortfall.

**3.** **Home Video Rights:** The following percentages of Gross Receipts arising from Exploitation of the Home Video Rights (the "HV Gross Receipts") accrue to Lessor:

| | |
|---|---|
| Home Video Rental Rights: | Twenty-five percent (25%) |
| Home Video Sell Through Rights: | Twenty-five percent (25%); decreasing prospectively to fifteen percent (15%) upon expiration of the Pay TV holdback |
| Mail Order Rights: | Twelve and one-half percent (12.5%) |

In calculating Lessor's share of HV Gross Receipts, Lessee shall not deduct any Distribution Expenses or other amounts each relating to the Exploitation of Home Video Rights; such Distribution Expenses and amounts are solely for Lessee's account. Lessee may retain Lessor's share of HV Gross Receipts in order to recoup any Cinematic Shortfall remaining unrecouped from Lessor's share of HV Gross Receipts. Lessee shall pay Lessor, as Overages, the amount, if any, that Lessor's share of HV Gross Receipts exceeds any Cinematic Shortfall. Notwithstanding the foregoing, for a period of one (1) year after the date upon which the Picture is first released on Home Video Sell-Through, Lessee may retain from HV Gross Receipts an amount equal to fifteen percent (15%) of Gross Receipts derived from Exploitation of the Home Video Sell-Through Rights (the "Returns Reserve"), against which Lessee shall charge returns, if any. At the end of such one-year period, Lessee shall account to Lessor for any returns charged and credit back to HV Gross Receipts the balance of the Returns Reserve, if any.

4.    Pay TV and Free TV Rights: Seventy percent (70%) of all Gross Receipts arising from Exploitation of the Pay TV and Free TV Rights ("TV Gross Receipts") accrues to Lessor and thirty percent (30%) accrues to Lessee as a Distribution Fee.  In calculating Lessor's share of TV Gross Receipts, Lessee shall not deduct for Distribution Expenses or other amounts relating to the Exploitation of the Pay TV and Free TV Rights; such Distribution Expenses and amounts are solely for Lessee's account. Lessee shall retain Lessor's share of TV Gross Receipts in order to recoup any Cinematic Shortfall remaining unrecouped under paragraphs F.1, F.2 and F.3 above from Lessor's share of TV Gross Receipts. Lessee shall pay to Lessor as Overages the amount, if any, that Lessor's share of TV Gross Receipts exceeds any such remaining Cinematic Shortfall.

5.    Pay-Per-View, Video-On-Demand and On-Line Rights: Sixty percent (60%) of all Gross Receipts arising from Exploitation of the Pay-Per-View, Video-On-Demand and On-Line Rights ("PPV/VOD/OL Gross Receipts") accrues to Lessor and forty percent (40%) accrues to Lessee as a Distribution Fee. In calculating Lessor's share of PPV/VOD/OL Gross Receipts, Lessee shall not deduct for Distribution Expenses or other amounts relating to the Exploitation of the Pay-Per-View, Video-On-Demand and On-Line Rights; such Distribution Expenses and amounts are solely for Lessee's account. Lessee shall retain Lessor's share of PPV/VOD/OL Gross Receipts in order to recoup any Cinematic Shortfall remaining unrecouped under paragraphs F.1, F.2, F.3 and F.4 above from Lessor's share of PPV/VOD/OL Gross Receipts. Lessee shall pay to Lessor as Overages the amount, if any, that Lessor's share of PPV/VOD/OL Gross Receipts exceeds any such remaining Cinematic Shortfall.

G.    DELIVERY:  As used in this Agreement, the term "Notice of Delivery" means delivery to Lessee of written notification that, upon receipt of payment for the Initial Physical Materials and any other sums then due and/or due thereon, Lessor is able to manufacture and deliver the Initial Physical Materials. Lessor shall not deliver the Initial Physical Materials, as defined in the Delivery Schedule attached hereto as Schedule B, to Lessee until: (i) Lessor has received the Advance in full; and (ii) Lessee has paid for the cost of the Physical Materials actually ordered by, and available for delivery to,

Lessee.  Lessee shall take delivery of the Initial Physical Materials within thirty (30) days after receipt of Notice of Delivery.  Notwithstanding the foregoing, Lessor shall provide marketing and publicity materials to Lessee as soon as such materials are available.  Lessee shall have access to all versions of the Picture and such access by Lessee shall be free to the extent Lessor has free access, provided, however, Lessor is not obligated to create more than one (1) version of the Picture.  Subject to Lessor's receipt of the Advance and cost of materials as set forth in this paragraph G, Lessor shall provide Lessee with access, if available, to the U.S. Theatrical version/cut. Lessor shall use best efforts to make the Video Masters described in section B of Schedule B attached hereto available for delivery to Lessee within thirty (30) days after the first Theatrical release of the Picture in the United States. Lessor shall not deliver the Video Masters until Lessee has paid for the cost of manufacturing and shipping such materials.

1.    Method Of Delivery:  All materials to be delivered to Lessee are at Lessee's sole cost and expense, including all freight and shipping costs, and will be delivered by either direct shipment to Lessee or by Lessor's issuance of a Print Order Authorization to a laboratory designated by Lessor.

2.    Materials Payment Instructions:  Unless otherwise instructed by Lessor, Lessee shall make all payments for Physical Materials by wire transfer in advance of shipment to:

Comerica Bank
2000 Avenue of the Stars, Suite 210
Los Angeles, CA 90067 USA
Account # : 1894003522
Account Name:  CMAFBO Summit Entertainment LLC Company Collection Account
ABA# 121137522
Swift Code: MNBDUS33

3.    Materials Shipping Instructions:  To be determined.

4.    Technical Quality:  Lessee is deemed to have accepted the technical quality of Initial Physical Materials if Lessee does not give Lessor Notice of any defects within twenty (20) days of delivery of such materials (such Notice to be accompanied by applicable laboratory inspection report(s)) ("First Defect Notice"). Lessor will replace any defective materials at its cost. If Lessor delivers replacement materials, such replacement materials will be deemed to be accepted by Lessee if Lessee does not give Lessor Notice of any defects with respect to such replacement materials within fourteen (14) days of their delivery to Lessee ("Second Defect Notice"). In the event a dispute as to the existence or extent of any alleged technical defect(s) remains between the Parties following Lessor's receipt of a Second Defect Notice, the Parties shall promptly submit the disputed material to Technicolor or Deluxe London. The Parties shall instruct the laboratory to review the materials which are submitted and to prepare a written report within fourteen (14) business days as to whether such materials are of commercially reasonable quality. The decision of the laboratory, once rendered, is final, conclusive, and binding as between the Parties, and the Party whose position was not endorsed by the laboratory shall pay the costs of such inspection and report.

Deal Terms: 09-0283
"THE TREE OF LIFE" - UK
V: May 19, 2008                                        8

H.    ADDITIONAL TERMS:

1.    Condition Precedent to Vesting of Rights:  As an express condition precedent to the obligations of Lessor to grant any rights in the Picture under this Agreement and as an express condition precedent to the vesting of any such rights granted, Lessee shall:

    a.    pay the Advance for the Picture in full; and,

    b.    execute any required documents pursuant to paragraph H.3 below.

2.    Notices:  Lessee shall send all Notices directly to Lessor with copies to Summit Entertainment, LLC, attn: Legal Affairs, 1630 Stewart Street, Suite 120, Santa Monica, California 90404, telephone:  (310) 309-8400, facsimile: (310) 828-4132 or by electronic mail to legal@summit-ent.com.

3.    Financing:  Lessee hereby agrees to execute customary assignment letters in the future, to be negotiated in good faith, should Lessor elect to assign the benefit of this Agreement to a bank or other entity or financial institution in order to secure financing relating to the Picture.

4.    Third Party Logos:  If Lessee acquires used prints of the Picture arising from its Theatrical release in the United States, Canada, the United Kingdom or other English speaking countries, then unless otherwise requested by Lessor, Lessee shall immediately remove the logo of the applicable Theatrical distributor in such countries from such used prints. In the event that any other materials supplied by Lessor inadvertently contain the logo(s) of the United States distributor of the Picture, then Lessee shall remove such logo(s) from said materials prior to Lessee's Exploitation of such materials.

5.    Pre-Approval of Lessee's Subdistributor: Lessor hereby pre-approves: (i) Warner Home Video as subdistributor for the Exploitation of the Video Rights; (ii) Filmbank Distributors Limited as subdistributor for the Exploitation of Non-Theatrical, Commercial and Public Video Rights; (iii) Filmflex, Front Row, British Sky Broadcasting, Arts Alliance Media, British Telecommunications plc and/or Video Networks Limited as subdistributors for the Exploitation of Pay-Per-View and Video-On-Demand Rights; (iv) British Sky Broadcasting Limited, the Sci-Fi Channel Limited, Melita Cable PLC and/or Radio Telefis Eireann as sub-distributors for the Exploitation of Pay TV Rights; and the British Broadcasting Corporation, Channel 4 and/or Radio Telefis Eireann as subdistributors for the Exploitation of Free TV Rights. The appointment of any other subdistributor for any of the Rights herein shall be subject to consultation between Lessor and Lessee.

6.    Expected and Outside Delivery Date:  In the event that Lessor is unable to make available to Lessee the Initial Physical Materials for the Picture by 31 July 2010, Lessor shall give Lessee Notice of the date that the Picture is expected to be available for delivery ("Extended Outside Delivery Date"). Lessee then may, by Notice to Lessor,

02-22-11   03:55pm   From-LOEB & LOEB                    3102822200              T-519   P.019/081   F-441

within twenty-one (21) days from Lessee's receipt of Lessor's Notice, either accept the Extended Outside Delivery Date, or terminate this Agreement, in which event:

- this Agreement shall be deemed to be null and void and of no further effect and the Rights leased herein for the Picture immediately revert to Lessor;

- Lessee and its Affiliates shall cause this Agreement and any other agreements for the Picture that arise herefrom to be deregistered with all applicable governmental authorities in the Territory, if necessary, and shall execute such documentation that may be necessary to effectuate such deregistration and termination;

- Lessor shall refund to Lessee any and all amounts received by Lessor to such date for the Advance; and,

- Lessor shall be free to immediately enter into agreements with third party(ies) for the Rights to the Picture in the Territory.

If Lessee does not give Notice that it wishes to terminate this Agreement during the aforesaid twenty-one (21) day period, then the Extended Outside Delivery Date is deemed disapproved by Lessee.

7.  Attached Documents: This Agreement includes and incorporates the Standard Terms and Conditions and the following schedule(s) that are attached hereto, all of which are incorporated herein by this reference.

Schedule A:  Specimen Laboratory Access Letter
Schedule B:  Delivery Schedule
Schedule C:  Standard Terms and Conditions

In the event that any provisions of this Motion Picture Lease Agreement contradict or conflict with any of the attached schedule(s) or any part of the Standard Terms and Conditions, the provisions of this Motion Picture Lease Agreement prevail. In the event that any provisions of the attached schedule(s) contradict or conflict with any part of the Standard Terms and Conditions, the provisions of the schedule(s) prevail.

Deal Terms: 08-8353
"THE TREE OF LIFE" - UK
V: May 18, 2009

IN WITNESS HEREOF, the Parties hereto have entered into this Agreement and agree to be bound by its terms and conditions as of the date first written above by placing their hands and seal below.

COTTONWOOD PICTURES, LLC              ICON FILM DISTRIBUTION LTD.

By: _____        By: _____

Its: _____V.P._____         Its: _____F.C._____

THIS AGREEMENT SHALL NOT BE EFFECTIVE OR BINDING UPON THE PARTIES HERETO UNTIL IT IS SIGNED BY BOTH PARTIES AND DELIVERED.

* * * * * *

SCHEDULE A

SPECIMEN LABORATORY ACCESS LETTER

Date:

Deluxe Italia Holding SRL
Via Delle Molette, 281
S. Lucia Di Mentana
00013 Rome
Italy

Re: "THE TREE OF LIFE" (the "Picture") - United Kingdom

Gentlemen:

You acknowledge that there are now on deposit with you the following preprint materials for the above-entitled motion picture (collectively the "Materials"):

- One (1) interpositive of the feature and, if available, trailer of the Picture;

- One (1) 35mm internegative of the feature and, if available, trailer of the Picture; and,

- One (1) 35mm optical soundtrack of the English language version of the feature and, if available, trailer of the Picture.

You are hereby instructed and directed that all Materials in your possession shall be held by you in the name, and for the account of, Cottonwood Pictures, LLC ("Lessor"), subject to paragraph 2 below. You are hereby advised that Lessor has granted certain rights to distribute and exhibit the Picture to Icon Film Distribution Ltd. ("Lessee"). Accordingly, you are hereby irrevocably authorized and instructed to honor, subject to your customary terms such as satisfactory credit arrangements, all orders of Lessee for as many 35mm color release prints of the Picture feature thereof, as Lessee may require. This authorization will remain valid for a period of fifteen (15) years and nine (9) months after notification that the Materials are available for delivery to Lessee (as may be extended) upon the following terms:

1.    Lessor shall, at all times, have complete and free access to all the Materials, including the right to remove any or all of the Materials without any further approval by Lessee; provided, however, if Lessor removes the Materials then Lessor shall immediately provide Lessee with a new laboratory access letter to the Materials.

2.    All laboratory services and materials ordered by either Lessor or Lessee shall be at the sole cost and expense of the party ordering the same.

Oasi Terms: 05-8283
"THE TREE OF LIFE" - UK
V: May 19, 2008

12

02-22-11     03:55pm     From-LOEB & LOEB                          3102822200          T-519   P.022/081   F-441

3.     You will not assert against Lessor or Lessee any lien at common law or under any applicable statute against any Materials relating to the Picture by reason of any unpaid charges incurred by any other party, and You will not refuse to honor any orders of either party because of unpaid charges incurred by the other party.

4.     The Materials mentioned above shall not be removed from your Laboratory without the prior written consent of Lessor. The instructions contained herein are irrevocable without the written consent of Lessor and may not be altered or modified except in writing signed by Lessor.

Please confirm your agreement to the foregoing by signing below where indicated.

Very truly yours,

Cottonwood Pictures, LLC

By: _____

Its: _____

AGREED TO AND ACCEPTED BY:

Deluxe Italia Holding SRL

By: _____

Its: _____

Deal Terms: 08-9203
"THE TREE OF LIFE" - UK
V: May 16, 2008

13

02-22-11    03:56pm   From-LOEB & LOEB                              3102822200           T-519   P.023/081   F-441

SCHEDULE B

DELIVERY SCHEDULE
FOR ENGLISH LANGUAGE FILM

For the purpose of this Delivery Schedule, "access" means free access clear of any origination costs. Items marked with an asterisk (*) shall be provided if and when available.

A.    INITIAL PHYSICAL MATERIALS: The Initial Physical Materials are defined as:

1.    Internegative Feature
Access to 1 (one) x 35mm Internegative of Feature. To be produced from the Interpositive of Feature, fully cut with main and end titles, edited, scored and assembled and in synchronisation in all respects with the composite Answer Print, Original Negative of Feature and Optical Sound Track Negative Feature. The Internegatives shall be of commercially acceptable quality and contain no splices. If the Feature is in any other Language than English, all appropriate English subtitles should be contained within this Facility. If the Internegative is from a Digital source i.e. a Digital Shoot, then it should be a One light facility containing no Light changes and should be on PolyEster Film.

2.    Interpositive Feature
Access to 1 (one) Interpositive of Feature, conformed for International, fully cut with main and end titles, edited, scored and assembled and in synchronisation in all respects with the composite Answer Print, Original Negative of Feature and Optical Sound Track Negative Feature. The Interpositve shall be of commercially acceptable quality, on PolyEster Film and contain no splices.

3.    Optical Sound Track Negative of Feature
Access to 1 (one) x Dolby SRD/Dolby SR (SDDS/DTS if applicable) 35mm Optical Sound Track Negative of Feature. In perfect synchronisation with the photographic action. The Optical Sound Track Negative shall be of commercially acceptable quality and contain no splices.

4.    Magneto Optical Disk of Feature
Delivery of 1 (one) MO Disk of Feature containing the 6 track SRD and 2 track SR mix.

5.    Interpositve Trailer
Access to 1 (one) x 35mm Interpositive of the Trailer.

6.    Internegative Trailer
Access to 1 (one) x 35mm Internegative of the Trailer.

7.    35mm Release Prints of Feature
Delivery of 2 (two) release prints of the Feature.

Deal Terms: 00-0203
"THE TREE OF LIFE" - UK                                              14
V; May 10, 2006

8.   35mm Release Prints of Trailer
Delivery of 2 (two) release prints of the Trailer.

9.   Combined Action Continuity/Dialogue Spotting List of Feature
Delivery of 1 (one) copy of a typed 'detailed' Combined Action Continuity/Dialogue Spotting List of the completed Film through Summit Entertainment's web download system, with the respective footage and frame counts listed, conformed in all respects to the action and dialogue contained in the completed Film, in form and condition suitable for submission to various censorship boards with respective footage and frame counts listed for each action cut, including scene descriptions, music lyrics, if any, music stops and starts in relation to the action or dialogue and translations of all dialogue spoken in any language other than English.

B.   ADDITIONAL MATERIALS: The Additional Materials are defined as:.

VIDEO MASTERS - Feature

Delivery of 1 (one) x Digi Beta direct telecine master of Feature with continuous Timecode and on 1(one) tape two part masters will not be accepted, in each of the following format/ratios.

i)       PAL Full Frame 4x3 (Pan + Scan)

ii)      PAL 16x9 original aspect ratio

iii)     High Definition HD Cam SR, 16x9 1.78, 1080/24p, 4x3 Full Frame and 16x9 original aspect ratio

         - with full stereo audio mix on tracks 1 & 2 and music and effects on tracks 3 & 4

Each tape must have passed a 100% full quality control check before final delivery. The Quality of the grading, pan and scan, framing etc must be approved by the Director / Director of Photography / Producer before delivery.

The Quality of the grading, pan and scan, framing etc must be approved by the Director / Director of Photography / Producer before delivery.

Textless main and end titles plus all inserts shall be included in the appropriate ratio at the end of each tape, beginning one minute after the end of the final credits. The Masters shall be slated and labelled accordingly.  Textless elements may be on as separate tape only if the duration of the feature film is over 120 minutes.

In the event the feature should contain subtitles and/or captions that are not part of the main and end titles, then a separate spot reel should be provided on all formats and on all applicable ratios that contain all the texted sections with each completed scene also included.

Audio Channels 1 & 2 are to contain a Dolby matrixed Stereo Left and Right mix of the
original language sound and Channels 3 & 4 are to contain a Dolby matrixed Stereo
Left and Right mix of the 100% filled Music and effects tracks. All audio channels
must be checked before delivery with a 100% quality control report.

Music
Delivery of CD Rom of Music, if available.

D-Cinema Master:
Access to D-Cinema Master, if and when available.

5.1 DA88 Delivery
DA88 of the original mix (5.1) master conformed to the 1 (one) part 16:9 Original
aspect ratio PAL Digital Betacam needs to be delivered to the following specification

M&E:
Delivery of the 6 track feature M&Es.

DA88 Specification:-
5.1 Master Flim Speed 25 FPS

Sample Rate 48KHz
Dolby – No Dolby encoding
Timecode EBU
Reference Level – 20 dbfs

Track Layout                 Channel 1 – Left
                             Channel 2 – Centre
                             Channel 3 – Right
                             Channel 4 – Left surround
                             Channel 5 – Right surround
                             Channel 6 – Boom
                             Channel 7 – Left Total
                             Channel 8 – Right Total

PICTURE – Trailer

1.      Combined Approved Check Print *
        1 (one) x 35mm Combined Approved Check Print of Trailer.

2.      Delivery of Trailer Digital data file containing the Flat texted and textless
        Trailer.  Icon is to order the digital file within 21 (twenty-one) days after
        notice of its availability. *

SOUND - Trailer

1.      Printmaster Trailer DA88 *

Deal Terms: OP-9293
"THE TREE OF LIFE" - UK
V: May 19, 2008                                            16

1 (one) x DA88 Timecode @ 25fps. Film Speed 24fps Sample Rate: 48 kHz six track (AKA 5.1) plus 2 track SVA mix original language fully mixed digital version of sound track of Trailer. Containing the following track specification: 1 = Left.   2 = Centre.   3 = Right.   4 = Left Surround.   5 = Right Surround. 6 = Sub Woofer.   7 = SVA Left Total.   8 = SVA Right Total.

2.     Full Mix
Delivery of 1 (one) Dolby SR-D MO Disk.

3.     DM&E: DA88, 48khz, 16-bit sample rate, film speed 24fps.

4.     M&E of Trailer: DA88

**POST PRODUCTION DOCUMENTS**

1. .   Music Cue Sheet
Delivery of 1 (one) typed copy of Music Cue Sheet of the Film, setting forth (1) the title of the musical compositions and sound recordings, if applicable; (2) names of the composers and their performing rights society affiliation; (3) names of recording artists; (4) the nature, extent and timing of the uses made of each musical composition in the Film; (5) the name of the owner of the copyright of each musical composition and sound recording; (6) the name of the publisher and company which controls the sound recording.

2.     Colour Pictures
Not less than 50 (fifty) different, good and approved colour photos on CD ROM (tiff files at 300 dpi, if available) thereof depicting scenes from the Film, the cast, director or locations plus captions for each picture.  Only approved photos will be delivered.

3.     Credit Requirements
A statement showing the layout of contractual advertising credits including percentage billings when such have been granted to anyone participating as an actor or in a technical capacity in the making of the Film together with copies of the applicable contracts.  Plus PMT's of the appropriate logos needed for paid advertising as well as a mock-up of the credit block and above title billing for paid advertising, with percentage sizes indicated.

4.     Restrictions and Approvals, if requested.
A statement giving artwork, biography, still, non-photographic likeness, behind the scenes, dubbing or subtitling restrictions and other approvals necessary.

5.     Production Notes
Synopsis of the Film, biographies and interviews with the principal cast and production staff, cast and technical personnel list, production stories and any useful background information to the Film; all with applicable approvals given.  Copies of any press clippings of Film during production and such publicity material as may be available to ensure adequate publicity for the Film.  Copy of the main and end titles list.

Deal Terms: DR-8293
"THE TREE OF LIFE" - UK
V: May 10, 2008                                           17

6.    Certificate of Origin
One original Certificate of Origin specifying the country of the origin of the Film.

7.    E&O Insurance
Certificate of Insurance evidencing Producer's Errors and Omissions coverage as follows:

(i)    Icon, its subsidiaries and affiliated companies, and the officers, directors, employees and agents of each of them, will be included as additional insureds free of charge.

(ii)   During the term of Producer's coverage, Producer's coverage will be primary, and any insurance coverage provided by Icon will apply solely to the benefit of Icon as excess insurance over and above Producer's coverage.

(iii)  Producer's insurance may not be modified, revised, or cancelled without (30) days prior written notice thereof to Icon.

(iv)   Producer's limits of coverage will not be less than US$1,000,000 for each claim and US$3,000,000 aggregate for all claims.

(v)    A policy deductible (in all cases payable by Producer) of US$25,000 or higher amount acceptable to Icon.

It is agreed that Icon's sublicences and/or subdistributors shall promptly be added to the policy as additional named insureds free of charge as and when requested by Icon

8.    Key Art *
Delivery of CD (with Photoshop layered files) as Quark document with all fonts and font names.

9. DVD Screener
1 (one) DVD screener (not a packaged DVD) of the Film, when available

## FURTHER MATERIALS

1.    EPK *
Delivery of PAL Digital Betacam master of the EPK, if available.

2.    TV Spots *
Delivery of PAL digital Betacam master with separate audio (dialogue/ narration/ music/ effects).

3.    Radio Spots *
Delivery of audio CD with separate audio (dialogue/narration/ music/effects)

4.    DVD Materials * (If available, at no extra cost to producer)
All DVD bonus materials, if available and cleared for international use: featurette, audio commentaries, subtitles etc. For clarity, Lessee shall have free access to all DVD bonus materials created by the U.S. distributor, if available, and to the U.S. theatrical campaign materials created by the U.S. distributor.

Plus sample of completed DVD and packaging artwork on CD (as layered files) (if available, at no extra cost to producer)

Deal Termat 08-8283
"THE TREE OF LIFE" - UK
V: May 19, 2008                                        18

02-22-11    03:57pm    From-LOEB & LOEB                        3102822200         T-519   P.028/081   F-441

\*\*  Lessor shall provide free access to Lessee advertising and promotional
materials, artwork, and all other materials to which Lessor has free access and
which are cleared for worldwide use.

Deal Terms: 00-8283
"THE TREE OF LIFE" - UK
V: May 19, 2009

18

02-22-11   03:57pm   From-LOEB & LOEB                    3102822200        T-519   P.026/081   F-441

<u>SCHEDULE C</u>

<u>STANDARD TERMS AND CONDITIONS</u>

STANDARD TERMS AND CONDITIONS

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| 1. | DEFINITIONS | | 1 |
| | 1.1 | Definitions - Rights: | 1 |
| | | (a) Cinematic Rights | 1 |
| | | (b) Home Video Rights | 1 |
| | | (c) Ancillary Rights | 2 |
| | | (d) Television Rights | 2 |
| | | (e) Other Rights | 3 |
| | 1.2 | Definitions - Other | 4 |
| 2. | DELIVERY OF PICTURE | | 10 |
| | 2.1 | Delivery of Initial Materials | 10 |
| | 2.2 | Delivery of Physical Materials | 10 |
| | | (1) Physical Delivery | 11 |
| | | (b) Print Order Authorization | 11 |
| | | (c) Laboratory Access | 11 |
| | | (d) Loan of Materials | 11 |
| | | (e) Satellite Delivery | 11 |
| | 2.3 | Evaluation of Physical Materials | 11 |
| | 2.4 | Delivery of Advertising and Promotional Materials | 12 |
| | 2.5 | Holding of Materials | 12 |
| | 2.6 | Materials Payment Instructions | 12 |
| | 2.7 | Lease Created Materials | 12 |
| | 2.8 | Return of Materials | 12 |
| | 2.9 | Outside Delivery Dates | 13 |
| 3. | EXPLOITATION OF RIGHTS | | 13 |
| | 3.1 | Leased Rights and Reserved Rights | 13 |
| | | (a) Grant of Lease | 13 |
| | | (b) Terminology | 13 |
| | | (c) Reservation | 13 |
| | 3.2 | Dubbing, Subtitling and Editing | 13 |
| | | (a) Lessor's Requirements | 13 |
| | | (b) Lessee's Rights | 14 |
| | | (c) Limitations | 14 |
| | | (d) Liability 14 | |
| | 3.3 | Territory | 14 |
| | | (a) General 14 | |
| | | (b) Exclusion | 14 |
| | | (c) Inclusion | 14 |
| | | (d) Broadcast Overspill | 14 |
| | 3.4 | Exploitation Periods | 15 |
| | | (a) Term   15 | |
| | | (b) Lessee Holdbacks | 15 |
| | | (c) Lessor Holdbacks | 15 |
| | | (d) First Theatrical Release | 15 |
| | | (e) First Video Release | 15 |
| | 3.5 | Reasonable Efforts | 15 |
| | 3.6 | Advertising and Billing | 15 |
| | | (a) Lessor's Requirements | 15 |
| | | (b) Lessee's Rights | 16 |
| | | (c) Limitations   16 | |
| (d) | Inadvertent Failure | | 16 |
| | 3.7 | Endorsements | 16 |
| | 3.8 | Censorship | 16 |
| | 3.9 | Affiliates | 17 |
| | 3.10 | Copyright Protection | 17 |
| | 3.11 | Reversion | 17 |
| | 3.12 | Music   18 | |
| | | (a) Synchronization Royalties | 18 |
| | | (b) Performance Royalties | 18 |
| | | (c) Mechanical | 18 |
| | | (d) Publishing Royalties | 18 |
| | | (e) Other Royalties | 18 |
| | 3.13 | Theatrical Exploitation Obligations | 19 |

|        | (a) | General 19 |    |
|--------|-----|------------|----|
|        | (b) | Consultation | 19 |
|        | (c) | Release Obligations | 19 |
|        | (d) | Release Notices | 19 |
|        | (e) | Exhibition Obligations | 20 |
|        | (f) | Controlled Theaters | 20 |
|        | (g) | Export Of Materials | 20 |
|        | (h) | Re-Release/Sequels and Remakes | 21 |
| 3.14   |     | Non-Theatrical, Commercial Video, Public Video and Ancillary Exploitation Obligations | 21 |
|        | (a) | General 21 |    |
|        | (b) | Consultation | 21 |
| 3.15   |     | Home Video Exploitation Obligations | 21 |
|        | (a) | General 21 |    |
|        | (b) | Limit On Means and Media of Exploitation | 21 |
|        | (c) | Limits on Early Exploitation | 21 |
|        | (d) | Best Efforts/Quality | 21 |
|        | (e) | Catalogue Availability | 21 |
|        | (f) | Consultation On Ad Campaign | 21 |
|        | (g) | Review Of Packaging | 21 |
|        | (h) | Consultation/Approval Regarding Video Release | 22 |
|        | (i) | Limits on Included Material | 22 |
|        | (j) | Minimum Retail Price | 22 |
|        | (k) | Minimum Wholesale Price | 22 |
|        | (l) | Free Goods | 22 |
|        | (m) | Sell-off Period | 22 |
|        | (n) | Import/Export Restrictions | 23 |
| 3.16   |     | Television, Pay-Per-View and Video-On-Demand Exploitation Obligations | 23 |
|        | (a) | General 23 |    |
|        | (b) | Release Obligations | 23 |
|        | (c) | "Run" Defined | 24 |
|        | (d) | Usage Reports | 24 |
|        | (e) | Commercials | 24 |
|        | (f) | Approval Obligations | 24 |
|        | (g) | Conclusion of Run(s) | 24 |
| 3.17   |     | Anti-Piracy Provisions | 25 |
|        | (a) | Notice Requirements | 25 |
|        | (b) | Copyright Notice | 25 |
|        | (c) | Basic Anti-Piracy Warning | 25 |
|        | (d) | Videogram Warning | 25 |
|        | (e) | Enforcement 25 |    |
|        | (f) | New Technology | 25 |
|        | (g) | No Warranty Against Piracy | 26 |
| 4.     |     | FINANCIAL CLAUSES, STATEMENTS AND PAYMENTS | 26 |
|        |     | Gross Receipts | 26 |
|        | (a) | Gross Receipts - Defined | 26 |
|        | (b) | Cost Recoveries | 26 |
|        | (c) | Subdistribution of Rights | 26 |
|        | (d) | Royalty Income | 27 |
| 4.2    |     | Distribution Expenses | 27 |
|        | (a) | Distribution Expenses - Defined | 27 |
|        | (b) | Third Party Costs | 28 |
|        | (c) | Limitations | 28 |
| 4.3    |     | Limits On Cross-Collateralization | 29 |
| 4.4    |     | Allocations | 29 |
| 4.5    |     | Distribution Reports | 29 |
| 4.6    |     | Financial Records | 30 |
| 4.7    |     | Audit Rights | 30 |
| 4.8    |     | Payments | 31 |
| 4.9    |     | Blocked Funds | 31 |
| 4.10   |     | Remittance Taxes | 31 |
| 4.11   |     | Exchange Rates | 32 |
|        | (a) | Recoupment | 32 |
|        | (b) | Exchange Rates, Late Payments | 32 |
| 5.     |     | ASSIGNMENT AND SUBLICENSING | 32 |
| 5.1    |     | Lessee's Limitations | 32 |

| | 5.2 | Exception | 32 |
|---|---|---|---|
| | 5.3 | Lessor's Right Of Approval | 33 |
| | 5.4 | Assignment | 33 |
| | 5.5 | Lessor's Assignment For Financing Purposes | 33 |
| 6. | | WARRANTIES AND INDEMNITIES | 33 |
| | 6.1 | Lessor's Warranties and Indemnities | 33 |
| | 6.2 | Lessee's Warranties and Indemnities | 34 |
| 7. | | DEFAULT/TERMINATION/ACTIONS | 34 |
| | 7.1 | Default 34 | |
| | 7.2 | Actions 35 | |
| | 7.3 | Arbitration | 35 |
| 8. | | GENERAL PROVISIONS | 35 |
| | 8.1 | Notices 35 | |
| | 8.2 | Entire Agreement | 36 |
| | 8.3 | Governing Law | 36 |
| | 8.4 | Terminology | 36 |
| | 8.5 | Cumulative Rights | 36 |
| | 8.6 | Force Majeure | 36 |
| | 8.7 | No Joint Venture | 37 |
| | 8.8 | Severability | 37 |
| | 8.9 | Confidentiality | 37 |
| | 8.10 | Captions | 37 |
| | 8.11 | Power Of Attorney | 37 |
| | 8.12 | Injunction | 37 |
| | 8.13 | Interpretation   38 | |

## STANDARD TERMS AND CONDITIONS

The following terms and conditions supplement any agreement or instrument into which they are incorporated as an integral part thereof as if fully set forth therein and, except as may be superseded by such agreement or instrument, have the same force and effect as any other provisions thereof. The following terms and conditions are subsequently referred to as "Standard Terms and Conditions" or "Standard Terms".

1.    DEFINITIONS:

As used in this document:

a.    Definitions - Rights:

i.        Cinematic Rights:

"Cinematic" means all forms of Theatrical, Non Theatrical, Public Video and Commercial Video Exploitation of a Motion Picture Copy.

"Theatrical" means exploitation of a Motion Picture Copy on whatever format or digitally transferred by direct exhibition in conventional or drive-in theaters that are open to the general public on a regularly scheduled basis and charge an admission fee to view a Motion Picture.

"Non-Theatrical" means exploitation of a Motion Picture Copy by direct exhibition before an audience at facilities or organizations not primarily engaged in the business of exhibiting Motion Pictures including, but not limited to, educational organizations, churches, restaurants, bars, clubs, trains, buses, libraries, prisons, industrial installations, Red Cross facilities, oil rigs, embassies, military bases, military vessels or any other governmental facilities flying the flag of countries within the Territory. Non-Theatrical does not include Public Video, Commercial Video, Airline, Ship and Hotel/Motel.

"Public Video" means exploitation of a Motion Picture Copy embodied in a Videogram by direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment which charges an admission to use the viewing facility or to view the Videogram and which is not licensed as a theater for the purposes of exhibiting Motion Pictures in a Theatrical manner.

"Commercial Video" means exploitation of a Motion Picture Copy embodied in a Videogram by direct exhibition before an audience at facilities or organizations not primarily engaged in the business of exhibiting Motion Pictures including, but not limited to, educational organizations, churches, restaurants, bars, clubs, trains, buses, libraries, prisons, industrial installations, Red Cross facilities, oil rigs, embassies, military bases and military vessels. Commercial Video does not include Non-Theatrical, Public Video, Airline, Ship and Hotel/Motel.

ii.        Home Video Rights:

"Video" or "Home Video" means the manufacture, distribution, rental, lease or sale of Videograms (restricted to the Videogram type(s) and format(s) authorized in the Deal Terms), which enable a Motion Picture to be perceived visually on viewing devices (including televisions) when displayed through or as part of an electronic apparatus (such as a television-type playback system) for private non-commercial use. Home Video is restricted solely to the Videogram type(s) and format(s) that are leased to Lessee in the Deal Terms. For avoidance of doubt, Home Video does not include any form of On-Line or Video-On-Demand.

"Home Video Rental" means Video and Home Video other than Home Video Sell Through.

"Home Video Sell Through" means the manufacture and distribution of Videograms (restricted to the Videogram type(s) and format(s) authorized in the Deal Terms) for purposes of sale to the public for private non-commercial use where: (i) ownership of such Videograms transfers to such ultimate purchasing members of the public who use the Videograms for private non-commercial use; and (ii) if a Maximum Net Sell Through Price is specified in the Deal Terms, the price per Videogram unit that is derived by Lessee or its subdistributors and Affiliates, net of

1

discounts and rebates, is less than such any Maximum Net Sell Through Price defined in the Deal Terms.

iii.           Ancillary Rights:

   "Ancillary" means all forms of Airline, Ship and Hotel/Motel Exploitation of a Motion Picture Copy.

   "Airline" means exploitation by direct exhibition of a Motion Picture Copy in airplanes, wherever located, which are operated by companies flying the flag of any country within the Territory, but excluding airplanes which are customarily licensed from a location outside of the Territory, or which are only serviced in but do not fly the flag of any country in the Territory.

   "Ship" means exploitation by direct exhibition of a Motion Picture Copy in ocean going vessels, wherever located, which fly the flag of any country in the Territory and are serviced from a country in the Territory, but excluding ships serviced from a location outside of the Territory.

   "Hotel/Motel" means the exploitation by direct exhibition of a Motion Picture Copy in temporary or permanent living accommodations such as hotels, motels, apartment complexes, co-operative or condominium projects where the exhibition is by means of closed-circuit television systems which originate within or in the immediate vicinity of such living accommodations.  For avoidance of doubt, Hotel/Motel does not include Pay-Per-View, On-Line or Video-On-Demand.

iv.           Television Rights:

   "Television" means all forms of Free TV and Pay TV exploitation of a Motion Picture Copy.

   "Free TV" means all forms of Terrestrial Free TV, Cable Free TV and Satellite Free TV exploitation of a Motion Picture.

   "Terrestrial Free TV" means broadcast by Terrestrial Transmission of a Motion Picture Copy that is intended for essentially simultaneous reception and display, either essentially simultaneously or after some delay by storage on a lawful storage device, on viewing devices (including televisions) by ultimate consumers of such transmissions in venues other than Cinematic venues ("Terrestrial Broadcast") without a charge being made to the viewer for the privilege of viewing the Motion Picture so broadcast.  For purposes of this definition, neither governmental television receiver assessments nor taxes are a charge to the viewer.

   "Cable Free TV" means broadcast by Cable Transmission by a broadcaster authorized to broadcast by such means by the appropriate governmental authority of a Motion Picture Copy that is intended for essentially simultaneous reception and display, either essentially simultaneously or after some delay by storage on a lawful storage device, on viewing devices (including televisions) by ultimate consumers of such broadcasts in venues other than Cinematic venues ("Cable Broadcast") without a charge being made to the viewer for the privilege of viewing a Motion Picture so broadcast.  For purposes of this definition, neither governmental television receiver assessments or taxes, nor regular periodic basic cable service charges (other than subscriptions paid for the right to receive specific programming channel(s) or amounts paid for the right to receive specific programs on a fee-per-exhibition basis) paid by a subscriber to a cable television system are a charge to the viewer.

   "Satellite Free TV" means broadcast by Satellite Transmission that is intended for essentially simultaneous reception and display, either essentially simultaneously or after some delay by storage on a lawful storage device, on viewing devices (including televisions) by ultimate consumers of such broadcasts in venues other than Cinematic venues ("Satellite Broadcast") without a charge being made to the viewer for the privilege of viewing a Motion Picture.  For purposes of this definition, neither governmental television receiver assessments or taxes, nor regular periodic basic satellite service charges (other than subscriptions paid for the right to receive specific programming channel(s) or amounts paid for the right to receive specific programs on a fee-per-exhibition basis) are a charge to the viewer.

Standard Terms
Ipca - Multiple Rights Lease
V: April 10, 2006
ref: 05-030 - "Tree of Life"

"Pay TV" means all forms of Terrestrial Pay TV, Cable Pay TV, and Satellite Pay TV exploitation of a Motion Picture Copy. Pay TV Rights do not include any form of Hotel/Motel, Pay-Per-View or Video-On-Demand Rights.

"Terrestrial Pay TV" means encrypted Terrestrial Broadcast where a charge is made: (i) to the viewer for the right to use the decryption device and/or for the privilege of viewing the decrypted Motion Picture Copy (along with other programming on an ongoing basis); or (ii) to the operator of an apartment complex, co-operative, condominium project or similar multiple-family dwelling place located distant from the place where such broadcast signal originated for the right to use the decryption device to receive and retransmit the programming on such channel throughout such place.

"Cable Pay TV" means encrypted and/or encoded Cable Broadcast where charge is made: (i) to the viewer for the right to use the decoding and/or decryption device and/or for the privilege of viewing the decrypted or decoded Motion Picture Copy (along with other programming on an ongoing basis); or (ii) to the operator of an apartment complex, co-operative, condominium project or similar multiple-family dwelling place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

"Satellite Pay TV" means encrypted and/or encoded Satellite Broadcast where a charge is made: (i) to the viewer for the right to use the decoding and/or decryption device and/or for the privilege of viewing the decrypted or decoded Motion Picture Copy (along with other programming on an ongoing basis); or (ii) to the operator of an apartment complex, co-operative, condominium project or similar multiple-family dwelling place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

v.       Other Rights:

"Incidental" means, subject to restrictions contained in the Agreement: (i) dubbing or subtitling the Picture and trailers thereof pursuant to paragraph 3.2 of these Standard Terms; (ii) the application for censorship and edit of the Picture pursuant to paragraphs 3.2 and 3.8 of these Standard Terms; (iii) advertising and publicizing the Picture pursuant to paragraphs 3.6 and 3.7 of these Standard Terms; (iv) the application for copyright protection in Lessor's name and pursuit of copyright infringements pursuant to paragraphs 3.10 and 3.17 of these Standard Terms.

"Merchandising" means the manufacture and distribution for profit of items of merchandise, other than books and records, featuring or embodying the title of the Picture, or any logos identifiable with the Picture, or the name or likeness of any characters, animals or objects identifiable with a Motion Picture.

"Music Publishing" means the administration of the copyright(s) in musical compositions appearing in the Picture's soundtrack, to the extent the same are owned or controlled by Lessor.

"Novelization" means the authorization of, or act of, writing (by translation or otherwise) and exploitation of the Picture or screenplay thereof as a book, novel, or other printed (electronic or otherwise) or published medium (electronic or otherwise).

"On-Line" means (i) Internet Downloading, (ii) Internet Streaming, (iii) Network Downloading, and (iv) Network Streaming.

"Pay-Per-View" means Terrestrial, Cable, and/or Satellite Transmission by means of an encrypted signal to view the transmission of a Motion Picture at a time designated by the broadcaster for each viewing and where a charge is made to the viewer for such viewing. For avoidance of doubt, Pay-Per-View Rights do not include any form of Hotel/Motel, Pay TV, On-Line, or Video-On-Demand Rights.

"Souvenir Program" means the preparation and exploitation of souvenir booklets or programs, not to exceed thirty (30) pages in length, featuring photographs and explanatory text relating to the Picture.

3

"Soundtrack Record" means the manufacture and exploitation of recordings in any form embodying all or any part of the soundtrack of the Picture or any re-recording of all or any part of the soundtrack of the Picture (packaged and labelled in such a way as to be identifiable with the Picture) in lieu of the actual soundtrack thereof.

"Video Game" means the manufacture, distribution, and sale, lease, or rental of video game(s) for platforms such as Sega Genesis, Nintendo SNES, 3DO multiplayer system or any similar or new platform formats where the user is given interactive control over "virtual" actors and surroundings and/or engages in contests of dexterity and that: (i) are developed from the Picture or its Underlying Material (whether or not such video game(s) use footage from the Picture); and/or (ii) are packaged and labeled in such a way as to be identifiable with the Picture.

"Video-On-Demand" means the making available of a Motion Picture Copy on demand which means Terrestrial, Cable, or Satellite Transmission of direct, addressable data to the ultimate consumer of a Motion Picture Copy that are not a common-general data accessible by multiple consumers at either a transmission or viewing time and to a place selected by the consumer and intended for essentially simultaneous reception and display, either essentially simultaneously or after some delay by storage on a lawful storage device, on viewing devices (including televisions) by ultimate consumers of such transmissions in venues other than Cinematic venues, for which a charge is made to such consumer either per viewing, monthly, or by subscription. Video-On-Demand does not include Airline, Ship Hotel/Motel, Pay TV, On-Line, or Pay-Per-View.

b.     Definitions - Other:

"Accounting Period" means starting from first release each quarter ending March 31, June 30, September 30 and December 31 for the two (2) years and then semi-annually throughout the reminder of the Term. If the Picture is not released Theatrically by Lessee, or its subdistributors and Affiliates, "Accounting Period" means each calendar quarter.

"Additional Materials" means those items, if any, expressly set forth as such in the Deal Terms.

"Advance" means the non-refundable sums due as an advance payment as set forth and more particularly described in the Deal Terms.

"Advertising Materials" means any materials available for use in advertising and promoting the Picture, including trailers, teasers, key artwork, advertising accessories, lithographs and ad slicks.

"Affiliate" means any Person (including any officer, director, employee or partner of any Person) owned or controlled by, controlling or under common control with Lessee as the case may be, including, but not limited to, parent companies and subsidiaries. For purposes of this Agreement, ownership directly or indirectly of ten percent (10%) or more of the voting stock and/or other voting equity security of a Person is deemed "control". Where the exploitation of some or all of the Leased Rights is performed by Affiliates, the obligations of Lessee hereunder apply to such Affiliate and Lessee is fully liable to Lessor for any breaches of this Agreement by such Affiliate(s).

"Agreement", means the instrument or agreement to which these Standard Terms and Conditions are attached, including these Standard Terms and Conditions, and any schedules. All references to "herein", "hereunder" or "hereof" refer to the entire Agreement.

"Approval" means prior written Notice of approval of, or assent to, a particular matter or element, or permission to engage in a particular action or course of action. In order for any Approval to be effective, (i) the Party seeking approval must provide the Party from which Approval is sought written Notice containing a clear statement of the request of Approval reasonably in advance of the event or the initiation of the action or course of action for which approval is sought to permit a meaningful response, but not less than fifteen (15) days; (ii) the Party from which approval is sought, if it approves the request, must do so in writing by Notice to the Party seeking approval. Unless otherwise provided for in this Agreement or subsequently approved by Lessor in writing, any request for which Approval is not given within ten (10) business days from Notice requesting Approval is received is deemed disapproved; however, the Party seeking Approval may transmit, within twenty-four (24) hours of such deemed disapproval, a second Notice advising that

4

such ten (10) business days have elapsed without response and resubmitting the same request.  If the Party from which Approval is sought fails to respond to such second request within the two (2) business days, Approval is deemed given.

"Availability Date"  means the first day after the end of any Holdback Period for a Right as may be set forth in the Deal Terms.

"Cable Transmission" means analog or digital transmission of data by means of electromagnetic waves (including rf, infrared, laser, visible light- and acoustic energy) through means other than over-the-air (e.g. telephone cable coaxial cable fiberoptic cable) regardless of the form of data transfer.

"Claim" has the meaning set forth in paragraph 8.1 of these Standard Terms.

"Consult" or "Consultation" means prior Notice of a particular matter, issue,  element, Exploitation, or course of action ("Matter") reasonably in advance of the event or initiation of the course of action to permit a meaningful exchange of ideas, comments, and  suggestions regarding the same.  Lessee acknowledges and agrees that, where in this Agreement Lessee is required to consult with Lessor, the Matter is subject to Third Party Approval, if any.

"Copyright and Similar Laws" has the meaning set forth in paragraph 3.10 of these Standard Terms.

"Computer Network" means any hardware and/or software combination that connects two or more computers together and that allows the computers to share and/or transfer data between them based on a transfer protocol that can specifically identify and securely transfer such data to one or more unique addresses.  While the Internet is a Computer Network, the term Computer Network excludes the Internet.

"Computer Network Transmission" means the transmission of digital data via a Computer Network other than the Internet to one or more devices on such Computer Network.

"Deal Terms" means the terms and conditions of a Motion Picture Lease Agreement, if any, into which these Standard Terms are incorporated.

"Delivery Date" of the Picture means the date of delivery of the initial Physical Materials of the Picture in accordance with the terms hereof.

"Distribution Expenses" has the meaning set forth in paragraph 4.2 of these Standard Terms.

"Distribution Fee" and "Distribution Fees" mean the percentage or percentages of Gross Receipts or Net Receipts, if any, indicated in the Deal Terms which Lessee may retain as profit.

"Dollar" means, unless otherwise specified, a monetary value in the currency of the United States of America.

"Expected Delivery Date" means the date by which Lessor shall effect delivery of the initial Physical Materials.

"Exploit" or "Exploitation" means the manufacture, exhibition, broadcast, transmission, dissemination, reproduction, distribution, sale, performance, publication, display, license, use, or exploitation by the means, and in the manners and media authorized by this Agreement.

"Extended Outside Delivery Date" has the meaning set forth in paragraph 2.9 of these Standard Terms.

"Financial Records" has the meaning set forth in paragraph 4.6 of these Standard Terms.

"First Theatrical Release" has the meaning set forth in paragraph 3.4(d) of these Standard Terms.

Standard Terms
Icon - Multiple Rights Lease
V: April 25, 2005
ref: 05-030 - "Tree of Life"

"First Video Release" has the meaning set forth in paragraph 3.4(e) of these Standard Terms.

"Gross Receipts" has the meaning set forth in paragraph 4.1 of these Standard Terms.

"Holdback" or "Holdback Period" means the period, if any, specified in the Deal Terms during which a specific Right must not be Exploited by the Party to which such Right is leased or by which such Right is Reserved. Lessor and Lessee, however, may enter into agreements at any time which permit exploitation of such Reserved Rights or Rights subject to Holdback after the expiration of the applicable Holdback Period, if any. (See paragraphs 3.4(b) and (c) below.)

"Initial Advertising and Promotional Materials" means those items expressly set forth as such in the Deal Terms.

"Initial Materials" means the Initial Physical Materials and the Initial Advertising and Promotional Materials.

"Initial Physical Materials" means those items expressly set forth as such in the Deal Terms.

"Internet" means any Computer Network used to communicate digital data to unique addresses, including without limitation (i) any Computer Network that uses or supports the use of the Transmission Control Protocol/Internet Protocol ("TCP/IP") suite, and/or any successor protocols thereto (whether now known or hereafter devised) and/or (ii) the open, world-wide, cross-platform Computer Network commonly known as the World Wide Web ("WWW") and/or any successor Network thereto (whether now known or hereafter devised) or any part thereof which may be accessed by the Hyper Text Transport Protocol ("HTTP") suite and or any successor protocol thereto (whether now known or hereafter devised).

"Internet Downloading" means the Internet Transmission of audio and visual elements of the Picture which permits individual viewers to download (receive and store) a digital copy of a Motion Picture onto a device (whether a computer, set-top box, or otherwise) for viewing upon demand (either immediately or at a later date regardless whether the viewer has an active Internet connection) in return for license, viewing or any other such similar fees.

"Internet Streaming" means the Internet Transmission of audio and visual elements of the Picture in a continuous stream in its complete linear form only (i.e. the Picture can be accessed online only where the viewer has an active Internet connection and neither the Picture nor any part thereof can be downloaded onto the individual viewer's viewing device (whether a computer or otherwise) or saved by the viewer for viewing at a later date or forwarding to another viewer and no Picture accessed can be held in "cache") for which a license, viewing, or other such similar fee may be charged.

"Internet Transmission" means the transmission of digital data via the Internet based on a unique user's Internet protocol address only (i.e. Lessee can identify and securely deliver content directly to a unique computer's location). Internet Transmission may be by any means comprising the Internet, including Cable, Terrestrial, and Satellite Transmission, including the wireless application protocol ("WAP").

"Language" means the language(s) which are leased to Lessee in the in the Deal Terms to which the Exploitation of the Rights is thereby restricted.

"Leased Rights" means the Rights which are leased from Lessor to Lessee for the Territory, in the Language, for the Term as set forth in the Deal Terms. For avoidance of doubt, Lessee's Exploitation of the Leased Rights shall not hinder Lessor's right to Exploit the Reserved Rights, provided that Lessor's Exploitation of the Reserved Rights does not materially interfere with Lessee's or Lessee's subdistributor's Exploitation of the Leased Rights hereunder.

"Letter of Credit" or "L/C" means an irrevocable documentary letter of credit which is issued in a form, and by a financial institution subject to Lessor's Approval.

Standard Terms
Icon - Multiple Rights Lease
Vi April 26, 2006
rch 05-030 - "Tree of Life"

"Materials" means the Physical Materials and all materials created by or for Lessee, including without limitation, all 35mm prints, internegatives, neutral backgrounds, alternative language tracks, dubbed or subtitled versions, videomasters, promotional and advertising Materials, web-sites and Videograms.

"Master" means a master video copy of the Picture to be used for either duplicating Videograms therefrom or for making television broadcasts or other transmissions of the Picture.

"Maximum Net Sell Through Price" means the price per Videogram derived by Lessee or its Affiliates, net of discounts and rebates, at or above which Lessee shall pay Lessor the percentage of Gross Receipts set forth in the Deal Terms for the Exploitation of Home Video Rental Rights.

"Motion Picture" means any audiovisual work consisting of a series of related images that, when shown in succession, impart an impression of motion, with accompanying sounds, if any.

"Motion Picture Copy" means the embodiment of a Motion Picture in any physical form, including film, tape, cassette, disc, digital, analog or celluloid. Where a specific medium is limited to exploitation by a specific physical form, for example, the exploitation of Videograms, then Motion Picture Copy with respect to such medium is limited to such physical form.

"Net Receipts" means Gross Receipts less Distribution Fees (but not subdistribution fees) and approved Distribution Expenses.

"Network Downloading" means the Computer Network Transmission of audio and visual elements of the Picture which permits individual viewers to download (receive and store) a digital copy of a Motion Picture onto a device (whether a computer, set-top box, or otherwise) for viewing upon demand (either immediately or at a later date regardless of whether the viewer has an active Computer Network connection) in return for license, viewing or any other such similar fees.

"Network Streaming" means the Computer Network Transmission of audio and visual elements of the Picture in a continuous stream in its complete linear form only (i.e. the Picture can be accessed online only where the viewer has an active Computer Network connection and neither the Picture nor any part thereof can be downloaded onto the individual viewer's viewing device (whether a computer or otherwise) or saved by the viewer for viewing at a later date of forwarding to another viewer and no Picture accessed can be held in "cache") for which a license, viewing, or other such similar fee may be charged.

"Notice" means a notice given in accordance with the terms of paragraph 8.1 of these Standard Terms and Conditions.

"Notice Of Delivery" means Lessor's first Notice to Lessee that it can promptly deliver the Initial Physical Materials for the Picture.

"Outside Delivery Date" has the meaning set forth in paragraph 2.10 of these Standard Terms.

"Overages" means the amounts, if any, that become payable to Lessor in excess of the Advance from Lessor's share of Gross Receipts hereunder.

"Parties" means Lessor and Lessee.

"Party" means either Lessor or Lessee, as applicable.

"Person" means any natural person or legal entity.

"Physical Materials" means the Initial Materials and the Additional Materials.

"Picture" or "Pictures" means only the complete Motion Picture or Motion Pictures set forth and described more particularly by working title(s) in the Deal Terms. (If the Rights to more than one Picture are leased to Lessee hereunder then the provisions of this Agreement apply to each such Picture.)

7

Standard Terms
Icon - Multiple Rights Lease
V: April 29, 2008
ref: 05-030 - "Tree of Life"

"Principal Photography" means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

"Release Date" means the first date the Picture is commercially exhibited before paying audiences in a country within the Territory or if the Agreement is for video distribution only or if the Picture is not released Theatrically or Non-Theatrically, the first date that the videocassette or discs are available for sale, lease or renting by any Person.

"Remake" means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

"Rentals" means Lessor's share of Gross Receipts as set forth in the Deal Terms.

"Reserved Rights" means all rights which are not among the Leased Rights in the Languages and the Territories and which Lessor hereby expressly retains, including, without limitation, all Underlying Material and intangible property relating to the Leased Rights and the Picture, including all trademarks and copyrights. For avoidance of doubt, Lessor's Exploitation of the Reserved Rights shall not hinder, materially interfere with Lessee's right to Exploit the Leased Rights.

"Rights" means the right to Exploit the Picture and all rights incidental to such Exploitation. When preceded by a defined term denoting a particular means, manner, or medium of exploitation, (i.e., Free TV Rights), Rights is limited in meaning the right to exploit the Picture in the means, manner, and medium comprising the defined term.

"Run" means the telecast of the Picture as defined in paragraph 3.16(c) of these Standard Terms.

"Satellite Transmission" means analog or digital transmission of data by means of electromagnetic uplink to a satellite and its corresponding downlink broadcast transmission to a terrestrial satellite reception dish regardless of the form of data transfer.

"Schedule" means a schedule, exhibit, or attachment to this Agreement.

"Sequel" means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which a character, event or locale depicted in the existing Motion Picture or its Underlying Material is shown engaged in or as the subject of substantially new or different events than those depicted in the existing Motion Picture.

"Shorts" has the meaning set forth in paragraph 3.13(c)(v) of these Standard Terms.

"Telegraphic Transfer" (abbreviated as "T/T") means an electronic transfer, of unencumbered and unconditional funds, free of any transmission or conversion charges, to the account, if any, specified in the Deal Terms or otherwise advised by Lessor.

"Terrestrial Transmission" means analog or digital transmission of data by wireless (e.g. over-the-air) terrestrial means (including electromagnetic waves, rf, infrared, laser, visible light- and acoustic energy) regardless of the form of data transfer.

"Term" means the period during which this Agreement is effective between the Parties hereto as set forth and more particularly described in the Deal Terms.

"Third Party Approval" means the right of approval, if any, over a particular matter (e.g., the subject of any required Consultation hereunder) held by directors, talent, or any other third party with whom or which Lessor or its Affiliates have contracted in connection with the Picture(s) ("Third Party Approvals"). Lessor shall deliver a statement detailing such Third Party Approvals to Lessee as soon as available and shall use reasonable efforts to obtain such Approvals on Lessee's behalf.

"Underlying Material" means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos,

6

directions, comments, ideas, stage business and other material incorporated in any version of a Motion Picture and, to the extent necessary rights and licenses have been obtained, all existing novels, stories, plays, songs, events, characters, ideas or other works from which any version of a Motion Picture is derived or on which it is based.

"Videocassette" means a VHS or Beta cassette or comparable magnetic storage device in the format(s) identified as being leased to Lessee in the Deal Terms which is designed to be used for storing a Motion Picture Copy on a permanent basis and is used in conjunction with a reproduction apparatus to cause a Motion Picture to be visible on the screen of a television receiver. A Videocassette does not include any type of Video Disc.

"Video Disc" means any laser or capacitance disc or comparable optical or mechanical storage device in the format(s) identified as being leased to Lessee in the Deal Terms which is designed to be used for storing a Motion Picture Copy on a permanent basis and is used in conjunction with a reproduction apparatus to cause a Motion Picture to be visible on the screen of a television receiver. A Video Disc does not include any type of Videocassette.

"Videogram" means any type of Videocassette or Video Disc, but only to the extent the specific type of electronic storage device and its format is identified as being leased to Lessee in the Deal Terms.

2.    DELIVERY OF PICTURE:

a.    Delivery of Initial Materials:

Within sixty(60) days of Lessor's Notice of Delivery, Lessee shall notify Lessor of the number of prints, available advertising and promotional materials and accessories, trailers and other available Initial Materials relating to the Picture which it requires, all of which are subject to Lessor's Approval. Lessor shall then send Lessee a pro forma invoice setting forth the cost "Freight On Board" for delivery of the approved Initial Materials. Lessee shall immediately pay for such Initial Materials in accordance with the instructions specified in the Deal Terms, and Lessor shall then deliver such Initial Materials to Lessee as specified below. In any case, Lessee must take delivery of all approved Initial Materials within sixty (60) days of Lessor's Notice of Delivery.

b.    Delivery of Physical Materials:

Where possible, and unless otherwise specified in the Deal Terms or mutually agreed between the Parties, all Physical Materials shall be delivered by courier or airfreight. Lessor shall effect delivery of the Physical Materials by one of the methods listed in the Deal Terms, as selected by Lessor for each item, as follows:

i.    Physical Delivery: Where "Physical Delivery" is indicated, Lessor shall deliver to the delivery location specified by Lessee the Physical Materials in the manner listed in the Deal Terms.

ii.    Print Order Authorization: Where "Print Order Authorization" is indicated, Lessor shall send instructions to the laboratory by facsimile with a copy to Lessee, authorizing the laboratory to fill Lessee's print order(s) upon the laboratory's receipt of Lessee's payment for the materials ordered.

iii.    Laboratory Access: Where "Laboratory Access" is indicated, Lessor shall provide Lessee with free laboratory access to those Physical Materials specified in the Deal Terms for purposes of manufacturing necessary exploitation materials. Such access will be pursuant to the terms of any Laboratory Access Letter attached as a schedule to the Deal Terms or, if no such Laboratory Access Letter is attached hereto, by a Laboratory Access Letter that is in a format conventionally used by Lessor. The applicable Physical Materials will be held in a recognized laboratory or facility in Lessor's name and be subject to the requirements of the Laboratory Access Letter. Lessee shall order prints and other exploitation materials for the Picture to be manufactured from such Physical Materials at Lessee's sole expense.

iv.    Loan of Materials: Where "Loan Of Materials" or "On Loan" is indicated, Lessor shall deliver on loan, to the delivery location specified by Lessee, the applicable Physical

Materials listed in the Deal Terms. The Physical Materials so loaned to Lessee shall be held in a laboratory or facility subject to Lessor's reasonable approval, and Lessee shall return the same to Lessor within the time specified in the Deal Terms, or in the absence of any such provision in the Deal Terms, within a reasonable time designated by Lessor.

     v.        Satellite Delivery: Where "Satellite Delivery" is indicated, Lessor may deliver the Physical Materials to Lessee by satellite transmission commensurate with available materials and Lessee's equipment. Lessor is responsible for all "uplinking" transmission costs, and Lessee is responsible for arranging to receive the satellite reception and for all "downlinking" reception costs. Lessee's failure to make suitable "downlinking" receiving arrangements, or failure to receive any Picture due to technical "downlink" or reception failure will not affect Lessee's obligations under this Agreement. If Lessee experiences a technical failure of transmission or reception, Lessor, upon receipt of timely Notice, shall attempt, at Lessee's sole cost, to assist Lessee to receive a retransmission.

    c.     Evaluation of Physical Materials:

        Each item comprising the Physical Materials are considered technically satisfactory for the manufacture of first-class preprint and exploitation materials if Lessee does not give Lessor notice of any defects in such materials within twenty (20) days after Lessor's delivery of said Physical Materials which specifies the exact nature of the defects and where they occur and which is accompanied by applicable laboratory reports confirming such defects. If Lessee so notifies Lessor, then Lessee shall, if Lessor elects, immediately return to Lessor any Physical Materials which Lessee claims are defective. If, upon Lessor's independent review, the Physical Materials are found to be defective, then Lessor shall: (i) if requested by Lessee, provide copies of applicable laboratory reports, (ii) correct any defects or deliver new Physical Materials at Lessor's cost; and (iii) reimburse Lessee for the cost of returning such defective Physical Materials to Lessor.

    d.     Delivery of Advertising and Promotional Materials:

        Lessor shall also provide, at Lessee's request and expense, available stills, advertising materials and other initial Advertising and Promotional Materials, and, if requested and agreed, Additional Advertising and Promotional Materials, as specified in the Deal Terms. If Lessee does not use said Advertising and Promotional Materials, then Lessee shall obtain Lessor's prior Approval before using any other advertising or promotional material not provided by Lessor, such Approval not to be unreasonably withheld or delayed but subject always to any Third Party Approvals.

    e.     Holding of Materials:

        Title to all Materials remains with Lessor, subject to the rights of Lessee hereunder. Except only for purposes of exploiting the Leased Rights in the Territory or as otherwise expressly provided herein, Lessee shall not make or permit others to make any reproductions of the Picture or Materials relating thereto or to permit any such reproductions or Materials to be removed from the Territory without Lessor's Approval, such Approval not to be unreasonably withheld or delayed. Lessee shall exercise due care in safe-guarding all Materials, will assume all risk for theft or damage while they are in Lessee's possession and shall maintain appropriate insurance to cover their destruction or loss. If requested by Lessor, Lessee shall supply to Lessor insurance certificate(s) evidencing such insurance.

    f.     Materials Payment Instructions:

        Unless otherwise stated in the Deal Terms, Lessee shall pay for the cost of the Materials that are delivered by Lessor, such amounts to be invoiced by Lessor at Lessor's cost for such Materials. All costs arising from delivery of the Physical Materials and their return to Lessor (including shipping charges, shipping insurance, import fees, duties, brokerage fees, storage charges and related charges) are Lessee's sole responsibility.

    g.     Lessee Created Materials:

        Lessor, or any third parties authorized by Lessor, may at any time access, and Lessee shall ensure that such access is unimpeded and free, to all alternate language tracks, dubbed

10

versions, subtitling materials, masters, advertising and promotional materials, artwork, and all other Materials created by Lessee pursuant to this Agreement; provided that Lessor shall pay for any license fees that may be legally required to be paid to the creator(s) of such materials for the Exploitation of such materials outside the Territory. Within twenty-one (21) days of completion of any dubbed or subtitled versions of the Picture, Lessee shall promptly notify Lessor of each person responsible for preparing any dubbed or subtitled tracks and of each laboratory or facility where such dubbed or subtitled tracks are located; and, upon Lessor's request, Lessee shall provide Lessor with immediate unrestricted free access to such versions and tracks and subtitling materials by means of laboratory access letter(s) mutually acceptable to Lessee and Lessor.  To the extant possible, Lessee hereby grants a non-exclusive free license (subject to Lessor's payment of any applicable license fees as aforesaid or any rights payments or any other payments necessary for the Exploitation of such materials outside of the Territory) to Lessor to Exploit all Materials worldwide in perpetuity without restriction.

      h.     Return of Materials:

      Upon termination of this Agreement for each Picture, Lessee shall at Lessor's election either: (i) return all Materials to Lessor at Lessor's expense; or (ii) destroy all Materials and provide Lessor with a customary certificate of destruction.

I.      Outside Delivery Dates:

In the event that Lessor shall not be able to deliver the Initial Physical Materials for the Picture by the latest date specified in the Deal Terms, if any, ("Outside Delivery Date") Lessor shall notify Lessee not later than thirty (30) days prior to such Outside Delivery Date specifying a new delivery date and the Outside Delivery Date shall automatically extend to the date contained in such Notice; provided, that the Outside Delivery Date shall not be extended for more than the total period of all event(s) of Force Majeure, as provided in paragraph 8.6, or six (6) months from the original Outside Delivery Date, whichever is the later (the "Extended Outside Delivery Date"). If Lessor fails to deliver the Picture, or notify Lessee that the Picture is available for delivery, by the Extended Outside Delivery Date, then Lessee may give written Notice to Lessor demanding delivery of the Picture. If Lessor fails or is unable to deliver the initial Physical Materials for the Picture within thirty (30) days after receiving such written Notice, either Party has the right within the next thirty (30) days to rescind this Agreement by written Notice to the other Party which is the sole remedy for Lessor's failure to make the Picture available for delivery. In the event of such rescission, neither Party has any further obligation to the other, except that Lessor shall return any Advance actually paid by Lessee plus interest on such amount calculated at LIBOR + 2% for the period of from the original Outside Delivery Date until the Extended Outside Delivery Date and received by Lessor in connection with this Agreement, net of withholding taxes and bank fees, and Lessee shall immediately return any and all Materials relating to the Picture. If neither Party exercises such right of rescission, this Agreement shall remain in full force and effect, and Lessor's later delivery is deemed excused.

3.      EXPLOITATION OF RIGHTS:

a.      Leased Rights and Reserved Rights:

i.      Grant of Lease:  Subject to the terms of this Agreement, and any conditions precedent set forth in the Deal Terms, Lessor leases to Lessee the Leased Rights in the Picture. The Leased Rights are leased to Lessee on an exclusive basis except as otherwise provided for in this Agreement.  In exercising any Leased Right, Lessee may only exploit the Picture: (i) in the Language(s) in a dubbed or subtitled version as specified in the Deal Terms; (ii) by means of the authorized Video type(s) and format(s) specified in the Deal Terms; and, (iii) for the authorized Run(s) or playdate(s) specified in the Deal Terms.  All Rights not expressly leased to Lessee are Reserved Rights (including the right to exploit the Picture using other Video type(s) and format(s) not authorized hereunder and the right to exploit the Picture in other than the Languages), even if such Reserved Rights are not expressly identified as being retained by Lessor in the Deal Terms.

ii.      Terminology:  The inclusion of provisions in this Agreement for any rights not specifically leased to Lessee in the Deal Terms is for ease of drafting only.  Their inclusion does not grant to Lessee explicitly or by implication any rights not specifically leased to Lessee in the Deal Terms.

iii.      Reservation:  Lessor reserves all the specific Reserved Rights listed in the Deal Terms and all other Rights not expressly leased to Lessee. Lessor may exploit such Rights as Lessor sees fit without restriction, except as otherwise expressly provided in this Agreement.

b.      Dubbing, Subtitling and Editing:

i.      Lessor's Requirements:  Lessor shall timely provide Lessee in writing with any dubbing, subtitling or editing requirements or restrictions applicable to the Picture or its trailers. Lessee shall comply with all these requirements in creating an authorized dubbed, subtitled or edited version of the Picture or its trailers.  Except as expressly provided in this Agreement, the Picture and its trailers as supplied by Lessor must be exhibited in their original continuity, without alteration, interpolation, cut or elimination.

ii.      Lessee's Rights:  Subject to Lessor's requirements and the provisions of this Agreement, Lessee will have the non-exclusive right at its sole expense and after consultation with Lessor to: (i) dub or subtitle the Picture but only in the Language(s) and only if expressly so authorized in the Deal Terms; and (ii) edit the Picture but only if necessary to meet censorship requirements or broadcast standards or to abridge and segment the Picture for television broadcast or broadcaster's time requirements and then only in accordance with paragraph 3.8 (if applicable)

Standard Terms
Icon - Multiple Rights Lease
V1 April 28, 2008
ref: 05-035 - "Tale of Life"

and any restrictions or requirements contained in the Deal Terms. Notwithstanding the foregoing, and subject to paid ad obligations, Lessee will have the right at its sole expense to interrupt the Picture with advertising spots for television broadcast as so prescribed by a television station.

iii.        Limitations: In exercising the Leased Rights Lessee may not: (i) alter or delete any credit, logo, copyright notice or trademark notice appearing on the Picture; (ii) include any advertisements or other material in the Picture, without Lessor's Approval, other than the name, credit trademark or logo of Lessee as described in paragraph 3.6(b) or an approved anti-piracy warning as provided in paragraph 3.17 or commercials for the Picture's exploitation on Free TV as provided in paragraph 3.16(a).

iv.        Liability: Lessee shall indemnify and hold Lessor and its Affiliates, employees, shareholders, officers, directors, and agents harmless from and against any loss, expense or damage arising out of Lessee's failure to comply with the provisions of this paragraph 3.2.

c.        Territory:

i.        General: The Territory means only those countries or territories listed in the Deal Terms as their political borders exist on the date of this Agreement.

ii.        Exclusion: The Territory excludes, unless otherwise specified in the Deal Terms: (i) foreign countries' embassies, military, and governmental installations, oil rigs and marine installations, airlines-in-flight and ships-at-sea located within the Territory; and (ii) contiguous territories, colonies, ex-colonies and protectorates of any country within the Territory.

iii.        Inclusion: In exploiting any Non-Theatrical and Commercial Video Rights, the Territory shall include the countries' military and governmental installations, oil rigs and marine installations and embassies wherever located, but only to the extent that they may be exploited in accordance with such Leased Rights.

iv.        Broadcast Overspill: Lessor acknowledges that broadcasts of the Picture (whether Terrestrial or Satellite Broadcasts or other forms of broadcast) which originate within the Territory may be capable of reception outside the Territory, and that such reception outside the Territory shall not be deemed a breach of this Agreement by Lessee provided that such broadcasts are: (i) intended for primary reception within the Territory, (ii) of the authorized language version of the Picture, and (iii) capable of reception by no more than an insubstantial number of households outside the Territory. Lessee acknowledges that broadcasts of the Picture (whether Terrestrial or Satellite Broadcasts or other forms of broadcast) which originate outside the Territory may be capable of reception within the Territory, and that such reception within the Territory shall not be deemed a breach of this Agreement by Lessor provided that such broadcasts are intended for primary reception outside the Territory are capable of reception by no more than an insubstantial number of households within the Territory.

d.        Exploitation Periods:

i.        Term: The Term starts and ends on the dates set forth in the Deal Terms except for: (i) any early termination pursuant to paragraph 7 of these Standard Terms; (ii) any early termination of Television Rights upon the broadcast of the last Run authorized in the Deal Terms for such Right(s) pursuant to paragraph 3.16(g) of these Standard Terms; and (iii) solely for the purposes of audit, the additional period as set forth in paragraph 4.7 of these Standard Terms. Lessee shall not exploit or authorize the exploitation of any Leased Right after the end of the Term.

ii.        Lessee Holdbacks: If the Deal Terms indicate a Holdback or Holdback Period on any Right leased to Lessee, then during the applicable Holdback Period, Lessee may not exercise or authorize the exercise in the Territory of such Leased Right. However, Lessee may enter into agreements at any time authorizing the exercise of such Leased Right after the expiration of the applicable Holdback Period.

iii.        Lessor Holdbacks: If the Deal Terms indicate a Holdback or Holdback Period on any of Lessor's Reserved Rights, then during such applicable Holdback Period, Lessor may not exercise or authorize the exercise in the Territory of such Reserved Right. However, Lessor may

13

enter into agreements at any time authorizing the exercise of each such Reserved Right after the expiration of the applicable Holdback Period.

iv.        First Theatrical Release: The "First Theatrical Release" shall mean the earlier of: (i) the date on which the Picture is first exhibited in theaters within the Territory to the paying public, including screenings to qualify for awards presentations; (ii) the earliest date on which Lessee must cause release of the Picture to occur as set forth in the Deal Terms; or (iii) the time period after Lessor's Notice of Delivery, if any, that is specified in the Deal Terms.

v.        First Video Release: The "First Video Release" shall mean the earlier of: (i) the date on which Videograms embodying the Picture are first sold or rented to members of the paying public within the Territory for Home Video use; (ii) the expiration of any Holdback Period relating to the Home Video Rights specified in the Deal Terms; or, (iii) if no Holdback Period is specified, six (6) months after the First Theatrical Release of the Picture.

e.        Reasonable Efforts:

Lessee accepts the grant of all Rights and agrees to use all reasonable efforts consistent with sound business judgement to Exploit the Rights under the terms hereof and to endeavor to obtain the maximum possible Gross Receipts and Net Receipts from the exercise of the Rights in the Territory during the Term.

f.        Advertising and Billing:

i.        Lessor's Requirements: Lessor shall timely provide Lessee with a list of all required screen credits (if not already contained in the Picture), paid advertising, publicity and promotional requirements, and Videogram packaging requirements (if needed). Lessee shall comply with these requirements at all times after Lessee's receipt thereof. If requested by Lessor, Lessee shall submit all Advertising Materials to be used by Lessee in the exercise of any Leased Rights for Approval by Lessor, such Approval not to be unreasonably withheld or delayed, but subject always to any Third Party Approvals. Lessor has the right from time to time by written Notice to Lessee to change the title or titles of the Picture as Lessor shall elect in its sole discretion, after which Lessee shall only use in the exercise of the Rights only the applicable changed title or titles designated by Lessor unless otherwise agreed by Lessor in writing. Upon receipt by Lessee of such Notice, Lessee shall ensure that any required Letter of Credit under the Agreement shall be automatically amended to reflect the changed title of the Picture.

ii.        Lessee's Rights: Subject to Lessor's requirements and the provisions of this Agreement, Lessee will have the exclusive right in the Territory, except as relates to any Reserved Rights in connection with the Picture, at its sole expense to: (i) advertise, publicize and promote the Picture; (ii) include in all such advertising, promotion or publicity the name, voice or likeness of any person who has rendered services on the Picture but not as an endorsement for any product or service other than the Picture, subject to Lessor's Approval; and (iii) include in the beginning or end of the Picture (including trailers, TV spots or other publicity materials) the credit or logo of Lessee. Notwithstanding the foregoing, Lessor may advertise the Picture in the Territory subject to Lessee's Approval, not to be unreasonably withheld.

iii.        Limitations: In exploiting the Leased Rights, Lessee may not; (i) change the title of the Picture without Approval by Lessor; (ii) alter or delete the relative size, order and prominence of type of any credit, logo, copyright notice or trademark notice appearing on the Picture; (iii) include any advertisements or other material in the Picture without Approval by Lessor other than Lessee's logo as described in paragraph 3.6(b) or an approved anti-piracy warning as described in paragraph 3.17 or commercials for the Picture's exploitation on Free TV as provided in paragraph 3.16(e).

iv.        Inadvertent Failure: Lessee shall, on a prospective basis, cure any failure to comply with the provisions of paragraph 3.6(c).. However, an inadvertent failure by Lessee to comply with any of the requirements of paragraph 3.6(c) will not be deemed a breach of this Agreement.

g.        Endorsements:

14

Standard Terms
tcm - Multiple Rights Lease
V: April 28, 2009
ref: 96-000 - "Tree of Life"

As part of an authorized publicity tie-in promotion, Lessee shall not, without Lessor's Approval, make or permit to be made, in any advertising, publicity or otherwise, any statement, directly or indirectly, expressly or by implication, which:

- May be understood as constituting an endorsement by (a) Lessor or any Affiliate of Lessor, (b) any Person employed or engaged by Lessor or any Affiliate of Lessor, or (c) any other Person with whom Lessor has any agreement, express or implied with respect to the Picture, of any article, product or service other than the Picture.
- Associates or relates the Picture and any Advertising Materials, titles, characters, story or other aspects of the Picture to the sale or exploitation of any product, article or service other than the Picture.
- Indicates that any of the Persons referred to in this paragraph are connected or associated with, or employed or engaged by, Lessee.

Lessee shall indemnify and hold Lessor harmless from and against any loss, expense or damage arising out of Lessee's failure to comply with the provisions of this paragraph 3.7.

h.    Censorship:

Promptly upon delivery to Lessee of the Initial Physical Materials, Lessee shall apply for censorship licensing and approval of the Picture to all required and competent agencies and organizations in each country within the Territory. If any editing changes are required in the Picture by reason of any censorship objections, Lessee shall promptly notify Lessor in writing, identifying the specific changes required and must request Approval by Lessor of all changes made by Lessee. Subject to the foregoing and any rights held by the Picture's director or other third parties, and subject to Lessor's Approval, Lessee may make such changes at Lessee's expense, but only to the extent required to meet the specific censorship objections. Notwithstanding the previous sentence, Lessor has the right to designate a representative to make such changes or to supervise Lessee in the making of such changes. Lessee understands, acknowledges and agrees that Lessor makes no warranties, assurances or representations concerning censorship. Lessor is not liable for any damages to Lessee if censorship approval or licensing cannot be secured and Lessor is not obligated to refund any sums paid by Lessee. Lessee shall use its best efforts to secure censorship licensing and approval, including promptly applying for rehearings or appeals and undertaking all other available remedies in the event of any refusal of license or approval.

i.    Affiliates:

All agreements between or among Lessee and its Affiliates with respect to the Picture, (including advertising and publicity thereof and the duplication of Videograms) shall be on an arms-length basis on terms: (i) customary in the Territory, (ii) which are as favorable to Lessor as the terms normally obtained by major Motion Picture distributors in the Territory for other Motion Pictures of comparable commercial quality, and (iii) no less favorable to Lessor than comparable agreements between Lessee or its Affiliates and unrelated Persons for other Motion Pictures.

j.    Copyright Protection:

Lessee shall take all necessary or appropriate actions in the name of Lessor to secure protection for the Picture and all materials relating thereto used by Lessee in the exercise of the Rights under the copyright or other similar laws under which Motion Pictures, other intellectual property, trademarks, ideas, characters, titles and names are accorded legal protection in the Territory ("Copyright and Similar Laws") and to renew, extend and maintain protection for the Picture and all materials relating thereto under Copyright and Similar Laws of the Territory throughout the Term. Lessee shall promptly notify Lessor in writing of any infringement ("Infringement") in the Territory of any Rights in and to the Picture under the Copyright and Similar Laws of the Territory, whether by any unauthorized or illegal exploitation of any Rights or by a failure to comply with the terms of any agreement under which any Rights have been granted, of which Lessee is aware. Lessee shall not bring or institute any legal action or proceeding with respect to any Infringement ("Action") without consulting with Lessor and only after Lessor and Lessee have agreed on their respective liability for the costs and expenses of the applicable Action ("Litigation Costs") and their respective shares of any such recovery in that Action ("Recovery"). Should Lessor and Lessee fail to agree in writing concerning the Litigation Costs and Recovery

15

within fifteen (15) business days after Lessor has approved commencement of any Action, then Lessor has the sole right to institute or bring the applicable Action and may retain all Recoveries pursuant thereto.  Otherwise, all Litigation Costs are repaid to Lessor and Lessee as their interests may appear solely from any Recovery in the applicable Action; and any Recovery shall not be deemed Gross Receipts but are divided as agreed in writing between Lessor and Lessee.

      k.    Reversion:

          The grant of all Rights and Incidental Rights shall terminate and immediately revert to Lessor upon expiration or termination of the Term, free and clear of any claim, lien, encumbrance or charge in favor of Lessee, or any Person deriving rights through Lessee. Lessee shall not at any time enter into any agreement with any Person for the exercise of any Rights or Incidental Rights for periods which continue after the expiration of the Term. Lessor may at any time enter into any agreement for the exercise of any Rights or Incidental Rights for periods that are after expiration or termination of the Term.

      l.    Music and Performance Royalties:

      i.    Synchronization Royalties: Lessor is solely responsible for acquiring all rights necessary to synchronize the music contained in the Picture on all copies exploited by Lessee throughout the Territory for the Term.  Lessor is solely responsible for paying all royalties or charges incurred in obtaining and maintaining such rights for the Term and shall indemnify and hold Lessee harmless from any payments in this regard.

      ii.    Performance Royalties:  Lessor represents and warrants to Lessee that the non-dramatic ("small") performing rights in each musical composition contained in the Picture are either: (i) in the public domain in the Territory; (ii) controlled by Lessor to the degree sufficient to allow Lessee to exploit the Leased Rights for no further payments by Lessee whatsoever; or (iii) available by license from local music performing rights society(ies) in the Territory including those societies affiliated with the International Confederation of Authors and Composers Societies (CISAC) as of the date hereof such as American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), SESAC, Inc. (SESAC) or SACEM.  With regard to the music in category (iii) only, Lessee is solely responsible for obtaining licenses to exploit such performance rights from the local music performing rights society(ies) (in which Lessor shall cooperate in good faith) and for paying all amounts arising therefrom.

      iii.    Mechanical Royalties:  Lessor shall buy-out all customary mechanical royalties for the Territory as part of its worldwide synchronization license(s).  Lessor will be solely responsible for paying all royalties or charges necessary to obtain and control such mechanical rights for the Term, and Lessor will hold Lessee harmless from any payments in this regard, provided that if levy, charge, or royalty that is not customarily bought-out worldwide as part of a customary synchronization license is assessed in the Territory, or if a mechanical or author's rights society in the Territory refuses to honor the authorization obtained by Lessor in the country of origin of the Picture, then Lessee will be solely responsible for such royalties or charges.

      iv.    Publishing Royalties:  As between Lessor and Lessee, Lessor is solely entitled to collect and retain the publisher's share of any music royalties arising from Lessee's exploitation of the Picture.

      v.    Other Royalties:  The Parties acknowledge that additional amounts (which are not payable currently) may become payable to collection societies or other entities during the Term from the Exploitation of the Leased Rights, including, without limitation, amounts that may be payable under directives and regulations issued by the governing body of the European Economic Community for so called "rental" and "lending" rights. Lessee is solely liable for any such amounts that become payable from the Exploitation of the Leased Rights.  The Parties acknowledge that a mechanical, performing or author's right society in the Territory may attempt to collect royalties attributable to the manufacture, sale or rental of Videograms or materials embodying the Picture. Such royalties may be called "mechanical", "performance", or "synchronization" royalties, or some similar designation.  To the extent that such royalties are territory-specific or to the extent that Lessor is not able, after using its best efforts, to buy-out such royalties as part of a worldwide license(s), then Lessee is solely responsible for such royalties or charges.  Lessor shall supply Lessee with all information necessary for Lessee to effect payment of such royalties, including the

16

Standard Terms
Ippn - Multiple Rights Lease
V: April 28, 2005
ref: 05-030 - "Tree of Life"

local rights society(ies), the royalties owed by Lessee and the bank account(s) to which Lessee shall direct payments. All payments made by Lessee pursuant to this paragraph 3.12(e) are recoupable Distribution Expenses for the applicable Right.

    m.    Theatrical Exploitation Obligations:

        i.    General: In exploiting any Theatrical Rights leased to Lessee, Lessee shall comply with the provisions of this paragraph 3.13 in addition to any other exploitation requirements set forth in this Agreement.

        ii.    Consultation: Lessee shall Consult with Lessor in a timely manner regarding all significant aspects of the distribution of the Picture in the Territory, including the initial release campaign, distribution policy, minimum and maximum print orders, print duplication prices, the total amount and specific items of the advertising and publicity budget, the advertising and marketing campaign, total Theatrical Distribution Expenses, the release dates, the release pattern, the theaters in key cities, marketing strategy, short subject allocations, double feature allocations and any modifications or amendments to them.

        iii.    Release Obligations: In releasing the Picture, Lessee shall:

- Place the Picture in general Theatrical release throughout the Territory in no less than the number of cities and theaters determined pursuant solely to the reasonable business judgment of Lessee;
- Expend monies pursuant to the advertising budget and otherwise conform with the advertising and marketing campaign for the Picture;
- Give Lessor reasonable advance notice of all premieres of the Picture in the Territory;
- Not discriminate against the Picture or use the Picture to secure more advantageous terms for any other picture, product or service;
- Not enter the Picture in any festivals, charitable screenings or the like or screen the Picture for entry into any festivals without Lessor's prior Approval.

        iv.    Release Notices: Lessee shall submit to Lessor in writing, for each country within the Territory by ten (10) days prior to the Picture's First Theatrical Release in that country details of all significant aspects of the Theatrical release in said country including: (i) the publicity budget detailed between media advertising and other publicity costs; (ii) the print cost budget detailed between print duplication costs, costs of authorized internegatives, dubbing, subtitling and other print costs; (iii) the number of 35mm and 70mm prints being duplicated; (iv) the print laboratory being used for any print duplications and the net price per meter or foot contracted for such print duplications after discounts and rebates; (v) the cinemas in which the Picture will be released in the key cities within the Territory and the release date in each such key city; (vi) the film rental terms contracted with exhibitors in the key cities; (vii) confirmation of any sublessee(s) being used; (viii) details of any print or other subsidies being received; (ix) confirmation of whether the Picture will be exhibited with Shorts or as part of double feature engagements and the basis upon which income from double features will be allocated; and (x) details of any publicity tie-ins and any other matters which may be relevant to the distribution of the Picture. In addition, Lessee shall submit to Lessor in writing any additional information reasonably requested by Lessor and any amendments made to the print and publicity budget and other items outlined in (i) to (x) above. In the event that the Picture qualifies for any print or other subsidies after the First Theatrical Release has occurred then Lessee shall give Lessor Notice of such subsidies. Lessee shall also submit to Lessor reports showing weekly and cumulative box office results earned by the Picture in the Territory for the first six (6) weeks of the Picture's Theatrical release, or for the duration that the Picture is exhibited in the key cities within the Territory, whichever is the longer.

        v.    Exhibition Obligations: In arranging for the exhibition of the Picture, Lessee shall:

- ensure that all exhibition agreements for the Picture are made separate and independent from exhibition agreements for any other Motion Picture, product or service;

17

Standard Terms
loab - Malaria Rights Lease
Vi April 28, 2006
mll( 05-070 - "Tree of Life"

at Lessor's request, after consultation with Lessee, audit any exhibition engagements for the Picture, consistent with the practices of first-class Motion Picture distributors in the Territory, for purposes of determining the accuracy of box office results reported by exhibitors;

do all things reasonably necessary to maximize collections from exhibitors as quickly as possible and shall secure from exhibitors the maximum film rental terms that are consistent with those normally liquidated by first class Motion Picture distributors in the Territory, or country within the Territory, for Motion Pictures of comparable commercial quality. Lessee shall not require exhibitors to pay for any costs that are not normally paid by exhibitors in the Territory in exchange for reduced film rental terms.

not authorize or allow the Picture during its first run to be exhibited on a flat license or 4-wall basis, or as part of if a multiple feature engagement, unless all relevant terms of such proposed exhibition, including the proposed allocation to the Picture of box office receipts, permitted advertising costs, license fees and film rentals have met with Lessor's Approval. Notwithstanding the above, all allocations of film rentals from double or multiple feature engagements between the Picture and other Motion Pictures shall be reasonable and shall reflect the relative commercial success and age of each film.

not authorize or allow the Picture to be exhibited with any other short feature or short subject ("Shorts"), provided that, if required to do so by law, then Lessee shall only allocate to Shorts for each related exhibition run the lesser of: (a) one percent (1%) of the total film rentals for the entire exhibition run at that cinema; or (b) the equivalent of five hundred Dollars ($500) in the currency of the Territory. Notwithstanding the above, the total film rentals allocated to all Shorts that are exhibited with the Picture throughout the Territory shall not exceed five thousand Dollars ($5,000).

vi.       Controlled Theaters:  A "Controlled Theater" is one in which Lessee, its Affiliates or any officer, director, partner, owner or shareholder owning more than 10% of the outstanding evidence of equity ownership of any of them, has any interest, direct or indirect, in the ownership or operation of such theater. Lessee shall not license any Picture to a Controlled Theater except on terms and conditions consistent with arm's-length transactions between such Controlled Theater and unaffiliated major Motion Picture distributors in the Territory for Motion Pictures of comparable commercial quality. If requested by Lessor, Lessee shall promptly provide Lessor with copies, certified to be accurate, of all agreements with controlled theaters for exhibition of the Picture.

vii.      Export Of Materials:  Lessee shall not sell or export 16mm, 35mm and 70mm gauge prints and trailers or other Materials to countries outside of the Territory without Lessor's Approval. Prices charged by Lessee to third parties for such authorized exported Materials shall be reasonable, shall not include service fees, overhead or allocations of dubbing costs or other Distribution Expenses and are subject to Approval by Lessor.

viii.     Re-Release/Sequels and Remakes:  Intentionally deleted.

n.      Non-Theatrical, Commercial Video, Public Video and Ancillary Exploitation Obligations:

i.        General:  In exploiting any Non-Theatrical, Commercial Video, Public Video or Ancillary Rights leased to Lessee, Lessee shall: (i) not authorize the exploitation of each such Leased Right before the end of any Holdback Period specified in the Deal Terms for such Right; and, (ii) not discriminate against the Picture or use the Picture to secure more advantageous terms for any other Motion Picture, product or service.

ii.       Consultation: Lessee shall consult with Lessor on a timely basis regarding all material terms of each agreement for exploitation of the Non-Theatrical or Ancillary Rights into

18

Standard Terms
loan - Multiple Rights Lease
V1 April 30, 2005
ref: 05-030 - "Tree of Life"

which Lessee desires to enter.  If requested by Lessor, Lessee shall immediately submit copies of all such agreements to Lessor.

       o.      Home Video Exploitation Obligations:

          i.      General:  In exploiting any Home Video Rights leased to Lessee, Lessee shall comply with the provisions of this paragraph 3.15 in addition to any other exploitation requirements set forth in this Agreement.

          ii.      Limit On Means and Media of Exploitation:  Lessee shall only exploit Videograms of the Picture using the types and formats set forth in the Deal Terms.

          iii.      Limits on Early Exploitation:  Lessee shall not begin exploiting Home Video Rights in the Picture until the end of the applicable Holdback Period specified in the Deal Terms, if any. Lessee shall not authorize or begin advertising the forthcoming availability of Videograms of the Picture to the public until two (2) months before the end of the applicable Holdback Period.

          iv.      Best Efforts/Quality:  Lessee shall use best efforts and skill in the manufacture, distribution and exploitation of the Videograms and shall ensure that the Videograms manufactured by Lessee meet quality standards at least comparable to other Videograms commercially available through legitimate outlets in the Territory for comparable Motion Pictures.

          v.      Catalogue Availability:  Unless otherwise requested by Lessor, Lessee shall, from the end of the applicable Holdback Period until the end of the Term, make Videograms of the Picture available in the Territory through its catalogue, and shall not allow Videograms of the Picture to leave normal channels of distribution for a commercially unreasonable period of time, without Approval by Lessor.

          vi.      Consultation On Ad Campaign:  Lessee shall Consult with Lessor on an ongoing basis regarding the advertising and marketing materials used for the exploitation of the Home Video Rights in the Picture.  If requested by Lessor, Lessee shall promptly submit all proposed advertising and artwork to Lessor for Lessor's information and any Third Party Approvals.

          vii.      Review Of Packaging:  If requested by Lessor, Lessee shall provide Lessor for review by Lessor and any Third Party Approvals, one (1) prototype copy of each authorized format of the Videogram and its packaging for each Picture promptly after their manufacture and before their sale or disposition.  If requested by Lessor, Lessee shall provide Lessor with a reasonable number (not exceeding five (5)) free copies of each authorized format of Videogram and its packaging, subject only to applicable duties.

          viii.      Consultation/Approval Regarding Video Release:

          (1)      Upon Lessor's request, Lessee shall provide to Lessor, for Lessor's information, details of all significant aspects of the Home Video Rental and Home Video Sell Through releases including, to the extent such information is available to Lessee in accordance with industry practice: (i) the advertising and marketing materials used for the exploitation of the Home Video Rights in the Picture; (ii) for each authorized format of Videogram for each Picture promptly after their manufacture and before their sale or disposition the Videogram and the packaging; (iii) the release dates; (iv) the list of wholesale and suggested retail selling prices; (v) the discounts and rebates offered; (vi) any leasing or rental arrangements; and (vii) the estimated Gross Receipts, unit sales and the number of Videograms being duplicated. If Lessee sells or otherwise packages the Picture with other Motion Pictures, such transactions must be at arms length and on terms commensurate with other Motion Pictures of similar commercial quality.

          (2)      If the Deal Terms provide for Home Video Distribution Expenses, or a portion thereof, to be deducted from Gross Receipts, or from Lessor's share of Gross Receipts, then: (i) Lessee shall Consult with Lessor regarding such Home Video Distribution Expenses; (ii) Lessee shall include in the pre-release Notice described above the publicity budget and the Videogram cost budget (detailed between the costs of blank cassettes or Video Discs, duplication costs, cases and inlays and other costs); and (iii) recharged Home Video Distribution Expenses shall not exceed the amount pre-approved by Lessor.

19

ix.        Limits on Included Material:  With exception of trailers of other Motion Pictures (but not pornographic Motion Pictures), Lessee shall not authorize or allow any advertising, or other material to be included on any Videogram embodying the Picture without Lessor's Approval.

x.         Minimum Retail Price:  Where a Minimum Retail Price is contained in the Deal Terms, Lessee, to the extent permitted hereunder by applicable laws, shall not exploit or authorize the sale of Videograms to the consumer at a price less than such Minimum Retail Price. In any case, for purposes of calculating Gross Receipts and all amounts due Lessor, all Videograms are deemed sold at retail for not less than any Minimum Retail Price set forth in the Deal Terms.

xi.        Minimum Wholesale Price:  Where a Minimum Wholesale Price is contained in the Deal Terms, Lessee, shall not exploit or authorize the sale of Videograms at a price less than such Minimum Wholesale Price. In any case, for purposes of calculating Gross Receipts and all amounts due Lessor, all Videograms are deemed sold at the greater of either: (i) their actual wholesale selling price; or (ii) the Minimum Wholesale Price set forth in the Deal Terms.

xii.       Free Goods:  Lessee shall not dispose of more than five percent (5%) of each type of Videograms units produced for the Picture as promotional, discount, or free samples ("Free Goods") without Lessor's Approval. Unless authorized by Lessor, any additional Free Goods disposed of beyond such five percent (5%) level will be considered as if sold at a price not less than the average net wholesale price per Videogram liquidated by Lessee or its Affiliates and subdistributors during the first three (3) months of the Home Video Rental release (or if there is no Home Video Rental release, during the first three (3) months of the Home Video Sell Through release), net of discounts and rebates, for purposes of computing any such amounts due Lessor.

xiii.      Sell-off Period:  During the last six (6) months of the Term, Lessee shall not manufacture Videograms in excess of those reasonably anticipated to meet normal customer requirements during the remainder of the Term.  At the end of the Term , Lessee shall destroy all remaining Videograms and provide Lessor with a customary certificate of destruction. There is no so-called "sell-off" period and Lessee shall not be entitled to sell any remaining Videograms after expiration of the Term.

xiv.       Import/Export Restrictions:  Unless Approved by Lessor, Lessee shall not import or authorize importation of Videograms embodying the Picture into the Territory other than the Physical Materials provided by Lessor.  At no time may Lessee export or authorize exportation of Videograms embodying the Picture from the Territory. Lessee shall not knowingly sell Videograms to wholesalers, subdistributors or retailers who are in the business of reselling Videograms to countries outside of the Territory.  The foregoing are material terms of this Agreement and failure to comply with the above provisions is deemed a material breach of this Agreement.

p.     Television, Pay-Per-View and Video-On-Demand Exploitation Obligations:

i.         General:  In exploiting the any Television, Pay-Per-View and Video-On-Demand Rights leased to Lessee, Lessee shall abide by the following exploitation requirements in addition to any of the exploitation requirements in this Agreement.

ii.        Release Obligations:  In releasing the Picture on Television, Pay-Per-View and Video-On-Demand, Lessee shall:

Not authorize any telecasting or other exploitation of the Pay TV, Free TV, Pay-Per-View and Video-On-Demand Rights before the end of the Holdback Period specified in the Deal Terms with respect to each such Right, unless otherwise Approved by Lessor;
Not discriminate against the Picture or use the Picture to secure more advantageous terms for any other Motion Picture, product or service;
Obtain for the Picture prices and terms that are at least comparable to those prices and terms normally obtained by first class Motion Picture distributors for other Motion Pictures in the Territory of comparable commercial quality and for a similar number of Runs;
Notify Lessor in advance of the time and place of each of the expected first Pay TV, Free TV, Pay-Per-View and Video-On-Demand telecasts of the Picture in the Territory;

·20

- Not authorize the Picture to be telecast by any form of Pay TV or Free TV from or within the Territory for more than the number of authorized Run(s) as specified for each such Television Right in the Deal Terms;
- Not authorize the Picture to be telecast by any form of Pay TV, Free TV, Pay-Per-View and Video-On-Demand in a dubbed or subtitled version, unless specifically authorized in the Deal Terms, and, if authorized, only in the Language(s);
- Not authorize the Picture to be telecast by any form of Pay TV, Free TV, Pay-Per-View and Video-On-Demand by any means not leased to Lessee in the Deal Terms;
- Not authorize the Picture to be transmitted by any form of Pay TV, Pay-Per-View and Video-On-Demand from or within the Territory in any form other than an encoded or encrypted form; and
- Not authorize the Picture to be telecast by any form of Pay TV, Free TV, Pay-Per-View of Video-On-Demand transmission, whether or not encoded, from or within Territory which is intended for primary reception outside the Territory and which is capable of reception, whether or not by means of retransmission or decoding devices, by more than an insubstantial number of home television receivers outside the Territory, without Approval by Lessor.

In the Exploitation of Pay TV, Pay-Per-View, and Video-On-Demand, Lessee shall use an encoding system authorized in the Territory that provides sufficient protection to ensure decoding occurs only by authorized recipients in the Territory and Language. Furthermore, if the encoding system fails to encode, Lessee shall ensure that all transmissions or broadcasts are terminated and suspended until a secure encoding system has been reestablished.

iii.        "Run" Defined:  A "Run" means, with respect to all forms of Pay TV Rights and Free TV Rights leased to Lessee, one (1) telecast of the Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of each authorized broadcaster, cable system or satellite service within the Territory such that the Picture is not capable of reception on television receivers within the broadcast reception zone of each such broadcaster, cable system, or satellite more than once during such period. By way of illustration, if a broadcaster within the Territory is capable of simultaneously transmitting the Picture over the facilities of several interconnected local broadcast stations (i.e. over a "network"), then one (1) broadcast of the Picture in a twenty-four (24) hour period on such network would be one (1) "Run"; alternatively, if such local stations were not interconnected and the reception area of their signals did not overlap, then one (1) broadcast of the Picture in a twenty-four (24) hour period on each local station would constitute one (1) "Run" in such local broadcast area, even though the broadcasts occurred on different days in different local areas.

iv.        Usage Reports:  Upon Lessor's reasonable request and to the extent reasonably available, Lessee shall notify Lessor regarding the time and place of each telecast of the Picture since the last notice to Lessor.

v.        Commercials:  If Free TV Rights are leased to Lessee, then Lessee may insert and permit others to insert commercial announcements within the Picture at those points reasonably required for such purpose but solely with respect to such Free TV Exploitation. Lessee shall require each broadcaster to televise all credits, copyright notices, trademarks and other symbols of the Picture appearing on the materials furnished by Lessor, including but not limited to Lessor's logo.

vi.        Approval Obligations:  Lessor has the right of approval of Lessee's Pay TV, Free TV, Pay-Per-View, Video-On-Demand and On-Line sublicense agreement(s).  If Lessor disapproves a Pay TV, Free TV, Pay-Per-View, Video-On-Demand and/or On-Line license proposed by Lessee, then Lessor shall have two (2) weeks from receipt of Lessee's Notice containing the terms of such proposed license to negotiate in agreement with another party for such Rights. If Lessor is able to secure a more favorable deal than the license Lessee was proposing, then Lessee will have three (3) business days to match the terms of Lessor's proposed license (i.e. in which event Lessee shall include in Gross Receipts the amount of Lessor's proposed license on the date such sums would have been payable pursuant to Lessor's proposed license); otherwise Lessee shall

license such rights according to the terms of Lessor's proposed license.  For clarity, such license agreement shall be entered into between the Lessee and the TV broadcaster.

    vii.         Conclusion of Run(s):  The Term of this Agreement with respect to each Television Right leased to Lessee shall expire at the earlier of: (i) the end of the Term; or, (ii) the conclusion of the last authorized Run for such Television Right. By way of illustration, if Lessor has authorized four (4) Runs for the all Pay TV Rights, then the Term with respect to all Pay TV Rights will expire at the end of such fourth Run, regardless of whether the Term continues with respect to other Free TV Rights that are leased to Lessee. In no event will the Term be extended because Lessee failed to take all authorized Run(s) with respect to any Television Right during the Term.

    q.     Anti-Piracy Provisions:

    i.        Notice Requirements:  Lessee shall include in each copy of the Picture distributed under its authority the copyright notice and anti-piracy warning supplied by Lessor. A "copy" of a Picture includes: (i) authorized negatives, pre-print materials and release prints of the Picture; (ii) all masters, tapes, discs or Videograms embodying the Picture and their packaging; and (iii) all negative, masters, prints, cassettes, tapes or discs of the Picture delivered to telecasters.

    ii.       Copyright Notice:  Unless otherwise indicated by Lessor, the copyright notice on each copy of each Picture shall read exactly as follows:
                        Copyright [year date of first release] [Lessor's name].
                            All Rights Reserved

    iii.      Basic Anti-Piracy Warning:  The anti-piracy warning on each copy of each Picture shall read substantially as follows:

WARNING
THIS MOTION PICTURE IS PROTECTED BY LAW

Any unauthorized copying, hiring, lending, distribu-
tion, exporting, importing, dissemination, exhibition or public
performance is prohibited by law. Violators will be subject to
investigation by the FBI, Interpol and other police agencies
and to criminal prosecution, civil penalties, or both.

    iv.      Videogram Warning:  Videograms embodying the Picture and their packaging shall contain this additional warning:

Licensed only for use in
[Insert all countries in Territory]

And, where such Videograms are exploited for Home Video use, each Videogram and its packaging shall also include the following additional phrase:

Authorized For Private Home Use Only

    v.        Enforcement: Lessee shall take all reasonable steps necessary to protect the copyright in each Picture to prevent piracy, including bringing enforcement actions consistent with paragraph 3.10.

    vi.      New Technology: If, during the Term, new technology in use in the Territory inhibits the unauthorized duplication of copies of a picture, interferes with the reception of television signals without use of an authorized decoding device, or otherwise provides protection against the unauthorized duplication, distribution, or public performance of copies of a picture, then Lessee shall apply such technology to all copies of the Picture manufactured, distributed or publicly performed under its authority. Lessee may deduct the cost of so doing as a Distribution Expense, to the extent that Distribution Expenses are recoupable under the Deal Terms.

    vii.     No Warranty Against Piracy:  Lessor and Lessee acknowledge that it is in their mutual best interest to prevent piracy of the Picture in the Territory.  Lessor has informed

22

Lessee of any substantial act of piracy of the Picture in the Territory of which Lessor is aware, and such information has been considered in determining the Advance. Lessee has also taken all necessary steps to inform itself of any piracy of the Picture, whether occurring before or after the execution of this Agreement. No piracy of the Picture will allow Lessee to terminate this Agreement or reduce any amounts due Lessor. However, Lessor shall cooperate with Lessee in seeking to prevent or remedy any such act of piracy.

4.    FINANCIAL CLAUSES, STATEMENTS AND PAYMENTS

a.    Gross Receipts:

I.    Gross Receipts - Defined:  "Gross Receipts" means all gross monies and/or other consideration received by, available to, used by and/or credited to Lessee, its subdistributors and Affiliates, from any Exploitation of the Leased Rights, including the Incidental Rights, without any deductions or diminutions of whatever kind or character except as specifically provided for in paragraph 4.1(b) or as required by law.  For avoidance of doubt, Gross Receipts includes, without limitation, the following:

- All gross monies or other consideration of any kind from any dealings in trailers, stills and other advertising materials;
- Income from any authorized advertisements embodied in the Videograms;
- Guarantees, security deposits and advances received from exhibitors and other parties excluding only guarantees or advances from subdistributors if the treatment of such subdistributor guarantees or advances are provided for separately in the Deal Terms; and,
- Any monies paid by Lessor for the repurchase of any Rights leased to Lessee under this Agreement.

(1)    Intentionally deleted.

(2)    If payments to Lessee or its subdistributors and Affiliates, are reduced by Distribution Expenses incurred by the paying party, such as cooperative advertising costs, then the Gross Receipts shall reflect the amounts received or earned prior to those deductions, and such deductions are treated as Distribution Expenses hereunder.

(3)    Reported Gross Receipts must not be net of cash, prompt payment or similar discounts given by Lessee, or its subdistributors and Affiliates, and such discounts are for Lessee's account.

II.    Cost Recoveries:  If received by or credited to Lessee, or its subdistributors or Affiliates, Lessee shall deduct from Distribution Expenses and shall not report as Gross Receipts: (i) print and publicity subsidies received from industry or governmental institutions; (ii) income from publicity tie-in agreements; (iii) freight, print, trailer, advertising and other costs recovered from exhibitors, subdistributors or other parties; and (iv) income from authorized sales of prints, trailers and other materials to Persons outside of the Territory.

III.    Subdistribution of Rights:  No fees or other charges made by Lessee's subdistributors or Affiliates may be deducted from Gross Receipts reported to Lessor. In instances where Lessee, or it's Affiliates, subject to Lessor's Approval, sells, leases, or otherwise transfers one or more of the Leased Rights to subdistributors or other Affiliates for amounts, net of discounts and rebates, that are below the amounts received by that party from their Exploitation of the Rights, Gross Receipts reported to Lessor shall reflect the prices received by such subdistributor or Affiliate, unless otherwise Approved by Lessor; it being the intention of this Agreement that Gross Receipts shall not be reduced by subdistribution fees effectively paid by way of such reduced prices.  The Parties agree and acknowledge that this subparagraph (c) applies without limitation to sales made to video wholesalers where such video wholesalers are used as the primary distribution channel for any geographical region within the Territory.

IV.    Royalty Income:  All amounts which are collected by authors' rights organizations, performing rights societies or governmental agencies which are payable to authors, producers or distributors and which arise from royalties, compulsory licenses, cable retransmission

23

Income, tax rebates, exhibition surcharges, so-called "rental and lending rights" and the like, will as between Lessor and Lessee be the sole property of Lessor and will not be included in, or credited to, any Gross Receipts. By way of illustration but not limitation, this subparagraph will apply to such amounts arising from any tax or royalty payable with regards to blank audio or Videograms, or the sale or rental of VCRs or other hardware, whether collected by SACD or any similar organization, from royalties collected by AGICOA or any similar organization from cable retransmissions of television programs, and from collections by music performing or mechanical rights societies. Lessor has the sole right to apply for and collect all these amounts. If any such monies are paid to Lessee, then Lessee shall immediately remit them to Lessor with an appropriate statement identifying the payment.

      b.    **Distribution Expenses:**

        i.      **Distribution Expenses - Defined:** "Distribution Expenses" means all necessary and reasonable out-of-pocket expenses which are directly related to the Picture, net of cost recoveries as provided for in paragraph 4.1(b), capable of being substantiated on audit, and which are actually paid by Lessee to third parties in arm's-length transactions, net of all discounts, credits, rebates or other allowances, whether received in cash or in kind, for:

           The manufacture of prints, trailers, Videograms, internegatives, pre-print materials, masters and advertising materials and other copies of the Picture, net of the costs of any Videograms that are reused for any other Motion Pictures or programs;

           Advertising, promotion and publicity costs of the Picture, including but not limited to, TV, radio and press advertising, the preparation and Exploitation of posters, lithographs and other permitted advertising accessories relating to the Exploitation of the Picture, test screening costs, EDI tracking, PR and co-promotional consultants fees, and Internet site costs;

           Costs of subtitling and dubbing the Picture into the Language(s);

           Costs of packaging the Videograms embodying the Picture;

           Customs duties, import taxes and permit charges necessary to secure entry of the Picture into the Territory;

           Notarization, translation, registration and similar fees and costs relating to the obtaining and securing of copyright registration, title registration, import clearances or similar activities for importation, exploitation or protection of the Picture in the Territory;

           Censorship fees and editing costs incurred in meeting censorship requirements; according to the censorship provisions of this Agreement;

           Freight, customs clearance, shipping and insurance charges relating to the delivery of materials to Lessee, as well as, freight costs incurred in shipping materials within the Territory but excluding any costs of returning materials to Lessor;

           Actual costs directly associated with the physical storage of prints;

           Actual and normal expenses incurred in recovering debts from defaulting third parties;

           Sales, use, admission and turnover taxes and related charges assessable against any Gross Receipts or Net Receipts realized from the exploitation of the Rights, but not including corporate income taxes (or taxes recoupable therefrom), or franchise or windfall profit taxes or value added and similar taxes and net of any applicable tax refunds or rebates;

           Outside legal costs and charges paid to obtain recoveries for infringement by third parties of the Rights; and,

           Theater checking costs for verifying the accuracy of box office results reported by exhibitors, provided that such costs shall not exceed one percent (1%) of Theatrical Gross Receipts without Lessor's Approval, such Approval not to be unreasonably withheld or delayed.

        (ii)     In no case may any cost be charged more than once. All costs not expressly covered by the above are Lessee's sole responsibility.

24

(ii)      Distribution Expenses shall not include: (i) general or administrative expenses including salaries, sales commissions, rent and other overheads; (ii) amounts paid to third parties for general or administrative services and other charges made by outside backrooms and warehouses; (iii) costs incurred in attending film or Television markets such as AFM, Cannes, Mifed, Mip-TV, or Mipcom; (iv) legal or other expenses relating to this Agreement; (v) membership fees or other levies charged by local industry associations; (vi) interest costs and bank fees incurred on amounts borrowed to cover payment of the Advance or Distribution Costs, costs of establishing any L/Cs as required hereunder; (vii) increased prices paid to laboratories, advertising agencies and other parties in exchange for extended credit periods given to Lessee, or its subdistributors and Affiliates; (viii) any distribution or service fees charged by subdistributors and Affiliates; and, (ix) general or corporate promotion and advertising expenses including costs incurred at sales conventions and costs incurred in entertaining staff members, subdistributors, suppliers, and publicists, it being the intention of this Agreement that recharged travel and entertaining expenses are restricted to costs directly incurred in publicizing the Picture to the public, such as costs incurred during promotional tours by actors and directors and costs of entertaining journalists.

ii.      Third Party Costs:   Where any of Lessee's Affiliates or approved subdistributors incurs any cost which would be a Distribution Expense if incurred by Lessee, then such expense may be treated as a Distribution Expense. Except for this exception, no costs of any third party may be recouped as a Distribution Expense hereunder.

iii.      Limitations:  Distribution Expenses are calculated only as incurred with respect to the exploitation of each Right leased to Lessee and are recouped only as specified in the Deal Terms. Distribution Expenses incurred with respect to the exploitation of any one Leased Right, may not be recouped from Gross Receipts derived from the exploitation of any other Leased Right, except only to the extent specifically authorized in the Deal Terms, if at all.  Nothing in this Agreement shall give Lessee the right to recoup amounts that do not constitute Distribution Expenses under the provisions of this paragraph 4.2.

c.      Limits On Cross-Collateralization:

This Agreement is treated separate and apart from any other Motion Picture leased pursuant to this Agreement or otherwise.  Unless specifically authorized in the Deal Terms, Gross Receipts and Distribution Expenses may not be cross-collateralized among the Picture and any other Motion Picture, and the payments applicable to the Picture under this Agreement are treated as separate and apart from payments due to Lessor by Lessee under any other agreements between Lessor and Lessee for any other Motion Picture. Therefore, the payments due under this Agreement for this Picture are not to be cross-collateralized or otherwise set off against any payments due to Lessor under any other agreements for any other Motion Pictures.  Further, no claims made by Lessee in relation to any other agreements it may have with Lessor are to be set off or cross-collateralized with any payments due to Lessor under this Agreement.

d.      Allocations:

If the Picture is exploited or advertised with any other Motion Picture(s) then, in addition to Lessee's other obligations under this Agreement, all allocations between the Picture and such Motion Picture(s) shall be reasonable, in good faith, and at arms-length and shall reflect the relative commercial success of each Motion Picture (in the case of Gross Receipts) or the relative prominence, space or use (in the case of Distribution Expenses).

e.      Distribution Reports:

Within thirty (30) days of the end of each applicable Accounting Period, Lessee shall deliver to Lessor written statements in English detailing the distribution results of the Picture for all Leased Rights and Lessor's share of Gross Receipts. Lessee shall ensure that all statements are based, and Gross Receipts and Net Receipts are calculated under generally accepted accounting principles on a billings or accrual basis, with exception of Gross Receipts from Television Rights which Lessee may calculate upon the cash received or otherwise credited.  Lessee shall include in each statement a detailed report of Gross Receipts, Distribution Expenses, Distribution Fees and Lessor's share of Gross Receipts by Lessor and also shall include in each statement the following:

25

- The Theatrical and Video release dates;
- Gross Receipts reported separately for each Leased Right;
- A concise textual description of the allowable Distribution Expenses paid or incurred for each Leased Right, detailed between print and duplication, mastering, dubbing, subtitling, media advertising, other publicity costs and other miscellaneous costs;
- Distribution Fees and Lessor's share of Gross Receipts calculated separately for each Leased Right; and,
- Any Advance and Overages previously paid, withholding or remittance taxes deducted and actually paid and any Overages due to Lessor.

(i)      Statements incorporating Video distribution results shall also include the following additional information with respect to each form of Videogram type sold, leased or rented:

- The number of units produced;
- The number of units sold, leased or rented; and
- The list wholesale price prior to any discounts or rebates, and, if available, the list suggested retail selling price.

(ii)      Lessee shall ensure that all statements show both the activity for the applicable Accounting Period and the cumulative results to the end of that period. If the Territory includes more than one country, then all Gross Receipts, Distribution Expenses, Distribution Fees and Lessor's share of Gross Receipts must be reported separately for each such country and each Leased Right in addition to being consolidated for the entire Territory.

(iii)      Lessee shall ensure that each statement is accompanied by payment of all monies due to Lessor. Failure to submit such statements and/or to remit Overages when due is deemed a material breach of this Agreement, if Notice is given and such default is not cured during the cure period provided for in paragraph 7.1.

(iv)      Lessee may not withhold any Gross Receipts as a reserve against returned or defective Videograms for more than one (1) year and the amount withheld may not exceed fifteen percent (15%) for rebates and returns of Gross Receipts for Video Rights for the one (1) year period for which the reserve is retained.

f.      **Financial Records:**

Lessee and its Affiliates shall maintain complete and accurate records in the currency of the Territory of all financial transactions regarding the Picture throughout the Term and for one (1) year thereafter as well as for any additional time thereafter that a dispute remains outstanding between Lessor and Lessee. The records will include, without limitation, all Gross Receipts derived, all Distribution Expenses paid, all allowed discounts or rebates received or given and all cash collected or credits received. Where any Video Rights are Licensed, such records shall also include, to the extent such information is available to Lessee, all Videograms manufactured, sold, leased or rented and Videograms returned, erased, recycled or destroyed. For avoidance of doubt, Lessee shall keep complete and accurate copies of all available statements from subdistributors and other third parties, box office returns from exhibitors, sales records including contracts with exhibitors, print movement records including the booking book or similar records, print shipping instructions and print vault cards or other warehouse and backroom records, contracts including subdistribution agreements and Television, Pay-Per-View and Video-On-Demand licenses and statements from applicable broadcaster(s) showing the broadcasts purchased and the revenues arising therefrom, vouchers, receipts, audit reports, box office results published by government or industry associations, publicity budgets, media advertising buying schedules, rate cards, broadcast affidavits, newspaper and magazine advertisements or tear sheets, and all correspondence or other writings from all Persons pertaining to the Picture, including subdistributors. The foregoing are defined as the "Financial Records" for the purposes of this Agreement. At Lessor's request, Lessee shall furnish to Lessor, at a place and time designated by Lessor, photocopies of any required portion of the Financial Records that Lessor deems necessary in its reasonable discretion.

28

g.    Audit Rights:

Continuing for one (1) year after the Term and for any time thereafter that a dispute remains outstanding between Lessor and Lessee, Lessor has the right through its accountants and representatives, upon thirty (30) days advance Notice, at all times during regular business hours, to have free and full access to all Financial Records and to make copies therefrom. Lessor may not audit Lessee's Financial Records more than once per calendar year. Lessor or its representatives shall also have the right to require Lessee's executives, employees, subdistributors, and agents to answer questions which are considered by Lessor or its representatives to be relevant to the distribution of the Picture or necessary for understanding the Financial Records. Lessor or its representatives shall also be given full access to all Affiliates and subdistributors. Lessor's access to the Financial Records shall specifically include, but not be limited to, the right to examine Lessee's cash and banking records relating to the Picture only to ascertain the actual payments made and the actual cash received by Lessee or its Affiliates; the right to examine any subdistribution agreements, and the right to examine the full agreement(s) for any Television sales, including multiple sales made at the same time, for purposes of ascertaining the reasonableness of any package allocations made between the Picture and other Motion Pictures contained in those agreements. All inspections are at Lessor's expense unless it is determined that the Lessor's share of Gross Receipts for the Accounting Periods to which the inspection relates have been under reported by Lessee by more than five percent (5%) or ten thousand Dollars (US$10,000), whichever is the greater, in which case Lessee shall pay the full cost of the audit on demand. At Lessee's request, Lessor shall provide a copy of any completed audit report.

h.    Payments:

Lessee shall make all payments of the Advance, Lessor's share of Gross Receipts, or other sums due to Lessor hereunder (whether directly or by payment under any letter of credit) by Telegraphic Transfer to the address and/or financial institution and account specified in the Deal Terms or as advised by Lessor. Any means of payment other than Telegraphic Transfer or payment to an account other than that specified in the Deal Terms is not deemed payment and does not satisfy Lessee's obligations to make such payments. Lessee shall use diligent efforts to timely obtain all governmental and other permits necessary to make all payments to Lessor. No payment is complete until Lessor has immediate and unencumbered use of the funds in the required currency for the full amount due. Timely payment is of the essence of this Agreement and is an express condition to Lessee's continued exercise of all Rights leased to Lessee in the Picture. If Lessor does not receive any payments by the due date, then all payments are due immediately, and in addition to any other right or remedy, Lessor may assess an interest charge on amounts overdue calculated at the rate of two percent (2%) per annum above the prime rate quoted by the Bank of America compounded monthly until paid in full. The Advance and Lessor's share of Gross Receipts shall be paid in Dollars or other such freely transmittable currency as Lessor may designate. All costs of currency conversion, bank fees, permit fees and transmittal costs shall be paid by Lessee and are for Lessee's account. Lessee shall not offset or otherwise withhold any amounts due to Lessor hereunder because of any amounts due to Lessee or its Affiliates from Lessor or its Affiliates.

i.    Blocked Funds:

If Lessee is prohibited or restricted from making payment of any monies at the time when due and payable to Lessor hereunder by reason of the laws or currency regulations within the Territory ("Blocked Funds"), Lessee agrees, upon Lessor's request, to either (i) deposit any Blocked Funds to the credit of Lessor in a bank or banks designated by Lessor; or (ii) pay such Blocked Funds to such Persons as Lessor may designate in writing. If monies are deposited into local bank account(s) for the credit of Lessor, Lessee shall not make any withdrawals from such account(s) without Lessor's written authorization, except for purposes of remitting such amounts to Lessor. Lessee shall also forward monthly bank statements of such account(s) to Lessor and all interest earned from such account(s) shall belong fully to Lessor. Lessee shall use diligent efforts to assist Lessor in remitting monies contained in such bank account(s) to Lessor.

j.    Remittance Taxes:

Any remittance or withholding taxes required to be withheld or paid upon any payments to Lessor hereunder may only be deducted from related payments to Lessor if and to the extent that such deductions are specifically allowed under the Deal Terms and so long as: (i) a certificate of deduction and withholding shall accompany the statement or other payment rendered

27

to Lessor; and, (ii) upon payment of such taxes, there is sent to Lessor a photostatic copy of the governmental receipt establishing payment thereof. Taxes in fact withheld in accordance with the terms hereof shall not be a Distribution Expense hereunder, and Lessee shall remit immediately any refunds or rebates of such taxes to Lessor.

k.    Exchange Rates:

i.    Recoupment: All calculations of Lessor's share of Gross Receipts are made in the currency of the Territory, or, if applicable, in the currency of the major country within the Territory. All payments made in other currencies are converted to the currency of the Territory at the actual exchange rate paid by Lessee or, its subdistributors and Affiliates, subject to paragraph 4.1(b) below. If Lessee pays any Advance or Distribution Expenses in foreign currencies from funds that they are holding in foreign currencies, then those payments are converted to the currency of the Territory at the official exchange rates existing on the dates that those payments were made or due, whichever is more favorable to Lessor. Revenues arising from any authorized sales to other countries or territories and Gross Receipts and Distribution Expenses of any Affiliates or subdistributors operating in other countries within the Territory are converted to the currency of the major country within the Territory at the exchange rate(s) prevailing on the last business day of the applicable month in which each related transaction occurred. Unless otherwise specified in the Deal Terms, any amounts, excluding the Advance, which are included in the Deal Terms in a currency that is other than the currency of the Territory, including break points, are converted to the currency of the Territory at the official exchange rate that it cost Lessee to pay such Advance. If no Advance is paid, such amounts are converted at the official exchange rate prevailing on the date of the Picture's first release in the Territory by Lessee.

ii.    Exchange Rates, Late Payments: If Lessee makes late payment(s) of the Advance or of any charges from Lessor for prints and other materials, then such payment(s) are converted to the currency of the Territory, for purposes of calculating amounts that Lessee may retain from Gross Receipts, at the official exchange rates prevailing on the date payment is due or the date payment is made, whichever is more favorable to Lessor. If Lessee makes a late payment of Overages, then Lessee shall pay Lessor any losses incurred by Lessor from exchange rate fluctuations between the date that payment is due and the date payment is made. Any such additional payments are at Lessee's sole cost and shall not be deducted from subsequent calculations of Overages.

5.    ASSIGNMENT AND SUBLICENSING:

a.    Lessee's Limitations:

This Agreement is personal to Lessee. Except as provided in paragraph 5.2, Lessee may not assign or transfer this Agreement, or sublicense or use an agent to exploit any of the Rights granted to Lessee, whether voluntarily or involuntarily, without the Approval of Lessor in Lessor's sole discretion. An assignment or transfer of a controlling interest in Lessee's capital stock or other evidence of ownership is deemed an assignment, transfer or sublicense for which Lessor's consent must be first obtained. Any assignment, transfer or sublicense of this Agreement will: (i) be binding on such authorized assignee, transferee, subdistributor or agent; and (ii) not release Lessee of any of its obligations hereunder. Lessee warrants and represents that all of its subdistributors, sublicensees or agents shall comply with any and all of the terms, conditions and obligations of Lessee hereunder.

b.    Exception:

Lessee may transfer or assign this Agreement to any wholly owned subsidiary or to any Affiliate which is wholly owned by any company which wholly owns Lessee without Approval by Lessor. In that case, all references to Lessee in this Agreement will include such subsidiary or affiliated company and Lessee remains liable to Lessor for all obligations of such assignee hereunder.

c.    Lessor's Right Of Approval:

Lessee shall submit to Lessor in writing for Approval by Lessor all material terms of each proposed license or subdistribution agreement for exploitation of any Rights into which Lessee

28

desires to enter.   Lessee shall submit to Lessor copies of all fully executed license, agency and subdistribution agreements within ten (10) days of Lessor's request for such agreement.  If such agreements are in a language other than English, Lessee shall submit to Lessor certified English language translations of such agreements at Lessee's cost (which are treated as Distribution Expenses hereunder to be recouped in accordance with the Deal Terms).

     5.4    Assignment:

          Lessor may freely assign, transfer or sublicense any of its rights under this Agreement, but no such assignment, transfer or sublicense will relieve Lessor of its obligations hereunder, unless it is to an entity which acquires all or substantially all of Lessor's assets.

     5.5    Lessor's Assignment For Financing Purposes:

          If Lessor pledges this Agreement or assigns its right to receive any payment to a lender, completion guarantor or other Person as security for or in connection with any loan or other obligation, then Lessee shall promptly on request execute a reasonable and customary notice and acknowledgement of assignment and charge or similar document as necessary to perfect the Person's interest or secure its rights. Lessee agrees to abide by consistent written instructions from Lessor and such Person. Lessee agrees not to assert any offset rights against such Person or to assert any rights it may have against Lessor to delay, diminish or excuse the payment of any sums pledged or assigned to such Person. Instead Lessee shall only treat such offsets or other rights as a matter solely between Lessor and Lessee.

    6.    WARRANTIES AND INDEMNITIES:

    a.    Lessor's Warranties and Indemnities:

          Lessor warrants, represents and agrees that: (i) it has the legal right to enter into this Agreement and to grant the Leased Rights and Incidental Rights for the Territory during the Term, which with the exception of any production financing and/or Guild liens, for which Lessor is solely responsible and which Lessor hereby covenants to satisfy, are free and clear of any claims, liens, charges or encumbrances which would impair or affect any Leased Right or Incidental Right for the Territory during the Term; and, (ii) it has not granted and will not grant to any other Person any of the Leased Rights. Lessor agrees to indemnify and hold Lessee (including its officers, directors, partners, shareholders, employees and agents) harmless from all claims and expenses (including reasonable outside attorneys' fees) arising out of breach by Lessor of such warranties. Should any claim or demand be made against Lessee as to which Lessee may be entitled to indemnity hereunder ("Claim"), Lessee shall give prompt Notice thereof to Lessor, and Lessor may, in its sole discretion, defend, settle or compromise any Claim through counsel of its choice on such terms and in such manner as Lessor may, in its sole discretion, determine. Lessor has the right to terminate the Term (exercisable by Notice to Lessee effective immediately) should any Claim be made that Lessee's Exploitation of the Rights in the Territory infringes or would infringe any copyright or other similar rights. In the event of any such termination of the Term, Lessor shall fully refund all portions of the Advance actually received from Lessee and any unrecouped distribution expense actually paid by Lessee to the extent that they have not yet recouped by Lessee from the exercise of the Rights to that date, but Lessor shall in no event be liable to Lessee for any consequential damages or lost profits. Lessor does not make and hereby expressly disclaims any warranty, representation, agreement or indemnity not expressly set forth in this Agreement.

    b.    Lessee's Warranties and Indemnities:

          Lessee warrants, represents and agrees that: (i) it has full authority to enter into and completely perform this Agreement; (ii) it has and will not undertake any action which might impair Lessor's rights under this Agreement; (iii) there are no existing or threatened claims or litigation which would adversely effect or impair Lessee's ability to completely perform under this Agreement; (iv) it will honor all restrictions on the exercise of the Leased Rights or any other rights granted in this Agreement, including Holdback Periods; (v) it will not exploit any Reserved Rights in the Picture; and, (vi) it will not exploit the Picture, or authorize others to do so, outside the Territory or after the Term, without Lessor's Approval. Lessee shall indemnify and hold Lessor (including its officers, directors, partners, owners, shareholders, employees and agents) harmless against all claims and expenses (including reasonable outside attorneys' fees) and liabilities due to Lessee's failure to abide by any restriction on the exercise of any rights granted to it or for any breach of Lessee's

02-22-11    04:11pm    From-LOEB & LOEB                3102822200           T-519   P.062/081   F-441

obligations, representations and warranties under this Agreement and with respect to any of its actions as a distributor. Lessee shall remain responsible for honoring Lessee's indemnities despite any assignment or sublicense pursuant to paragraph 5. Lessee does not make and hereby expressly disclaims any warranty, representation, agreement or indemnity not expressly set forth in this Agreement.

7.    DEFAULT/TERMINATION/ACTIONS:

a.    Default:

No breach by either Party of any term or condition herein shall be deemed material until the other Party has given Notice to the breaching Party and such breaching Party fails or refuses to cure or correct the applicable breach after such Notice is served within fourteen (14) days for monetary breaches, and twenty-one (21) days for non-monetary breaches. During the cure period for monetary breaches, the Party not in breach may suspend its performance hereunder. Moreover, if the breaching Party fails to cure either a monetary or a non-monetary breach within such prescribed time period, such breaching Party is thereafter deemed in default of this Agreement, the obligations of the non-breaching Party are discharged, and, at such Non-breaching Party's election, this Agreement may be terminated. Notwithstanding the foregoing, should Lessee:

become insolvent or be unable to pay its debts as they become due;

acquiesce in the filing of a petition for bankruptcy, appointment of a receiver, trustee or liquidator, distress or other forced sale of a substantial part of its assets, or a convening of a meeting of its creditors;

seek the protection of any applicable bankruptcy or insolvency law; or,

take, do or omit to do any action which has the purport or effect of substantial cessation of Lessee's business as a first-class Motion Picture distributor in the Territory; then

Lessee is conclusively deemed to be in material breach and default of this Agreement irrespective of any Notice of breach or other action or statement by Lessor, Lessor may, in its sole discretion, terminate this Agreement. In the event that Lessee is in default of its obligations hereunder, Lessor may, in addition to any other remedies, retain all monies paid by Lessee as liquidated damages, and all materials delivered to Lessee shall be returned by Lessee to Lessor at Lessee's expense.

b.    Actions:

In the event of any action, suit or proceeding hereunder, the prevailing Party shall be entitled to recover reasonable outside attorney's fees and outside accountant's fees and travel expenses, in addition to the costs of the said action, suit or proceeding. Lessor and Lessee, each as to and for the benefit of the other hereby irrevocably:

submit to the non-exclusive jurisdiction of the federal courts in Los Angeles, California (the "Applicable Court") for the purpose of any action, suit or proceeding arising out of or related to the subject matter of, or transactions contemplated by, this Agreement (each and "Applicable Action");

waive and agree not to assert (by way of motion, by way of defense or otherwise) in any Applicable Action brought in the Applicable Court any claim: (i) it is not subject personally to the jurisdiction of the Applicable Court; (ii) the Applicable Action is brought in an inconvenient forum; (iii) venue of the Applicable Action is improper; or (iv) this Agreement or its subject matter may not for any other reason be enforced in the Applicable Court;

consent to service of process of the Applicable Court in the same manner as any other Notice is served on Lessor or Lessee (as the case may be); agree that the judgment, upon exhaustion or expiration of all rights to appellate review in the United States, shall be conclusive and may be enforced in any other jurisdiction; and

agree not to challenge the enforcement of the final judgment of the courts of the United States on any grounds should either Party seek to enforce such judgment in a jurisdiction outside the United States.

c.      Arbitration:

Notwithstanding the above, if Lessor or Lessee so elects, any dispute or claim arising out of or relating to this Agreement (including any dispute regarding delivery or the quality of materials delivered by Lessor) or the breach hereof may be resolved by arbitration in Los Angeles, California, in accordance with the rules and procedures of the Independent Film & Television Alliance (formerly known as the American Film Marketing Association) ("IFTA") as such may be amended from time to time, which rules and procedures are incorporated into and made part of this Agreement. The Parties agree to abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such decision or award shall be final and conclusive and may be enforced in any court of law with jurisdiction over any of the Parties. All notices required to be given to effectuate service to initiate arbitration or to confirm an arbitration award shall be deemed to have been duly served if sent by certified mail (whether or not the return receipt is returned to the party giving notice by the party receiving notice).

8.      GENERAL PROVISIONS:

a.      Notices:

All notices to be given by either Party under the terms hereof (a "Notice") shall be in writing and shall be deemed to have been duly served if delivered or sent by hand, facsimile or courier correctly addressed to the relevant Party at that Party's registered office, as reflected in the Deal Terms, or other address advised by that Party in writing, and any Notice so given shall be deemed served: (i) if hand delivered, at the time of delivery; (ii) if sent by facsimile, by the later of twenty four (24) hours from its transmission or the commencement of normal business hours at its destination if sent outside of normal business hours at such destination; and (iii) if sent by courier, within two (2) business days of the date that such telegram or courier package is sent. All Notices and deliveries to Lessor, unless Lessor serves Notice to the contrary, shall be sent to the address set forth in the Deal Terms with a copy to:

Summit Entertainment L.P.
1630 Stewart Street, Suite 120
Santa Monica
California 90404
United States of America
Tel. (310) 309-8400
Fax. (310) 828-4132

b.      Entire Agreement:

Standard Terms
Icon - Multiple Rights Lease
V: April 26, 2006
ref: 06-030 - "Tree of Life"

This Agreement contains the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and the transaction contemplated hereby and supersedes any and all prior oral and written agreements, promises, statements, representations and information given by either Party. Each Party expressly waives in favor of the other any right to rely on any such negotiations, understandings or representations, if any. This Agreement may not be modified orally and no waiver, amendment or modification shall be binding or effective unless in writing and signed by both Parties. Lessor and Lessee shall execute any and all documents and instruments and shall do all acts which may be necessary or appropriate to fully implement the provisions of this Agreement. In the event of any inconsistency between any instrument into which these Standard Terms are incorporated by reference and the terms hereof, the provisions of the incorporating instrument control.

C.      Governing Law:

This Agreement is subject to all applicable laws and treaties. Unless provided otherwise in this Agreement, this Agreement and its validity, construction and effect is governed by and construed under the laws of the State of California, excluding California's choice of law provisions.

D.      Terminology:

Words used in the singular shall include the plural and vice versa. Any references herein to "including" means "including without limitation". This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. If any part of this Agreement is declared invalid or unenforceable by any governmental authority or court of competent jurisdiction, the validity of the balance of this agreement shall not be affected.

E.      Cumulative Rights:

Except as otherwise provided in this Agreement, all of Lessor's and Lessee's rights and remedies under this Agreement shall be cumulative and resort to any one right or remedy does not preclude resort to any other right or remedy at any time. Any waiver by either Party of any breach of this Agreement is not a waiver of any preceding or succeeding breach of the same or any other provisions hereof unless such waiver is in writing signed by both parties.

F.      Force Majeure:

Neither Lessor nor Lessee is in breach of any term or condition hereof and shall not be liable or responsible to the other to the extent its performance is materially delayed or hindered by reason of acts of God, government, war or other disturbances, acts (whether misfeasance or nonfeasance and whether or not negligent) of any carrier, transportation facility or laboratory, weather or any other cause, whether or not similar, not within its reasonable control or which it could not by reasonable diligence have avoided ("Force Majeure"). Should any Force Majeure delay or hinder performance by either Lessor or Lessee for a period in excess of six (6) months, then the other Party may terminate the Term on ten (10) days Notice. No Force Majeure or other event or excuse shall extend the duration of the Term or excuse Lessee's failure to make any payment to Lessor hereunder, and only the provisions of paragraph 4.9 shall apply should any Force Majeure affect payments to Lessor hereunder.

G.      No Joint Venture:

Nothing in this Agreement shall be deemed to create a partnership, joint venture, or any relationship other than as Lessor/Lessee and in no event shall either Party be liable for the actions, statements or omissions of the other.

H.      Severability:

If any of the provisions of this Agreement become invalid, illegal or unenforceable in any respect under any law, for any reason, such provision is deemed automatically adjusted to the minimum extent necessary to conform to the requirements for validity as declared at such time and, as so adjusted, are deemed a provision of this Agreement as though originally included herein. In the event that the provision

32

Standard Terms
Icon - Multiple Rights Lease
V: April 28, 2005
rsh 09-003 - "Tree of Life"

invalidated is of such a nature that it cannot be so adjusted, the provision is deemed deleted from this Agreement as though such provision had never been included herein, and the validity, legality and enforceability of the remaining provisions hereof are not in any way affected or impaired.

I.        Confidentiality:

Lessee and Lessor shall keep the terms of this Agreement confidential and shall not disclose them to third parties, other than to its shareholders, Affiliates, financiers, accountants, professional advisors or prospective purchasers, without the other Party's Approval.

J.        Captions:

The captions, headings, titles and subtitles herein are inserted solely for convenient reference only, do not constitute a part of this Agreement and may not be utilized or referred to in the construction or interpretation of this Agreement.

K.        Power Of Attorney:

Lessee hereby agrees to execute and deliver any and all documents reasonably requested by Lessor to evidence, protect, or perfect the rights of Lessor pursuant to this Agreement, and Lessee hereby grants Lessor an irrevocable power of attorney, coupled with an interest, to execute any and all such documents on behalf of Lessee.

L.        Injunction:

Lessee acknowledges that the Picture is unique and that Lessor may suffer irreparable harm from Lessee's breach of this Agreement. Accordingly, Lessor may seek injunctive or other equitable relief to enforce the terms of this Agreement. In consideration for the terms, conditions, covenants, promises, and other consideration set forth in this agreement, Lessee waives all equitable remedies arising out of or related to this Agreement and agrees that its sole remedy shall be at law for damages.

M.        Interpretation:

This Agreement has been negotiated at arms-length between persons knowledgeable in the matters dealt with herein. In addition, each party has been represented by experienced and knowledgeable legal counsel or has otherwise waived such right. Accordingly, any rule of law, including without limitation section 1654 of the California Civil Code, or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it, is of no application and is hereby expressly waived.

-END-

Standard Terms
Icon - Multiple Rights Lease
Vr April 29, 2008
ref: 06-030 - "Tree of Life"

02-22-11    04:12pm    From-LOEB & LOEB                    3102822200            T-519   P.066/081   F-441

# EXHIBIT B

NOTICE OF ASSIGNMENT

This Notice of Assignment (the "<u>Agreement</u>") is entered into as of October 19, 2009, by and between Icon Film Distribution Ltd., a company formed and maintained under the laws of England ("<u>Distributor</u>"), Cottonwood Pictures, LLC, a Delaware limited liability company ("<u>Licensor</u>"), and Union Bank, N.A., a national banking association, in its capacity as administrative agent ("<u>Agent</u>") for the Lenders (as such term is defined below), in reference to the following facts:

    A.    Licensor and the Distributor entered into a Motion Picture Lease Agreement, dated as of May 16, 2008 (that agreement and all other documents executed in connection therewith, as amended by this Agreement and as hereafter amended, modified or supplemented, the "<u>Distribution Agreement</u>"), pursuant to which Licensor licensed to the Distributor certain rights with respect to a motion picture tentatively entitled "The Tree of Life" (by whatever title such motion picture is now or may hereafter become known, the "<u>Film</u>"). (Those rights, and any other rights, liens, mortgages, charges, and security interests of the Distributor, if any, in or with respect to the Film or any physical elements thereof, whether under the terms of the Distribution Agreement or otherwise being hereinafter collectively referred to as the "<u>Distribution Rights</u>.")

    B.    Under the terms of the Distribution Agreement, the Distributor has agreed to pay Licensor a total of US$2,250,000 (the "<u>Minimum Guaranteed Payment</u>") (no withholding taxes applicable, subject to any change in applicable United Kingdom laws which would require withholding taxes to be withheld by the Distributor provided that the Distributor has first notified the Licensor and the Agent in writing of any such change prior to deducting any such withholding taxes), which is payable under the terms thereof in installments, with each installment being payable immediately upon satisfaction of the condition(s) indicated for such installment as set forth in the Distribution Agreement (collectively, the "<u>Conditions Precedent</u>"). Licensor hereby acknowledges receipt of the initial installment of the Minimum Guaranteed Payment; and Distributor hereby acknowledges that all Conditions Precedent to the payment of the initial installment of the Minimum Guaranteed Payment have been satisfied.

    C.    For the purpose of securing the obligations owing to the Agent and to the various lenders (the "<u>Lenders</u>") under a Credit, Security, Guaranty and Pledge Agreement (the "<u>Credit Agreement</u>") and under certain related security and other documents (collectively with the Credit Agreement, the "<u>Facility Documents</u>"), Licensor and certain other parties have granted to the Agent, for the benefit of the Agent and Lenders, a first priority security interest in the Distribution Rights and all amounts payable by the Distributor under the Distribution Agreement, including the Minimum Guaranteed Payment (collectively, the "<u>Distribution Agreement Proceeds</u>").

    D.    The parties hereto desire to determine their relative rights and obligations with respect to the Distribution Agreement, the Distribution Rights, and the Distribution Agreement Proceeds, and the priority of the Agent's security interests with respect thereto, in accordance with the terms of this Agreement.

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 1 of 9

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows.

1.    Distributor Covenants and Representations.

(a)    The Distributor shall pay directly to the bank account set forth below ("Collection Account") (or such other address or account as the Agent may designate in writing) the Minimum Guaranteed Payment (other than the initial installment thereof, which has already been received by Licensor) and all other the Distribution Agreement Proceeds in United States Dollars, as and when due, by wire transfer:

Union Bank, N.A.
1980 Saturn Street
Monterey Park, California 91755
Attention: Martha Arreaga
ABA Number: 122000496
Swift Code: BOFCUS33MPK
Account Name: UB Control - River Road Pictures LLC
Account No.: 4420007588
Reference: Collection – Tree of Life

(b)    The Agent and its representatives, in lieu of Licensor, may exercise and enforce all of Licensor's rights under the Distribution Agreement, including the rights of Licensor under the Distribution Agreement to examine and audit the Distributor's books and records pertaining to the Film.

(c)    The Distributor shall furnish to the Agent copies of all notices and statements (including accounting statements and notices of default) from the Distributor to Licensor given under the Distribution Agreement.

(d)    The Distributor may only discharge its obligation to pay Distribution Agreement Proceeds by paying all such amounts to the Collection Account in accordance with paragraph 1(a) hereof.  The Distributor may not discharge that obligation by paying the Distribution Agreement Proceeds to Licensor or any other person, other than the initial installment of the Minimum Guaranteed Payment which has already been received by Licensor.

(e)    The payment to the Collection Account (or, solely with respect to the initial installment of the Minimum Guaranteed Payment, to the Licensor) of the Minimum Guaranteed Payment in full, as and when due hereunder, is a condition precedent to the grant to the Distributor of any of the Distribution Rights.  Upon the Agent's election, the Distributor's interest in the Distribution Rights will be fully, automatically, and immediately terminated without further action or notice if, within fourteen (14) calendar days after Distributor has been notified in writing by Licensor or Agent that Distributor has failed to pay any portion of the Minimum Guaranteed Payment in strict accordance with the terms of this Agreement, Distributor has failed to cure such payment default.

Notice of Assignment
"THE TREE OF LIFE" - UK
Page 2 of 9

(f)       The Distributor's obligation to pay the Distribution Agreement Proceeds as set forth herein is absolute, and conditioned only on satisfaction of the applicable Conditions Precedent.

(g)       The Distributor waives, as to the Agent and the Lenders only, all defenses to the payment of the Minimum Guaranteed Payment other than a failure to satisfy the applicable Conditions Precedent. Without limiting the generality of the foregoing, the Distributor hereby waives, as to Agent and the Lenders only, all of the following defenses to the payment in full of the Minimum Guaranteed Payment: any discount or offset to, or reduction thereof, for any reason whatsoever (including by reason of the revenues of, or any obligation of Licensor to pay the expenses of, the Film or of any other motion picture licensed to the Distributor under any present or future agreement), any "chain-of-title" defect, any right to apply any Distribution Agreement Proceeds to any obligation of Licensor (whether under the Distribution Agreement or under any other present and future agreements with Licensor or any affiliate), counterclaim, right to withhold any Distribution Agreement Proceeds for withholding taxes (subject to any change in applicable United Kingdom laws which would require withholding taxes to be withheld by the Distributor provided that the Distributor has first notified the Licensor and the Agent in writing of any such change prior to deducting any such withholding taxes), failure of the Film to comply with the censorship requirements of any governmental authority, failure of the Film to comply with any release requirements, any claimed credit, right, defense, or other claim (legal or equitable) which the Distributor may have against Licensor pursuant to the Distribution Agreement or otherwise, and any claim of any breach or default by Licensor under the Distribution Agreement or the agreements pursuant to which Licensor is to acquire the Distribution Rights.

(h)       Distribution Agreement Proceeds paid to the Collection Account (or, solely with respect to the initial installment of the Minimum Guaranteed Payment, to the Licensor) by the Distributor shall not be subject to refund or return by the Agent or the Lenders for any reason whatsoever.  If it is determined pursuant to an arbitration conducted under paragraph 5 hereof that Notice of Delivery (as defined below) has not and cannot be effected to the Distributor, then all of Distributor's interests in the Distribution Rights shall thereupon automatically terminate and Licensor shall refund to the Distributor all installments of the Minimum Guaranteed Payment previously paid by the Distributor to the Collection Account. For all purposes of the Distribution Agreement and this Agreement, "Notice of Delivery" means written notice given by Licensor or any sales agent for the Film to Distributor stating that the materials necessary to manufacture the Initial Physical Materials (as defined in the Distribution Agreement) are available for the manufacture and shipment (at Distributor's sole cost and expense) of the Initial Physical Materials.

(i)       The Agent and the Lenders have taken an assignment only of the rights of Licensor under the Distribution Agreement, including the right to receive payment of the Distribution Agreement Proceeds. Neither the Agent nor the Lenders have assumed any of the Licensor's obligations or liabilities thereunder. The Distributor shall look solely to Licensor for the performance and discharge of any such obligations and liabilities.

Notice of Assignment
"THE TREE OF LIFE" - UK
Page 3 of 9

(j)    Any and all liens, mortgages, charges, and other security interests created by Licensor or any of its predecessors-in-interest or any other person in the Agent's favor in or with respect to the Film, Distribution Rights and the Distribution Agreement Proceeds shall at all times be senior to and have priority over any and all of the Distributor's rights, liens, or entitlements to the Film, the Distribution Rights and the Distribution Agreement Proceeds (all which are hereby subordinated to the Agent's security interests therein); provided, however, the Agent will not exercise its security interest or other rights in any manner that would materially and adversely prejudice, disturb, infringe upon, interfere with, prevent or impede the full, complete, free and unencumbered purchase, enjoyment, exploitation and exercise by the Distributor of the Distribution Rights provided the Distributor has paid to the Collection Account (or, solely with respect to the initial installment of the Minimum Guaranteed Payment, to the Licensor) the Minimum Guaranteed Payment in full as and when due under this Agreement and the Distributor is not otherwise in breach of its obligations under the Distribution Agreement.

(k)    The Agent has the right to terminate Distributor's interests in the Distribution Rights if Distributor defaults in any of its obligation to pay the Minimum Guaranteed Payment as and when due under this Agreement or the Distribution Agreement.

(l)    Notwithstanding anything to the contrary contained herein, if the Distributor or any of its sub-distributors releases (or authorizes the release of) the Film in any medium, or is conclusively presumed to have released the Film in any medium, then solely as between the Distributor, on the one hand, and the Agent, on the other hand, all Conditions Precedent to the payment of the Minimum Guaranteed Payment (including Notice of Delivery) shall be conclusively presumed to have been satisfied and the entire unpaid balance of the Minimum Guaranteed Payment shall thereupon be immediately due and payable in full. Nothing in this Agreement shall relieve Licensor of its obligations to deliver the Film elements and other materials to the Distributor in accordance with the terms of the Distribution Agreement.

(m)    The Agent and the Lenders did not make and do not make any representations or warranties, express or implied, with respect to the Film, including the budget, the actual costs of the Film, the Distribution Rights or any other matter. The Agent and Lenders have no duty to disclose any information to the Distributor concerning the Film, including but not limited to the amount of the budget for the Film or the actual production costs thereof. The Distributor shall hold the Agent and the Lenders harmless from any liability or damage that may be incurred by the Distributor as a result of the budget for or any other fact or matter concerning the Film being other than as represented by any other person.

(n)    The Distributor shall promptly notify the Agent of any claim by any other party that such party is entitled to receive any portion of the Distribution Agreement Proceeds.

(o)    Except for Brad Pitt's and Sean Penn's acting services during principal photography of the Film, no individual(s), elements or dates, including, without limitation, the cast members or crew members (including the director), the title of the Film, or any other element is a condition precedent to the payment of the Minimum Guaranteed Payment or is (are) essential for purposes of effectuating Notice of Delivery and the Distributor may not refuse to accept Notice of Assignment or refuse to pay any installment of the Minimum Guaranteed Payment

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 4 of 9

(or any other Distribution Agreement Proceeds) should any individual(s), elements or dates (including any delivery date specified in the Distribution Agreement) be changed, other than Brad Pitt and Sean Penn during principal photography of the Film, or the title of the Film is changed, for any reason whatsoever. Notwithstanding anything to the contrary contained in the Distribution Agreement, the Distributor hereby waives, for the benefit of the Agent and the Lenders only and without waiving any rights the Distributor might have against the Licensor, any and all approval rights it may have with respect to any element or aspect of the Film.

(p)     If the Distributor assigns to any person, other than the Agent (for the benefit of the Agent and the Lenders), any of its rights under the Distribution Agreement (or any of its obligations thereunder) as, and to the extent permitted hereunder, then the Distributor and the assignee shall be jointly and severally liable to the Agent under this Agreement and under the Distribution Agreement.

2.     <u>Representations and Warranties.</u>   The Distributor represents and warrants as follows:

(a)     No third person has asserted any prior claims to the Distribution Agreement Proceeds.

(b)     The Distribution Agreement is and shall remain in full force and effect and the Distributor has all necessary power and has taken all action necessary to enter into this Agreement, and upon its execution, this Agreement constitutes a valid, binding and enforceable obligation of the Distributor in accordance with its terms; and no consent, waiver or approval of any third party is necessary for the Distributor to enter into and perform this Agreement or consummate any of the transactions contemplated hereby.

(c)     There are no agreements between the Distributor, on the one hand, and Licensor, on the other hand, concerning or mentioning the Distributor's right to distribute or exploit the Film, including all so-called "side agreements," other than the Distribution Agreement.

(d)     No Distribution Agreement Proceeds have been previously paid to the Licensor or any other person, other than the initial installment of the Minimum Guaranteed Payment which has previously been paid to Licensor.

(e)     No statements, promises, representations, or other statements have been made to and relied upon by the Distributor in entering into the Distribution Agreement other than any the statements, promises, representations, and other statements expressly set forth in the Distribution Agreement.

3.     <u>Amendments, Modifications, Waivers, and Termination.</u>   Licensor   and   the Distributor shall not, without the prior written consent of the Agent, waive, modify, amend, or supplement the Distribution Agreement in any manner that directly or indirectly adversely affects any Condition Precedent (including Notice of Delivery) or the Distribution Agreement

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 5 of 9

Proceeds, or terminate the Distribution Agreement. Any such purported waiver, modification, amendment or supplement made without the Agent's prior consent is null and void ab initio.

    4.    <u>Reservation of Rights</u>. As to the Licensor only, the Distributor reserves all of its rights under the Distribution Agreement to the extent not inconsistent with the terms hereof. Without limiting the generality of the foregoing, notwithstanding anything to the contrary contained herein, as between Licensor and the Distributor only, nothing contained herein shall relieve Licensor of its obligation to deliver the Film to the Distributor in accordance with the terms of the Distribution Agreement.

    5.    <u>Arbitration</u>.

    (a)    All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Film or the Distribution Rights, this Agreement, or any resulting transaction, including, but not limited to, their respective obligations hereunder, payment of the Minimum Guaranteed Payment and any other Distribution Agreement Proceeds, a disagreement about the meaning, interpretation, application, performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by mandatory binding expedited arbitration conducted under the auspices of the Independent Film & Television Alliance and its rules in effect as of the date the request for arbitration is filed (the "<u>Rules</u>") and, to the extent not otherwise covered above, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code; <u>provided, however</u>, if the issue of whether Notice of Delivery has been effected is the subject of dispute, then prior to the commencement of an arbitration proceeding with respect thereto the Agent shall first have a 30-calendar day period (commencing on the date on which the Agent is first notified by the Distributor in writing of that dispute) within which to cause any alleged defect relating to Notice of Delivery to be cured. If the Distributor has not, within 3 business days after the expiration of such 30-day period, notified the other parties hereto that the alleged Notice of Delivery defect(s) remain uncured then Notice of Delivery shall be deemed to have been effected for all purposes hereof.

    (b)    Each of the parties may initiate such an arbitration pursuant to the Rules. The arbitration shall be held in Beverly Hills or Los Angeles, California (such site being herein referred to as the "<u>Forum</u>"). The arbitration proceeding shall be conducted in the English language. Each of the parties hereto shall abide by any decision rendered in such arbitration, and any court having jurisdiction may enforce such a decision.

    (c)    If the issue of whether any of the Conditions Precedent has been effected is the subject of any arbitration proceeding hereunder, then that issue (and only that issue) shall be determined in a separate arbitration proceeding before any other claim is heard. The Distributor may not assert in such proceeding any counter-claim or other offset, or any defense other than the defense of a failure to effect one or more of the Conditions Precedent to the Distributor. That arbitration proceeding shall continue on consecutive business days until fully concluded, unless continued by the arbitrator for good cause shown, but in no event shall that arbitration continue for more than five (5) business days from the commencement thereof

(exclusive of continuance days). The arbitration must result in either a finding that either (1) the applicable Conditions Precedent have been effected to the Distributor and, if so, the date on which each of the applicable Conditions Precedent were effected, or (2) the applicable Conditions Precedent have not been effected to the Distributor. If there is a finding that the applicable Conditions Precedent were effected, then the arbitrator shall immediately issue and award, ordering the Distributor to immediately pay the Minimum Guaranteed Payment to the Collection Account without asserting any defenses. Until Distributor has completely satisfied such award, the Distributor waives any and all rights to assert any and all claims of any kind whatsoever (whether legal or equitable) against the Agent and/or the Lenders relating to the Film, this Agreement, the Distribution Agreement, or the Distribution Agreement Proceeds. The arbitration award shall also provide for payment by the losing party (i.e., the party or parties against whom an arbitration award is issued) of: (i) the fees and costs incurred in connection with said arbitration, as well as the reasonable attorneys' fees and costs incurred by the prevailing parties (i.e., all parties to the arbitration other than the losing party), and (ii) shall further provide for the payment by the losing party of all other amounts payable pursuant to the Distribution Agreement. The arbitrator shall immediately upon conclusion of the arbitration proceedings, render and issue a written decision.

(d)     Each of the parties hereto submits to the non-exclusive personal jurisdiction of the courts of the Forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award, and irrevocably waives any objection which it may now or hereafter have to the venue of any such enforcement proceeding brought in any of said courts and any claim of inconvenient forum. Service of process for all arbitration proceedings may be made in accordance with the Rules. Service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in the manner provided in paragraph 6 hereof and shall be deemed effective as provided therein. Each of the parties hereto waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

(e)     Any claim or action of any kind (including, but not limited to, any claims for breach of contract), against the Agent or the Lenders arising out of or connected with this Agreement shall be barred and waived unless asserted by the commencement of an arbitration proceeding within 180 days after the accrual of the action or claim. This limitation shall also apply to claims that might otherwise be asserted against the Agent or the Lenders as a "set-off," credit, cross-complaint, or defense. This section and the foregoing limitation shall survive termination of this Agreement.

6.     Notices.  All notices, statements, and copies thereof given hereunder must be given in writing at the respective addresses for the parties set forth after their respective signatures, and must be delivered either by hand, or by fax or by internationally recognized courier service (such as DHL, FedEx or UPS), and shall be deemed to have been given when personally delivered (if by hand); or (if by fax) upon confirmation of successful transmittal (with such confirmation issued by the sender's fax machine), or (if by internationally recognized courier service) two (2) business days after dispatch by the sending party. A courtesy copy of each notice given to Agent shall be concurrently provided to: Akin Gump Strauss Hauer & Feld,

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 7 of 9

LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067 USA, Facsimile: +(310) 229-1001, Attention: Marissa J. Roman, Esq. A courtesy copy of each notice given to Licensor shall be concurrently provided to: Loeb & Loeb LLP, 10100 Santa Monica Blvd., Suite 2200, Los Angeles, California 90067 USA, Facsimile: +(310) 919-3990, Attention: Susan Zuckerman Williams, Esq.

7.      Long Form Agreement.  If Licensor, on the one hand, and Distributor, on the other hand, enter into any other agreement concerning the distribution of the Film, including a long-form version of the Distribution Agreement, the parties hereto agree that the terms of this Agreement shall remain in effect and supersede the terms of such other agreements to the extent they conflict with the terms hereof.

8.      Termination.  This Agreement shall terminate when the Agent gives written notice to the Distributor stating that (a) all of the obligations respectively owed to the Agent, the Lenders and the other secured parties under the Credit Agreement have been indefeasibly paid in full and performed in full and (b) the commitments of the Lenders to make advances under the Credit Agreement have been terminated.

9.      Miscellaneous.  This Agreement shall be governed by the laws of the state of California without regard to its conflicts of law rules.  Time is of the essence in the performance hereof.  No amendment to this Agreement shall be effective unless in writing and signed by each party hereto.  If there is a conflict between the terms of this Agreement and the Distribution Agreement, then as between Distributor, on the one hand, and the Agent and the Lenders, on the other hand, only, the terms of this Agreement are controlling.  This Agreement may be executed in counterparts, each of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile or by electronic transmission in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") shall be equally effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart by facsimile, TIFF or PDF shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not effect the validity, enforceability, or binding effect of this Agreement, and the parties hereby waive any right they may have to object to said treatment.  The Agent and each Lender may sell or assign any or all of its rights or obligations pursuant to the Facility Documents and all related agreements, including this Agreement, to any party acquiring any or all of Agent's or such Lender's (as applicable) rights with respect to the Facility Documents.  This Agreement is binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns.  This Agreement is intended by the parties hereto to be the final, complete, and exclusive expression of the agreement between them with respect to the subject matter hereof.  This Agreement supersedes any and all prior oral or written agreements relating to such subject matter.

*signatures on next page*

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 8 of 9

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"LICENSOR"
Cottonwood Pictures, LLC

By: _____
Its: _Vice President_____

Address for notices:
2000 Avenue of the Stars, Suite 620-N
Los Angeles, California 90067
Attention: Deborah Zipser
Fax No.: +(310) 461-1490

"AGENT"
Union Bank, N.A., as Administrative Agent

By: _____
Its: _____

Address for notices:
1901 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
Attn: Brian Stearns
Fax No.: +(310) 551-8980

"DISTRIBUTOR"
Icon Film Distribution Ltd.

By: _____
Its: _CHIEF EXECUTIVE_____

Address for notices:
Solar House
915 High Road
London N12 8QJ
ENGLAND
Fax No.: +(44) 20.8492.6301

Notice of Assignment
"THE TREE OF LIFE" – UK
Page 9 of 9

02-22-11    04:16pm    From-LOEB & LOEB                    3102822200            T-519   P.076/081   F-441

# EXHIBIT C

## ASSIGNMENT AGREEMENT

This Assignment Agreement ("Agreement") is entered into as of February 10, 2011, by and between Union Bank, N.A., a national banking association ("Union Bank"), in its capacity as Administrative Agent and a Lender under the Credit Agreement referred to below, on the one hand, and Cottonwood Pictures, LLC, a California limited liability company ("Cottonwood"), on the other hand, with reference to the following facts:

A.  Pursuant to that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 26, 2009, by and among River Road Pictures, LLC, as Borrower, the Guarantors referred to therein, the Sponsor referred to therein and Union Bank, as Administrative Agent, Issuing Bank and a Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), the Lenders agreed to provide certain financial accommodations to or for the benefit of Borrower on the terms more fully set forth therein. Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

B.  On or about May 16, 2008, Cottonwood, a Subsidiary of Borrower and a Guarantor under the Credit Agreement, entered into a Motion Picture Lease Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Lease Agreement") with Icon Film Distribution Ltd. ("Icon") pursuant to which Icon licensed certain distribution rights in and to that certain feature length theatrical motion picture entitled "The Tree of Life" (the "Picture") in the United Kingdom on the terms more fully set forth therein.

C.  On or about October 19, 2009, Union Bank, Cottonwood and Icon entered into a Notice of Assignment (as amended, restated, supplemented or otherwise modified from time to time, the "Notice of Assignment") pursuant to which Icon agreed to pay certain amounts payable by Icon to Cottonwood under the Lease Agreement directly to Union Bank on the terms more fully set forth therein.

D.  Icon has failed to make payment of certain amounts to Union Bank as required pursuant to the terms of the Notice of Assignment.

Now, therefore, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Union Bank and Cottonwood agree as follows:

1.  Assignment of Rights Under the Notice of Assignment. Subject to the terms and conditions hereof, Union Bank hereby absolutely and irrevocably assigns, grants and transfers to Cottonwood all of its right, title and interest of whatever kind and nature and whether now owned or hereafter acquired or arising in, to and under the Notice of Assignment and all properties and things of value pertaining thereto and all accounts and other rights to payment now or hereafter arising in connection therewith and amounts recovered as damages by reason of the breach thereof or derived therefrom in any manner whatsoever and all proceeds of any of the foregoing, including cash

LA2107495.1
31414-10004

02-22-11    04:17pm    From-LOEB & LOEB                   3102822200              T-519   P.078/081   F-441

proceeds and proceeds of claims against Icon with respect to the foregoing, including but not limited to (a) all rights to pursue litigation or arbitration against Icon for amounts owing to Union Bank pursuant to the Notice of Assignment or the Lease Agreement, and (b) all other rights Union Bank may have against Icon under the Notice of Assignment (collectively, the "Assigned Rights"), in each case solely in the name of Cottonwood as assignee of such right, title and interest.

2.    Disposition of Amounts Collected.  Notwithstanding the assignment set forth in paragraph 1 above, the Assigned Rights shall constitute Collateral and any Net Icon Proceeds (as hereinafter defined) received by Cottonwood or any of its Affiliates shall be remitted by Cottonwood to Union Bank within ten Business Days following receipt thereof for application by Union Bank against the Obligations as provided under the Credit Agreement. As used herein, "Net Icon Proceeds" shall mean (a) all sums collected by or on behalf of Cottonwood or any of its Affiliates from Icon in respect of the Picture, whether pursuant to the Notice of Assignment, the Lease Agreement or otherwise, less (b) (i) amounts Cottonwood becomes legally obligated to pay Icon by way of any claim, counterclaim or any other legal procedure in respect of the Picture, (ii) any out-of-pocket expenses incurred by Cottonwood in collecting any such sums from Icon, including attorneys' fees and costs, experts' fees and any other out-of-pocket expense and (iii) any amounts necessary to reimburse Cottonwood for any amounts paid by Cottonwood to Union Bank pursuant to paragraph 3 below.

3.    Reimbursement Obligation.  Cottonwood hereby agrees to reimburse Union Bank for any reasonable out-of-pocket costs incurred by Union Bank in connection with the enforcement of claims under the Notice of Assignment, including any outside attorneys' fees and costs or experts' fees.

4.    Litigation Decisions.  Cottonwood shall have the sole right to determine how to prosecute any claims against Icon whether pursuant to the Notice of Assignment or Lease Agreement, including any decisions regarding whether or how to settle any outstanding claims.

5.    Choice of Law; IFTA Arbitration Clause.  This Agreement shall be governed by the laws of the State of California applicable to contracts made and performed in that State. Any dispute related to or arising out of this Agreement shall be resolved by mandatory, binding arbitration in accordance with the Arbitration Rules of the Independent Film and Television Alliance ("IFTA").

6.    Counterparts.  This Agreement may be executed in identical counterpart copies, each of which shall be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

LA2107495.4
214146-10004

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date
first set forth above.

Union Bank, N.A.

By: _____

Name: Alex Cho

Its: AVP

Cottonwood Pictures, LLC

By: _____

Name: Michael J. Lenart

Its: Vice President

02-22-11    04:18pm    From-LOEB & LOEB                          3102822200              T-519    P.080/081    F-441

# PROOF OF SERVICE

I, Monette Delfin, the undersigned, declare that:

I am employed in the County of Los Angeles, State of California, over the age of 18, and not a party to this cause. My business address is 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, California 90067-4120.

On February 22, 2011, I caused a true copy of the **ARBITRATION DEMAND** to be served on the parties in this cause as follows:

[X]    (VIA HAND DELIVERY) in a sealed envelope addressed as set forth below, or on the attached service list.

Independent Film & Television Alliance
c/o Richonda Starkey, The Arbitral Agent
10850 Wilshire Boulevard, 9th floor
Los, Angeles 90024
Tel: (310) 446-1000
Fax: (310) 446-1600

[X]    (VIA U.S. MAIL) by placing the above named document in a sealed envelope addressed as set forth below, or on the attached service list and by then placing such sealed envelope for collection and mailing with the United States Postal Service in accordance with Loeb & Loeb LLP's ordinary business practices.

[X]    (VIA FACSIMILE) by transmitting the above named document to the fax number set forth below, or on the attached service list.

Icon Film Distribution LTD.
90 High Holborn
London WC1V 6XX
Attn: Steven Corney
Tel: +44 20 7067 3000
fax: +44 20 7067 3999

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Loeb & Loeb
Limited Liability Partnership
Including Professional
Corporations

LA2102174.2
214146-10004

7

Executed on February 22, 2011, at Los Angeles, California.

Monette Delfin
_____
Monette Delfin

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2102174.2
214146-10004                        8

# EXHIBIT 2

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3210**

WRITER'S INTERNET ADDRESS
**garygans@quinnemanuel.com**

April 19, 2011

Richonda Starkey, Arbitral Agent
Independent Film & Television Alliance
10850 Wilshire Boulevard, Ninth Floor
Los Angeles, California 90024

Michael Anderson, Esq.
Donald A. Miller, Esq.
Loeb & Loeb
10100 Santa Monica Boulevard, Suite 2400
Los Angeles, California 90067

Re:    *Cottonwood Pictures, LLC v. Icon Film Distribution Ltd.*
       **I.F.T.A. Arbitration No. 11-15**

Gentlepersons:

Icon Film Distribution Ltd. ("Icon") hereby responds to the Arbitration Demand of Cottonwood
Pictures, LLC ("Cottonwood") and counterclaims against Cottonwood.

**The Parties and Counsel:**

The parties to this arbitration and their counsel are:

Cottonwood Pictures, LLC
Attn:  Mitch Horwits
2000 Avenue of the Stars, Suite 620-N
Los Angeles, California 90067
Telephone:  (310) 461-1491
Facsimile:  (310) 461-1490

Michael Anderson, Esq.
Donald A. Miller, Esq.
Loeb & Loeb
10100 Santa Monica Boulevard, Suite 2400
Los Angeles, California 90067
Telephone:  (310) 282-2000
Facsimile:  (310) 282-2200

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

April 19, 2011
Page 2

Icon Film Distribution Ltd.                Gary E. Gans, Esq.
Attn:  Estelle Overs, General Counsel       A.J. Bedel, Esq.
Charlotte Building, 17 Gresse Street        Quinn Emanuel Urquhart & Sullivan
London W1T 1QL                              865 South Figueroa Street, Tenth Floor
United Kingdom                              Los Angeles, California 90017
Telephone: +44 20 7927 6900                 Telephone:  (213) 443-3000
Facsimile:  +44 20 7927 6901                Facsimile:  (213) 443-3100

**The Nature of the Dispute**

This arbitration concerns the distribution of a motion picture entitled *The Tree of Life* (the
"Film"), directed by Terrence Malick.

As of May 16, 2008, Icon and Cottonwood entered into a contract entitled "Motion Picture Lease
Agreement" with respect to the Film (the "Lease Agreement").  Arbitration Demand, Exhibit A.
Pursuant to the Lease Agreement, Cottonwood agreed to license to Icon certain rights to exploit
the Film in the United Kingdom and related territories. *Id.*, § D.  In consideration, Icon agreed to
make a payment of US$2,250,000 (the "Advance") payable as follows: (i) US$450,000 after
execution of the Lease Agreement (the "Signature Payment"); and (ii) US$1,800,000 after
receipt of a "Notice of Delivery" (the "Delivery Payment"). *Id.*, § E.1.  A "Notice of Delivery" is
defined as written notification to Icon that Cottonwood is able to manufacture and deliver to Icon
the "Initial Physical Materials" for the Film. *Id.*, § G.  The "Initial Physical Materials" consist of
internegatives of the feature and trailer, interpositives of the feature and trailer, an optical
soundtrack negative of the feature, an MO disk of the feature, two release prints of the feature,
two release prints of the trailer and a combined action continuity/dialogue spotting list of the
feature. *Id.*, Schedule B, § A.

The Lease Agreement provides that if Cottonwood is unable to make the Initial Physical
Materials available to Icon by July 31, 2010, Cottonwood must give Icon notice of the date that
the Film is expected to be available for delivery, and Icon may either accept the new delivery
date or terminate the agreement.  If Icon elects to terminate the agreement, the agreement shall
be deemed null and void and Cottonwood shall refund to Icon all amounts of the Advance that
have been paid. *Id.*, § H.6.

As of October 19, 2009, Icon, Cottonwood and Union Bank, N.A. (as agent for certain lenders)
entered into a contract entitled "Notice of Assignment" with respect to the Film (the "Notice of
Assignment").  Arbitration Demand, Exhibit B.  The Notice of Assignment provides that, upon
satisfaction of certain "Conditions Precedent," *inter alia*, Icon would pay the Delivery Payment
directly to Union Bank.  Icon waived various defenses to payment, but did not waive satisfaction
of the Conditions Precedent.  Notice of Assignment, §§ 1(a), (f) and (g).  The Conditions
Precedent are the conditions for payment set forth in the Lease Agreement. *Id.*, Recital B.  Icon
reserved all of its rights under the Lease Agreement. *Id.*, § 4.

April 19, 2011
Page 3

Thus, under the contracts, Cottonwood was obligated, *inter alia*, to make the Initial Physical Materials available to Icon by July 31, 2010 as a condition to Icon's obligation to pay the Advance and its failure to do would give Icon the right to terminate the Lease Agreement and to a refund of its Signature Payment.  Cottonwood did not make the Initial Physical Materials available to Icon by July 31, 2010 and still has not made them available, causing Icon to miss its scheduled release date for the Film.

On August 5, 2010, Cottonwood sent Icon a purported Notice of Delivery stating that it was ready to provide to Icon the Initial Physical Materials.  However, the Notice of Delivery was improper and ineffective because, *inter alia*, the Film had not been completed and all of the Initial Physical Materials were not available for delivery.  Icon is informed and believes that the director, Mr. Malick, had not completed the editing of the Film at that time and that Cottonwood not only concealed that fact from Icon, but issued a false Notice of Delivery to get Icon to make the Delivery Payment on a fraudulent premise.

Cottonwood also failed to give Icon notice of the date that the Film was expected to be available for delivery under § H.6 of the Lease Agreement.  Consequently, Icon elected to terminate the Lease Agreement and requested the return of the Signature Payment it made after execution of the Lease Agreement.

Based on the foregoing facts, Icon denies the material allegations of Cottonwood's Arbitration Demand and asserts the following affirmative defenses:  failure to state a claim, waiver, estoppel, unclean hands, failure to mitigate, failure to satisfy conditions precedent, breach of contract, breach of the implied covenant of good faith and fair dealing, excuse and failure of consideration.

Furthermore, based on the foregoing facts, Icon asserts the following counterclaims:

1.      Under the Lease Agreement and the Notice of Assignment, Cottonwood is obligated to return to Icon the Signature Payment.  Cottonwood has committed a breach of contract by failing to do so.

2.      Cottonwood must indemnify Icon against any liability to Union Bank or its successors in interest (including any claim brought by Cottonwood or any other entity as the assignee of Union Bank) under the Notice of Assignment.

3.      Icon is entitled to arbitral declarations that:  (a) the Lease Agreement has been terminated; and (b) Icon has no obligation to pay the Advance under the Lease Agreement or the Notice of Assignment.

April 19, 2011
Page 4

**The Arbitration Agreements**

The Lease Agreement, in Schedule C, § 7c, contains the following arbitration clause:

Notwithstanding the above, if Lessor or Lessee so elects, any dispute or claim arising out of or relating to this Agreement (including any dispute regarding delivery or the quality of materials delivered by Lessor) or the breach hereof may be resolved by arbitration in Los Angeles, California, in accordance with the rules and procedures of the Independent Film & Television Alliance (formerly known as the American Film Marketing Association) ("IFTA") as such may be amended from time to time, which rules and procedures era Incorporated into and made part of this Agreement. The Parties agree to abide by and perform in accordance with any award rendered by the arbitrator in such arbitration proceedings and any such decision or award shall be final and conclusive and may be enforced in any court of law with jurisdiction over any of the Parties. All notices required to be given to effectuate service to initiate arbitration or to confirm an arbitration award shall be deemed to have been duly served if sent by certified mail (whether or not the return receipt is returned to the party giving notice by the party receiving notice).

The Notice of Assignment, in § 5, contains the following arbitration clause:

(a)  Arbitration.

(i)  All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Film or the Distribution Rights, this Agreement, or any resulting transaction, including, but not limited to, their respective obligations hereunder, payment of the Minimum Guaranteed Payment and any other Distribution Agreement Proceeds, a disagreement about the meaning, interpretation, application, performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise, shall be subject to and resolved by mandatory binding expedited arbitration conducted under the auspices of the Independent Film & Television Alliance and its rules in effect as of the date the request for arbitration is filed (the "Rules") and, to the extent not otherwise covered above, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code; provided, however, if the issue of whether Notice of Delivery has been effected is the subject of dispute, then prior to the commencement of an arbitration proceeding with respect thereto the Agent shall first have a 30-calendar day period (commencing on the date on which the Agent is first notified by the Distributor in writing of that dispute) within which to cause any alleged defect relating to Notice of Delivery to be cured. If the Distributor has not, within 3 business days after the expiration of such 30-day period, notified the other parties hereto that the alleged Notice of

April 19, 2011
Page 5

Delivery defect(s) remain uncured then Notice of Delivery shall be deemed to have been effected for all purposes hereof.

(ii)     Each of the parties may initiate such an arbitration pursuant to the Rules.  The arbitration shall be held in Beverly Hills or Los Angeles, California (such site being herein referred to as the "Forum").  The arbitration proceeding shall be conducted in the English language.  Each of the parties hereto shall abide by any decision rendered in such arbitration, and any court having jurisdiction may enforce such a decision.

(iii)     If the issue of whether any of the Conditions Precedent has been effected is the subject of any arbitration proceeding hereunder, then that issue (and only that issue) shall be determined in a separate arbitration proceeding before any other claim is heard.  The Distributor may not assert in such proceeding any counter-claim or other offset, or any defense other than the defense of a failure to effect one or more of the Conditions Precedent to the Distributor.  That arbitration proceeding shall continue on consecutive business days until fully concluded, unless continued by the arbitrator for good cause shown, but in no event shall that arbitration continue for more than five (5) business days from the commencement thereof (exclusive of continuance days).  The arbitration must result in either a finding that either (1) the applicable Conditions Precedent have been effected to the Distributor and, if so, the date on which each of the applicable Conditions Precedent were effected, or (2) the applicable Conditions Precedent have not been effected to the Distributor.  If there is a finding that the applicable Conditions Precedent were effected, then the arbitrator shall immediately issue and award, ordering the Distributor to immediately pay the Minimum Guaranteed Payment to the Collection Account without asserting any defenses.  Until Distributor has completely satisfied such award, the Distributor waives any and all rights to assert any and all claims of any kind whatsoever (whether legal or equitable) against the Agent and/or the Lenders relating to the Film, this Agreement, the Distribution Agreement, or the Distribution Agreement Proceeds.  The arbitration award shall also provide for payment by the losing party (i.e., the party or parties against whom an arbitration award is issued) of (i) the fees and costs incurred in connection with said arbitration, as well as the reasonable attorneys' fees and costs incurred by the prevailing parties (i.e., all parties to the arbitration other than the losing party), and (ii) shall further provide for the payment by the losing party of all other amounts payable pursuant to the Distribution Agreement.  The arbitrator shall immediately upon conclusion of the arbitration proceedings, render and issue a written decision.

April 19, 2011
Page 6

**Statement of Relief Sought**

Icon requests the following relief:

1.    An award that Cottonwood take nothing by means of its Arbitration Demand;

2.    Arbitral declarations that: (a) the Lease Agreement has been terminated; and (b) Icon has no obligation to pay the Advance under the Lease Agreement or the Notice of Assignment;

3.    An order that Cottonwood must indemnify Icon against any liability to Union Bank or its successors in interest (including any claim brought by Cottonwood or any other entity as the assignee of Union Bank) under the Notice of Assignment;

4.    An award of US$450,000 for the return of Icon's Signature Payment, together with interest thereon;

5.    An award of Icon's reasonable attorney's fees and costs herein; and

6.    Such other and further relief as the Arbitrator deems just and proper.

The foregoing is not intended to be a complete statement of the facts and legal issues involved in this matter, and it shall not be construed as a waiver of any of Icon's rights, remedies or claims, legal or equitable, all of which are expressly reserved.

Yours truly,

Gary E. Gans

GEG:av
99998.76876/4094832.3

**PROOF OF SERVICE**

1

2        I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa

3    Street, 10th Floor, Los Angeles, California  90017-2543.

4        On April 19, 2011, I served true copies of the following document(s) described as **RESPONSE TO ARBITRATION DEMAND** on the interested parties in this action as follows:

5

6    Richonda Starkey                          Michael Anderson, Esq.
     Independent Film & Television Alliance    Donald A. Miller, Esq.

7    10850 Wilshire Blvd., 9th Floor           Loeb & Loeb
     Los Angeles, CA 90024                     10100 Santa Monica Blvd., Suite 2400

8                                              Los Angeles, CA 90067

9    **BY MAIL:**  I am "readily familiar" with the practices of Quinn Emanuel Urquhart & Sullivan, LLP for collecting and processing correspondence for mailing with the United States

10   Postal Service.  Under that practice, it would be deposited with the United States Postal Service
     that same day in the ordinary course of business.  I enclosed the foregoing in sealed envelope(s)

11   addressed as shown above, and such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary

12   business practices.

13   **BY ELECTRONIC MAIL TRANSMISSION:**  By electronic mail transmission from ajbedel@quinnemanuel.com on , by transmitting a PDF format copy of such document(s) to each

14   such person at the e mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and

15   without error.

16       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

17       Executed on April 19, 2011, at Los Angeles, California.

18

19                                              _____

20                                              A.J. Bedel

21

22

23

24

25

26

27

28

04470.23482/4100402.1

# EXHIBIT 3



MICHAEL T. ANDERSON
for Loeb & Loeb LLP

10100 Santa Monica Blvd.
Suite 2200
Los Angeles, CA 90067

**Direct**  310.282.2303
**Main**   310.282.2000
**Fax**    310.510.6735
manderson@loeb.com

Via Email and US Mail

May 12, 2011

Richonda Starkey, Arbitral Agent
Independent Film & Television Alliance
10850 Wilshire Boulevard, Ninth Floor
Los Angeles, CA 90024

Jack Freedman, Esq.
1093 Broxton Ave., Suite 228
Los Angeles, CA 90024

Gary E. Gans
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:   *Cottonwood Pictures, LLC v. Icon Film Distribution, Ltd.*
      IFTA Arbitration No. 11-15

Dear Ms. Starkey, Mr. Freedman and Mr. Gans:

Cottonwood Pictures, LLC ("Cottonwood") hereby responds to the Counterclaim of Icon Film Distribution Ltd. ("Icon").

**Factual Background re Icon's Counterclaims:**

In its April 19, 2011, letter, Icon asserts three "counterclaims": (1) "Cottonwood is obligated to return to Icon the Signature Payment" of $450,000; (2) "Cottonwood must indemnify Icon against any liability to Union Bank"; and (3) "Icon is entitled to arbitral declarations that . . . the Lease Agreement has been terminated . . . and . . . Icon has no obligation to pay the Advance" of $1.8 million to Cottonwood. Counterclaim at ¶ 3. All three of the counterclaims are dependent on the following two propositions as articulated in the Counterclaim: (1) "Cottonwood did not make the Initial Physical Materials available to Icon by July 31, 2010 and still has not made them available" and (2) "the Notice of Delivery was improper and ineffective because, *inter alia*, the Film had not been completed and all of the Initial Physical Materials were not available for delivery." Id.

Both factual propositions are false.

First, Cottonwood, through its sales agent Summit Entertainment, sent a Notice of Delivery to Icon on both July 30, 2010 and, again, on August 4, 2010. Icon apparently quarrels that the first notice of delivery, but not the second, went to an improper address.

A limited liability partnership including professional corporations

LA2125028.3
214146-10010



Second, Cottonwood made available to Icon the Initial Physical Materials (the "Materials") by July 31, 2010.  In fact, at Icon's insistence, Cottonwood provided proof to Icon – several months ago –  that the Materials were available to Icon by July 31, 2010.  For example, Cottonwood caused Deluxe Italia Holding ("Deluxe"), the independent laboratory in Rome holding the Materials, to prepare a letter confirming that it received the Materials on *July 27, 2010*. ("On behalf of Deluxe . . . I hereby confirm that the preprint materials listed on that certain Laboratory Access letter *dated July 27, 2010* from Cottonwood Pictures, LLC to Deluxe, for the benefit of Icon Film Distribution, Ltd., concerning the motion picture entitled, 'The Tree of Life' are in accordance with [certain] specifications" (emphasis added)).

Additionally, when Icon complained that Deluxe's confirmation letter was not enough proof of the availability of the Initial Physical Materials, Cottonwood sent an annotated copy of the actual laboratory access letter – received-stamped July 27, 2010, by Deluxe – which was delivered to Deluxe along with the Initial Physical Materials on or before July 27, 2010.

The Film was therefore completed and available to Icon by July 30, 2010.  Icon's only quarrel, apparently, is that a US theatrical release version of the film was later created.  A US theatrical release version is explicitly contemplated by the Motion Picture Lease Agreement and was available to Icon as well.  Arb. Demand, Ex. A, ¶ G.

Cottonwood is informed and believes, therefore, that Icon's refusal to pay for the Film is not actually based on any failure to timely deliver the Film, but Icon's new management's dissatisfaction with the film after screening it on July 13, 2010.  For all of these reasons, Cottonwood denies the allegation of the Counterclaim.

**Affirmative Defenses:**

Even though Cottonwood denies the allegations of the Counterclaim, the relief sought by the Counterclaim is also barred by the following affirmative defenses:  breach of the implied covenant of good faith and fair dealing, excuse, failure to satisfy conditions precedent, waiver, estoppel, unclean hands, offset, and Icon's waiver of the right to assert counterclaims pursuant to paragraph 5 (c) of the Notice of Assignment.

**Relief Sought:**

Cottonwood therefore requests the following relief:

1.     An award that Icon take nothing by means of its Counterclaim;

2.     An award of Cottonwood's attorney's fees and costs herein; and

3.     Such other and further relief as the Arbitrator deems just and proper.

Sincerely,

Michael T. Anderson

# EXHIBIT 4

# Independent ∎
# Film & Television
# ∎ ∎ ∎ Alliance
# A r b i t r a t i o n®

10850 Wilshire Boulevard / 9th Floor
Los Angeles, CA 90024-4321
310-446-1000 TEL / 310-446-1600 FAX
www.ifta-online.org / info@ifta-online.org

November 30, 2011

Michael T. Anderson, Esq.
Donald A. Miller, Esq.
Loeb & Loeb LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067
     Via email: manderson@loeb.com; dmiller@loeb.com and certified mail

Gary E. Gans, Esq.
Dawn Utsumi, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
     Via email: garygans@quinnemanuel.com; dawnutsumi@quinnemanuel.com and certified
     mail

**Re:**     **Arbitration #11-15 – Cottonwood Pictures, LLC v. Icon Film Distribution Ltd.**

Gentlepersons:

In accordance with Paragraph 12.3 of the applicable IFTA Rules for International Arbitration, enclosed is a fully executed Award and final invoice for services rendered in this matter.

This Award is being forwarded to the Parties via email, with an original to follow via USPS certified mail. If you would like to receive the Award via courier, please provide IFTA with your courier account number no later than the next business day from the date of this letter.

Sincerely,
IFTA

Richonda Starkey
Arbitral Agent

enclosures by certified mail

cc:     Jack E. Freedman, Esq., Arbitrator – 310-208-2201 w/o attachments
       Kim Tommaselli, Senior Counsel, IFTA
       Susan Cleary, Vice President & General Counsel, IFTA

# DECLARATION OF SERVICE

I, Richonda Starkey, declare as follows:

I act as Arbitral Agent for IFTA Arbitration in Los Angeles, California. I am over the age of eighteen years of age and am not a party to this action. IFTA's address is 10850 Wilshire Boulevard, 9th Floor, Los Angeles, CA 90024. On November 30, 2011, I served the **Award** on the interested parties as follows:

☒  **BY REGISTERED AND/OR CERTIFIED MAIL:** I placed a true copy in a sealed envelope addressed the party/ies indicated at the address(es) below. The envelope is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party serviced, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day after date of deposit for mailing in affidavit.

☐  **BY COURIER/OVERNIGHT SERVICE:** I caused DHL Express or Federal Express to deliver a true copy of the aforementioned document(s) in a sealed envelope with airbill addressed to the party/ies indicated at the address(es) shown below.

☐  **BY FACSIMILE:** I caused the aforementioned document to be transmitted by facsimile machine to the parties and numbers indicated below. The transmissions were reported as complete, and no errors were reported by the facsimile machine. Copies of the transmission records are maintained by our office.

☐  **BY PERSONAL SERVICE:** I caused Express Group, Inc. to hand deliver a true copy of the aforementioned document(s) in a sealed envelope addressed to each person(s) named at the address(es) shown below.

☒  **BY ELECTRONIC MAIL (.PDF FORMAT):** I caused a true copy of the aforementioned document(s) to be sent via e-mail (.pdf format) to the interested party/ies at the e-mail address/es indicated below.

Executed on November 30, 2011 at Los Angeles, California.

☒  **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

**RICHONDA STARKEY**
**Arbitral Agent**
**IFTA Arbitration**

# SERVICE LIST

**IFTA Arbitration #11-15**
**Cottonwood Pictures, LLC v. Icon Film Distribution Ltd.**


Michael T. Anderson, Esq.
Donald A. Miller, Esq.
Loeb & Loeb LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA  90067
manderson@loeb.com
dmiller@loeb.com

Gary E. Gans, Esq.
Dawn Utsumi, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
garygans@quinnemanuel.com
dawnutsumi@quinnemanuel.com

**BEFORE THE ARBITRATION TRIBUNAL OF**
**THE INDEPENDENT FILM & TELEVISION ALLIANCE**

| | |
|---|---|
| In the Matter of Arbitration between | CASE NO. 11-15 |
| **Cottonwood Pictures, LLC** | |
| Claimant and Counter Respondent, | AWARD |
| and | |
| **Icon Film Distribution Ltd.** | |
| Respondent and Counter Claimant. | |

This matter duly came on for Hearing on October 18, 2011 at 10 am before Jack E. Freedman, Arbitrator, at the offices of Claimant's attorney, as agreed by the Parties, continuing through October 21 and concluding on October 26, 2011.

Cottonwood Pictures, LLC, Claimant and Counter Respondent ("Claimant") was represented by Michael T. Anderson and Donald A. Miller of Loeb & Loeb, LLP and Icon Film Distribution, LLC, Respondent and Counter Claimant ("Respondent") was represented by Gary E. Gans and Dawn Utsumi of Quinn Emanuel Urquhart & Sullivan, LLP.

Claimant and Respondent ("Parties") were afforded the opportunity to appear and present their case. In that regard, testifying under oath at the Hearing, were six witnesses (including two experts) for Claimant and six witnesses (including three experts) for Respondent.

This Arbitration arises out of a Motion Picture Lease Agreement entered into between the Parties dated May 16, 2008 ("Agreement") regarding a motion picture entitled *The Tree of Life* ("Picture") directed by Terrance Malick ("Director") starring Brad Pitt ("Star"). Pursuant to said Agreement, Claimant, as Lessor, licensed to Respondent, as Lessee, certain distribution rights to the Picture for the Territory of the United Kingdom ("Territory") for a period of fifteen years after the earlier of: (i)

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 2 of 12

the first Theatrical release of the Picture in the Territory, or (ii) nine (9) months after

Lessor's Notice of Delivery ("Term"), in consideration of an advance payment by

Respondent of $2,250,000 ("Advance") plus certain contingent overages. The

Advance was payable $450,000 within fourteen days after execution of the

Agreement ("First Advance") and $1,800,000 within fourteen days after the Notice of

Delivery ("Second Advance"). The First Advance was paid but the Second Advance,

which forms the primary basis of this Arbitration, was not.

The Agreement states that "Notice of Delivery" ("NOD") means "...delivery to

Lessee of written notification that, upon receipt of payment for the Initial Physical

Materials ("IPM") and any other sums then due and/or due thereon, Lessor is able to

manufacture and deliver the Initial Physical Materials." At the time of service of the

NOD, Claimant did not have to deliver or provide access to the IPM until payment

was made by Respondent for the IPM and for the Second Advance. IPM was defined

in Schedule B to the Agreement ("Schedule B") as providing *access or delivery* to

nine listed items. *Access* was to be provided as per Schedule C of the Agreement

("Schedule C") by a Laboratory Access Letter ("LAL") a specimen of which was

attached as Schedule A to the Agreement ("Schedule A") from Deluxe Italia Holding

SRL ("Deluxe Italia"). As to the LAL it was acknowledged during testimony by

Respondent's General Counsel Ms. Estelle Overs ("Overs") that the Agreement

contained no contractual date for delivery of the LAL, which Claimant testified would

customarily be delivered only after the aforesaid payments were made by

Respondent.

The Agreement provides, among other things, that any dispute or claim

arising from the Agreement shall be resolved by binding arbitration pursuant to the

Rules for International Arbitration ("Rules") published by the Independent Film and

Television Alliance ("IFTA") in effect at the time the notice of Arbitration is filed which

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 3 of 12

Rules therefore applicable to this matter are dated June 1, 2009 and which establish

the authority of the Arbitrator hereunder.

Two other agreements are related to this matter:

1. Pursuant to a Notice of Assignment, dated as of October 19, 2009, between

Union Bank ("Bank"), Claimant and Respondent ("NOA"), Respondent was to pay the

Second Advance directly to the Bank. The Parties agreed at the outset of this matter

that the arbitration provision of the Agreement would control over the one contained

in the NOA.

2. Pursuant to an Assignment Agreement, dated as of February 10, 2011,

between Claimant and the Bank ("AA"), the Bank assigned to Claimant all of its

rights pursuant to the NOA, including its right to pursue any claims against

Respondent for non-payment of the Second Advance.

With respect to the procedural requirements pertaining to this matter, I find

that arbitration of the dispute between the Parties was properly initiated, under the

Rules, by Claimant's *Notice of Arbitration* dated February 22, 2011 responded to by

Respondent, including counterclaims, on April 19, 2011 with a response thereto from

Claimant on May 12, 2011. On April 21, 2011 the undersigned was appointed to act

as the sole Arbitrator in this matter.

The Arbitrator has reviewed the transcripts of the Hearing, considered the

pleadings, pre-Hearing briefs, witness testimony, exhibit books (including viewing

two versions of the Picture), documentary evidence, post-Hearing briefs and the

arguments presented by the Parties and now makes the following determination.

## BACKGROUND AND CLAIMS

On July 30, 2010 Claimant's sales agent for the Picture, Summit

Entertainment ("Summit"), sent a Notice of Delivery ("NOD"), as required pursuant

to the Agreement, for payment of the Second Advance to Respondent. Said NOD

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 4 of 12

related to a version of the Picture running approximately 2 hours 45 minutes
("Longer Version"). The NOD, rather than being sent to Respondent in London, was
sent by fax to the attention of Respondent's former executive, David Miercort, at
their former Los Angeles offices which had been the practice on other pictures
between the Parties prior to Icon being sold in November 2009 which separated the
UK operations from those of Los Angeles and Australia. Mr. Miercort promptly
forwarded the NOD to Respondent in London, where it was received on August 2,
2010, and Claimant, upon realizing the misdirection of the NOD, likewise promptly
sent it directly to Respondent in London where it was received on August 5, 2010
after a transmission error when it was initially sent on August 4, 2010.

    Respondent on receipt of the NOD on August 5, 2010, notified Claimant that it
was terminating the Agreement (and its obligation to make the Second Advance) due
to the NOD being received after the date of July 31, 2010. Respondent claimed that
if Claimant was unable to make the IPM available by July 31, 2010 that Claimant had
to provide, under paragraph G6 of the Agreement, a new date which would be
considered an "Extended Outside Delivery Date" as to which, within twenty-one days
thereafter, Respondent would have the option of either accepting or of terminating
the Agreement. Overs advised Claimant in writing and testified that "[w]e did not
receive any notice from you with the relevant NOD by 31 July 2010 and therefore
assumed that you would not be delivering this title to us within the relevant
timeframe. We therefore elect to terminate... and look forward to return of the
signature payment," i.e., the First Advance.

    Over the next nine months the Parties alternatingly asserted their rights and
attempted to resolve the dispute. On October 28, 2010, Overs wrote to the Bank
asserting the claim that "[t]he version of the film shown to our representative prior
to the purported service of NOD was not a finished picture. We understand the film is
currently being edited.... Contractually, we have access to all versions of the film."

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 5 of 12

Then, on November 26, 2010, Overs requested "confirmation that all final deliverables of the long version of the film have been available at the lab since 31 July 2010" and that "we understand… that after payment of the minimum guarantee we will be entitled to access delivery materials for the long and the short version of the film." It wasn't until the end of August 2010, following delivery of the Longer Version pursuant to the NOD, that Claimant prevailed upon the Director to produce a subsequent version of the Picture, which was completed on or about November 2010 and which had its world premiere on May 18, 2011 at the Cannes Film Festival, with a running time of two hours and nineteen minutes ("Shorter Version").

In response to these queries, Claimant, in an effort to satisfy Respondent's requests for information prior to it making the Second Advance, provided Respondent on November 12, 2010, though it had no obligation to do so, with a letter from Deluxe Italia dated October 29, 2010 referencing existence of the LAL and confirming that the preprint materials listed thereon consisted of nine reels, i.e., the complete Longer Version of the Picture including credits on Reel 9. Then on January 4, 2011 Claimant provided Respondent with a redacted copy of the LAL (redacted because it was not intended to be effective and delivered until Respondent had made the required payments as aforesaid), and finally on May 10, 2011, Mr. Anderson wrote to Mr. Gans that, as payment of the Second Advance was not forthcoming, Claimant was terminating the Agreement pursuant to #7(a) as well #1(e) of Exhibit C - Standard Terms and Conditions ("STC").

Respondent, in its Pre-Hearing Brief and confirmed at the Hearing, waived its claim to late delivery of the NOD which was the foundation of its initial refusal to pay the Second Advance. Instead, in support of Respondent's termination action and as defense to its obligation to payment of the Second Advance, it augmented its arguments to allege that: (a) The NOD was defective because it did not relate to the final, completed and approved subsequent version of the Picture, i.e., the Shorter

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 6 of 12

Version and that (b) The NOD as to the Longer Version was not in compliance with the requirements of the Agreement. As to point (a) above, Overs testified that Respondent wanted "evidence that the materials listed in the... NOD... related to the final international version... that was complete and ready to be delivered on July 31, 2010 to international distributors with no further edits or amendments and a running time of less than two hours, 45 minutes" and that it "is the version that all international distributors are going to be using."

Claimant argues that the NOD properly related to the Longer Version which it claims was the final, completed and approved version that existed at the time of the NOD and that the NOD was in all respects in compliance with the Agreement entitling it to the Second Payment.

Claimant, by testimony of David Garrett, accepted and acknowledged that it had an obligation to mitigate damages and that Summit, on behalf of Claimant, had successfully re-licensed the theatrical rights to the Picture in the Territory to Fox Searchlight Pictures, Inc. ("Fox") on June 7, 2011 for that purpose.

## DISCUSSION AND FINDINGS

The Agreement required Claimant to provide the NOD by an outside delivery date of July 31, 2010 as agreed by the Parties in their contractual negotiations buttressed by Claimant's behavior in actually providing said NOD by that date. Respondent, by way of waiver, acknowledged that Claimant did timely provide the NOD; that NOD was, in effect, notice that the Picture was available for delivery by such date, obviating Respondent's right to terminate under paragraph G6 of the Agreement.

While Respondent, after making all required payments for rights and materials, would be entitled to various rights to all versions of the Picture, the definition of Picture as including all versions thereof does not mean that Claimant is

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 7 of 12

required to deliver each and every version that might exist in the future at the time
it elects to give the NOD. Respondent argues that it had a right to terminate the
Agreement if all versions of the Picture were not made available by July 31, 2010.
That illogical construction as argued by Respondent would mean that Respondent
could avoid payment on the theory that other theatrical versions *might* be made.
That clause, as was confirmed by testimony and as is customary in contracts of this
nature, is primarily to ensure that other distributors do not lay claim to ownership of
other versions. The Agreement expressly contemplates that Claimant might, but was
not obligated to, create more than one version and that "Subject to Claimant's
receipt of the Advance and cost of materials… Claimant shall provide Respondent
with access, if available, to the U.S. Theatrical version/cut." In such event,
Respondent would have had ample time prior to the expected release date in the
Territory to choose which version it preferred to release. Finally, there is nothing in
the express language of the Agreement, or Schedules A, B and C, that prevented
Claimant from choosing to complete and deliver the Longer Version even though it
was continuing editing in the hopes of producing the Shorter Version. If Respondent
wished to only pay on delivery of a U.S. theatrical version, if any, then such
provision might have been negotiated to be part of the Agreement and if so this case
would likely not have arisen.

      Respondent argues that delivery of the Longer Version was not a version that
was approved as the completed Picture by the Producer, Director and Star.
Respondent argues that the Picture had to be approved before it could be considered
complete, yet the Agreement does not condition payment of the Second Advance on
evidence of such approval. However, I find that by testimony of Claimant's Mitch
Horwits and simply by virtue of the fact that Claimant delivered the Longer Version,
Claimant acknowledged that it was an approved version of the Picture as existed at
that time; furthermore the evidence made it clear that the Director preferred the

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 8 of 12

Longer Version, delivering it as his final approved cut at that time, and that the
Claimant had to cajole the Director into making the Shorter Version. Respondent
introduced no credible evidence establishing lack of approval of the Longer Version.
In fact by the specific terms of the Director's contract his final cut rights might have
been eliminated for a number of reasons. However, even if he retained his final cut
rights and had not approved the Longer Version, the Director would not have been
entitled to prevent the Respondent from the free exercise of its rights under the
Agreement. The Director's claim, if any, would be solely against the Claimant and
furthermore, the Director's contract does not allow him to rescind said contract,
enjoin or otherwise impair Claimant's, and therefore Respondent's, exploitation of
the Picture. Additionally, it was not established that the Star had approval rights over
any cut of the Picture.

Respondent's only claim that the IPM were not available relates to the fact
that the one Interpositive of the Picture ("IP") listed as one of the IPM was at Deluxe
Hollywood while the LAL implied that all of the IPM film elements (including the IP)
were at Deluxe Italia. In fact all of the IPM except the IP were at Delux Italia.
However, there was no requirement in the Agreement that the IP had to be housed
at a particular location. While there were compelling arguments on both sides, the
weight of the testimony tilted to the conclusion that the IP being housed at Deluxe
Hollywood was not a violation of any of Claimant's obligations under the Agreement.
Supporting this conclusion, Overs testified that regarding a NOD clause, one "would
normally want it to be on technical acceptance of the materials. Effectively, [the NOD
in this case] compels you to pay on service of a piece of paper. But this is the way
that Summit worked and they were the terms we had to accept." Furthermore,
providing the NOD, as Claimant did in a timely fashion, satisfied its condition
precedent requiring Respondent to pay the Second Advance. Sometime subsequent
to payment, on delivery of the LAL, when Respondent would have learned that the IP

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 9 of 12

was at Deluxe Hollywood, it would have had the obligation to notify Claimant of

breach and allow twenty-one days for Claimant to cure under the provisions of

Schedule C. The issue of *location* of the IP was not a condition precedent to payment

of the Second Advance. In fact, the IP was transferred from Deluxe Hollywood to

Deluxe Italy where it arrived on August 9, 2010 (only nine days from the date of the

NOD) so the breach, if any, was not material especially in light of the substantial

testimony as to when, if ever, the Respondent would have needed access thereto in

light of the distance of their anticipated release date as permitted under the

Agreement. In this regard, Overs testified that "[i]f there was a problem they wanted

to have direct access to [the IP]," which was only a theoretical concern, in light of

the expected release date being approximately nine months in the future. Lastly,

there was credible testimony that the IP was not defective, as claimed by

Respondent, but even if it was determined to be defective Respondent was required

to provide a "First Defect Notice" under paragraph G (4) of the Agreement, re:

"Technical Quality", to allow Claimant time to provide a replacement.

      While, for the purposes of identifying what was being delivered, there might

have been some confusion as to the actual length of the Longer Version both in the

NOD and Deluxe Italia letter of October 29, 2010, mentioned above, these

discrepancies related to differing mathematical calculations and/or different ways of

measuring the length (e.g., leader inserted by labs for prevention of damage to the

film and/or for billing purposes) rather than some breach of contract especially since

the Agreement did not guarantee or promise that Respondent would be delivered a

film of a certain length. Regarding requesting a clause in the Agreement

guaranteeing a specific running time, Overs testified that "I would never get it."

      Nothing in the Agreement tied Respondent's rights to the rights of any other

international distributor regarding receiving the same version of the Picture.

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 10 of 12

However, it should be noted that the numerous Notices of Delivery sent by July 31, 2010 to international distributors all related to the Longer Version.

At Respondent's request, this arbitrator viewed both the Longer Version and Shorter Version and is of the opinion that both were finished movies, not works in progress, with the primary difference being that the Shorter Version was twenty-seven minutes shorter than the Longer Version. In addition, there was a reduction in repetitive scenes, re-ordering and re-cutting of others and some added voice over. However, none of these changes vitiated from the fact that both films were completed motion pictures by the Director with the same cast, based on the same screenplay, with the apparent technical quality necessary to make each capable of being theatrically released.

I find that the Claimant (a) had the right to deliver the Longer Version, even as it continued to edit the Shorter Version, as the Longer Version, at the time that it elected to deliver, to which it provided timely NOD, was a completed Picture ready for distribution and (b) that it was able to manufacture and deliver or provide access to the IPM (and had in fact manufactured same at that time) pursuant to the LAL, in a timely manner upon receipt of payments due from Respondent. Therefore, Claimant is entitled directly and as assignee of Bank under the AA, to be paid the Second Advance.

Arbitrator determines that Claimant made a good faith and timely effort to resell the Picture and that the present value of the Picture in the Territory for the purposes of mitigation is the amount the Claimant received, or is expected to receive, from reselling the UK territory to Fox Searchlight Pictures, Inc. in the amount of $522,165. Such sum consists of the present value of both the minimum guarantee of $275,000 paid by Fox and the estimated future contingent compensation that Fox will most likely pay to Claimant; the latter includes the assumption that Fox will make a B Sky B deal, which I find is likely based on both

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 11 of 12

testimony at the hearing as well as recognition that the Picture's notoriety and the various accolades it has received including having been accorded the Palme d'Or at the 64th 2011 Cannes Film Festival and the "FIPRESCI GRAND PRIX 2011" award to the Director at the 59th San Sebastian International Film Festival. Claimant was willing to give one-half of the difference in value based on its assumption that a B Sky B deal was a 50-50 possibility, and if the B Sky B deal was not made, Claimant would have been out of pocket for sums not received. As I feel that the probabilities for a B Sky B deal are much higher than Claimant's expectation, it is appropriately within my discretion to build on Claimant's suggested method for resolving this issue so that, if a B Sky B deal does not happen, Claimant will bear the risk of the resultant out of pocket.

Respondent offered no expert on the issue of mitigation to counter the expert testimony of Claimant's witness Mr. Phil Fier ("Fier"). In the absence thereof, despite some weaknesses in Fier's testimony, as perceived by Respondent, it was generally credible, reasonable and necessary for the arbitrator to rely thereon. Furthermore, no credible testimony was proffered regarding revenue that might be received from so-called "new media," from Fox or otherwise, and as such I find same to be too speculative and uncertain to be considered as mitigation hereunder.

Respondent's numerous arguments and legal theories, including those not specifically addressed above have been carefully considered in reaching this decision. Thus, for Respondent's breach of the Agreement by failure to pay the Second Advance, it is determined that Claimant lawfully terminated the Agreement, and is entitled to the relief it seeks, as is now awarded herein.

## AWARD

1. Respondent owes and is hereby ordered to pay Claimant the sum of US$1,277,835 representing the unpaid balance of the moneys remaining

Re: Cottonwood Pictures, LLC v Icon Film Distribution Ltd
Page 12 of 12

due Claimant under the terms of the Agreement, i.e., the Second Advance
of $1.8 million, less Arbitrator's determination, as aforesaid, of the
amount by which Claimant was able to mitigate its damages in the
amount of $522,165; plus interest thereon calculated as provided in
Schedule C of the Agreement ("at the rate of 2% per annum above the
prime rate quoted by the Bank of America compounded monthly until paid
in full"), from the due date of August 14, 2010.

2. Distribution rights under the Agreement are terminated as of May 10,
   2011, the date of the notice of default given by Claimant to Respondent.

3. Pursuant to the Agreement and Rule 14 of the Rules, the Arbitrator has
   the power to award and make an unequal allocation of all costs of the
   arbitration and Arbitrator finds that Claimant, as the prevailing party, is
   entitled to recover and Respondent is to pay forthwith to Claimant such
   costs in the total amount of $754,392 which consists of Claimant's legal
   fees, allowed by Arbitrator as being reasonable, in the amount of
   $670,051 and Claimant's costs of $84,341 which include its share of both
   IFTA filing fees and Arbitrator fees.

4. This Award is in full settlement of all claims and counter claims submitted
   to this Arbitration. All claims and counter claims not expressly granted
   herein are hereby denied.

5. This Award may be executed in any number of counterparts, each of
   which shall be deemed an original, and all of which shall constitute
   together one and the same instrument.

Dated November 28, 2011
Los Angeles, California

Jack E. Freedman      Sole Arbitrator

**Freedman Communications, Inc.**
**fso JACK E. FREEDMAN, ESQ.**
1093 Broxton Ave., Suite 228, Los Angeles, CA 90024
JackFreedmanEsq@Gmail.com

**ARBITRATOR INVOICE – Prepared November 28, 2011**

RE:     IFTA  Arbitration #11-15
_____ Cottonwood Pictures, LLC v Icon Film Distribution, LTD

| DATE | SERVICES | HOURS |
|------|----------|-------|
| **2011** | | |
| 4.30 | Review Letter from IFTA dated 4.21 w/ attachments including Amended NOA of 4.21, underlying contracts  & R Response & Counterclaim of 4.19. | 4 |
| 5. 2 | Arbitrator email requesting dates for Preliminary Hearing | ¼ |
| 5. 4/16 | Arbitrator follow-up emails (8) re: PH; | ¼ |
| 5.17 | Preliminary Hearing | 1 |
| 5.20 | Prepare and Issue Scheduling Order | 1 |
| 6.14 – 17 | Discovery Motion by Respondent , setting hearing (10 em) | ½ |
| 6.17 | Discovery Motion: Claimant Response | ½ |
| 6.19 | Discovery Motion: Respondent counter | ½ |
| 6.20 | Discovery Motion: Telephonic hearing | 1 ½ |
|  | & Order preparation and distribution | ¾ |
| 7.6 – 14 | Discovery Motion re: (a) MO & (b) Subpoenas; 13 emails with Attachments/exhibits | 1 |
| 7.14 | Discovery Conference Call; Issuance of Order #2 | 1 ½ |
| 7.21 - 25 | Discovery re: choice of lab for MO and document production (11em) & Review attached letters of 6.24 & 7.15 | 2 ½ |
| 7.26 | Document production conference call & em to parties | 1 ¾ |
| 7.28 | Review parties' letter to arbitrator of July 28, 2011. | 1 |

| | | |
|---|---|---|
| 7.29 | Preparation and issuance of Order #3 | 1 |
| 8.3 – 5 | Production of additional dvd's without reasonable security (8 em) | ½ |
| 8.25 | Review Expert Witness Disclosures from both parties | ½ |
| | Request for postponement of Hearing (2em) | ¼ |
| 9.28 | Request for production of director's contract (2em) | ½ |
| 10.3-4 | Respondent request for Hearing postponement (5em) | ½ |
| 10.7 | Request for viewing of 2 non-watermarked versions of TOL (5em) | ¼ |
| 10.12-13 | Opening Statement, DVD's of versions. (3em) | ¼ |
| 10.14,16,17 | DVD availability for Respondent (9em) | ¼ |
| 10.14 | Motions to be addressed at Hearing (1em) | ¼ |
| 10.14-17 | Review Briefs (2), Exhibit Books (5), Motions (2), Supporting Cases & Declaration, Witness Lists (2), Depositions (1). | 20 |
| 10.16 | Screen two versions of TOS | 5 |
| 10.17 | Respondent Opposition & supporting case re: Excluding Witness | 3 ½ |
| 10.18 | Hearing Day    (10-5:30 + ½ hour r/t travel) | 8 |
| 10.19 | Hearing Day    (9:30-5:30 + ½ hour r/t travel) | 9 |
| 10.20 | Hearing Day    (10- 6:15 + ½ hr rt/ travel) | 8 ¾ |
| 10.21 | Hearing Day    (10-5:30 + ½ hr rt/ travel ) | 8 ½ |
| 10.26 | Hearing Day    (9-2:45 + ½ hour rt/ travel) | 6 ¼ |
| 11.8 | Review various transcripts | 5 |
| 11.18 | Transcript & legal fee declaration questions fr Respondent (2em) | ¼ |
| 11.21 | Request clarification legal fee declaration (3em) | ¼ |
| 11.21 | Post-Hearing Briefs & Attorney fee declaration | 4 ¼ |
| 11.22-25 | Review evidence, prepare & finalize Award | 10 |

111 hours at $300 per hour =$ 33,300  less deposits = Balance  $300. – waived as a courtesy.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John Kronstadt and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 10773 JAK (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central    District of California

ICON FILM DISTRIBUTION LTD., a United
Kingdom limited liability company,
           *Plaintiff*

           v.

COTTONWOOD PICTURES, LLC, a
California limited liability company,
           *Defendant*

)
)
)
)
)
)
)
)

Civil Action No. **CV11 10773-JAK (JCGx)**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Cottonwood Pictures, LLC, a California limited liability company
Michael A. Anderson, Esq.
Loeb & Loeb
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA  90067

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Gary E. Gans, Esq.
Quinn Emanuel, Urquhart & Sullivan, LLP
865 S. Figueroa Street
10th Floor
Los Angeles, CA  90017

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: December 29, 2011

MARILYN DAVIS
*Signature of Clerk or Deputy Clerk*

AO-440

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                                                *Server's signature*

                                             _____
                                                                *Printed name and title*


                                             _____
                                                                *Server's address*

Additional information regarding attempted service, etc:

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| ICON FILM DISTRIBUTION LTD., a United Kingdom limited liability company, | COTTONWOOD PICTURES, LLC, a California limited liability company, |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Gary E. Gans, Esq. (Bar No. 89537) Quinn Emanuel Urquhart & Sullivan, LLP 865 S. Figueroa Street, 10th Floor Los Angeles, California  90017 213-443-3000 | Michael Anderson, Esq. Loeb & Loeb 10100 Santa Monica Blvd, Suite 2200 Los Angeles, CA  90076 (310) 282-2000 |

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES -** For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No          ☐ MONEY DEMANDED IN COMPLAINT: $

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Petition to Vacate Arbitration Award.  Federal Arbitration Act, 9 U.S.C. §1, et seq.; Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§201, et seq.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 446 American with Disabilities - Other | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | IMMIGRATION | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 462 Naturalization Application | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 463 Habeas Corpus- Alien Detainee | | |
| | ☐ 290 All Other Real Property | | ☐ 465 Other Immigration Actions | | |

FOR OFFICE USE ONLY:   Case Number:   **CV11 10773**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a).   **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No  [ ] Yes

If yes, list case number(s): _____

VIII(b).   **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No  [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   [ ]   A.  Arise from the same or closely related transactions, happenings, or events; or

[ ]   B.  Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]   C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]   D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.   VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[ ]   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | London, United Kingdom |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ]   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los AngElEs |  |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):**  *Gary Gans / D.Y.*    Date December 29, 2011

Gary E. Gans

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |